UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MONSTER WORLDWIDE, INC., SECURITIES LITIGATION | Civil Action No. 1:07-cv-02237 (JSR)<br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiffs Middlesex County Retirement System and the Steamship Trade Association-International Longshoreman's Association Pension Fund, individually and on behalf of all other persons and entities similarly situated, by their undersigned attorneys, allege in this Amended Class Action Complaint for Violation of the Federal Securities Laws[1] ("Complaint") the following based upon personal knowledge as to themselves and their own acts and on information and belief as to all other matters based upon the investigation of Plaintiffs' counsel, which included, among other things: 1) a review of United States Securities and Exchange Commission ("SEC") filings by Monster Worldwide, Inc. ("Monster," "TMP" or "Company"),[2] as well as regulatory filings and reports; 2) a review of securities analysts' reports and advisories about the Company; 3) a review of press releases, conference calls and other public statements issued by the Company; 4) a review of media reports about the Company; 5) a preliminary review of documents produced by Monster, and 6) a review of other publicly available information about the Company. Plaintiffs believe that substantial additional evidentiary support for the allegations set forth in this Complaint ("Complaint") will become known after a reasonable opportunity for discovery.

---

[1] Consistent with the Court's statement at the June 14, 2007 hearing on Defendant McKelvey's motion to dismiss, this Complaint is amended only as against Defendant Andrew J. McKelvey and will not prejudice Lead Plaintiffs' rights to file a Second Amended Complaint at a later date.

[2] Monster was formerly known as TMP Worldwide, Inc.

## SUMMARY OF ALLEGATIONS

1.      This is a federal class action on behalf of all persons and entities, other than defendants, who purchased or acquired the securities of Monster from May 6, 2005 until June 9, 2006, inclusive (the "Class Period") and who were economically damaged. The Action seeks remedies under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.* (the "Exchange Act"). Throughout the Class Period, defendants engaged in a fraudulent scheme and/or published a series of materially false and misleading statements that defendants knew, and/or were severely reckless in not knowing, were materially false and misleading, and failed to disclose material information necessary to render such statements not false and misleading.

2.      Monster has admitted in SEC filings that its previously reported financial results were artificially inflated by an improper stock option backdating scheme perpetrated at the highest levels of the Company, one effect of which was the overstatement of Monster's reported net income by $339.6 million over a period of years.

3.      During the Class Period, defendants granted stock options to themselves and to other Monster officers and directors on dates at which Monster stock had reached its lowest, or next-lowest, price in weeks or months. These grants almost invariably preceded sharp gains, and/or followed significant drops in the Company's stock price. In public disclosures, however, defendants falsely claimed that the grants were dated and priced as of the date of the actual grants.

4.      Defendants' wrongdoing was akin to placing a wager on an event after the event has occurred. Through this scheme, defendants provided themselves with direct undisclosed compensation that came at the direct expense of Monster and its investors. In addition to lying about the manner in which Monster granted and priced options, defendants failed to comply with

Generally Accepted Accounting Principles ("GAAP") governing the expensing of stock option

grants. Under applicable accounting rules, the amount by which a stock option is "in the money"

at the time of grant must be recorded as compensation expense. The Company failed to record, as

a compensation expense, the difference between the price of Monster's stock on the date of the

actual grant and the "backdated" exercise price of the options, leading to an improper

understatement of compensation expense and an overstatement of its reported income.

Monster's Class Period financial statements did not accurately present the Company's results and

deceived investors.

5.      On June 12, 2006, *The Wall Street Journal* published an article titled "Monster

Worldwide Gave Officials Options Ahead of Share Run-Ups." The article stated that Monster

may have backdated option grants, and reported that there was a one in nine million chance that

the grant dates of the options *The Journal* examined were selected at random. The June 12, 2006

article discussed three possibly backdated grants – December 12, 1997, August 5, 1999 and April

4, 2001.

6.      That same day, Monster issued a press release announcing receipt of a subpoena

from the U.S. Attorney for the Southern District of New York relating to the Company's stock

option granting practices.

7.      Monster's stock price dropped sharply on the news, closing at $38.60, down $3.40

from the prior trading day close of $42, a one day drop of 8.1% on unusually heavy volume of

over 7.7 million shares. Monster's stock price continued to drop as the market digested the news,

falling to $35.58 per share by the close of June 13, 2006. This drop is in addition to the

significant decline in Monster's stock price (from $58 per share to $42 per share) that occurred

between May 11, 2006 and June 9, 2006, which was due to market anticipation (later proven to

be correct) that Monster was involved in the headline-grabbing option backdating scandal, even in the absence of a specific Company acknowledgment of backdating issues.[3]

8.      Monster subsequently admitted to a long-running scheme involving the manipulation of stock option grants so that the stock options, when granted, were "in the money" options, even though Monster represented to the market that, and accounted for such stock option grants as if, the options were granted at then current market prices.

9.      Defendant Olesnyckyj has pleaded guilty to criminal federal securities fraud and conspiracy to commit securities fraud. As reported by the Associated Press on February 16, 2007:

> Myron Olesnyckyj, 45, of New Providence, N.J., pleaded guilty to securities fraud and conspiracy to commit securities fraud, charges that carry potential penalties of up to 25 years in prison and fines of more than $5.2 million. He promised to cooperate, which can earn him leniency.
>
> Olesnyckyj, also a former Monster senior vice president and its former secretary, agreed to forfeit $381,000, which he said represents the amount he illegally gained. The scheme lasted from 1996 to 2006; he was accused of participating from 1996 to 2003. Olesnyckyj told U.S. District Judge Laura Taylor Swain that he worked as an attorney at two law firms from 1986 to 1994, when he accepted a position as general counsel for a company that became Monster Worldwide Inc.
>
> **Monster went public in 1996. After that, Olesnyckyj said, he and others agreed to backdate annual companywide stock option grants, choosing the dates of the grants after looking at the historical records of the company's stock price movements.** Backdating involves issuing stock options retroactively to coincide with low points in the share price, thus boosting payouts. It can be illegal if it is not properly accounted for and disclosed to investors.
>
> **Olesnyckyj said he and others then concealed the backdating from the company's financial records, which were submitted to the Securities and Exchange Commission, auditors, investors and others.**
>
> As a result, the company failed to increase its compensation expenses and reduce its earnings accordingly in its financial records, he said. **"I understood the company's books and records ... were inaccurate and misleading,"** he said.

---

[3] As discussed below, articles regarding option backdating practices at many companies were published in May 2006. *See* ¶ 46.

Federal prosecutors said new hires at Monster were promised they would be granted options at the lowest price within the 30 days following their first day.

**Prosecutors said Olesnyckyj concealed this practice from Monster's auditors, telling an employee in Monster's Human Resources department by e-mail, "No written document should ever state lowest price over next 30 days! The auditor(s) will view that as backdating options and we'll have a charge to earning ... ."** [Emphasis added].

10.     Defendants' wrongdoing caused the Company's market capitalization to decrease dramatically.

11.      Monster has restated its annual financial statements from 2001 to 2005 to record additional non-cash stock based compensation expenses and related income tax effects to reflect a cumulative after-tax adjustment of $339.6 million for backdating-related accounting fraud that began in 1997, just one year after it went public.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 10(b), 20(a) and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1, and Rule 10b-5, 17 C.F.R. §240.10b-5.

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14.     Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Because Monster is headquartered in this District, many of the acts and transactions alleged herein occurred in substantial part in this District.

15.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

16.     Plaintiffs Middlesex County Retirement System and the Steamship Trade Association-International Longshoreman's Association Pension Fund purchased Monster common stock at artificially inflated prices during the Class Period and were damaged economically by defendants' wrongdoing.

17.     Defendant Monster is a Delaware corporation with its headquarters at 622 Third Avenue, 39th Floor, New York, New York 10017. Monster describes itself as the "leading global online careers property that is changing the way people look for jobs and the way employers look for people." The Company's stock is publicly traded on NASDAQ under the ticker symbol "MNST."

18.     Defendant Andrew J. McKelvey ("McKelvey") was Monster's CEO and Chairman of the Board during the Class Period.  He resigned in October 2006.

19.     Defendant Myron Olesnyckyj joined Monster in 1994 and became the Company's General Counsel, Senior Vice President and Secretary until he was suspended on September 19, 2006. On February 17, 2007, he pled guilty to two felony counts relating to his involvement in illegal conduct regarding the Company's historical stock option grants.

20.     Defendants McKelvey and Olesnyckyj are collectively referred to as the "Individual Defendants."

21.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, compensation practices, operations, operational trends, financial statements, markets and present and future business prospects by means of access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto)

available to them and conversations and connections with other corporate officers and employees. With respect to all Individual Defendants, they had access to the adverse undisclosed information about the Company's business, compensation practices, operations, operational trends, financial statements, markets and present and future business prospects through, among other things, their attendance at management and Board meetings and meetings of their respective board committees and through reports and other information provided to them in connection therewith.

22.     Each of the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. The Individual Defendants, because their positions of control and authority as officers of Monster, were involved in drafting, producing, reviewing, approving and/or disseminating communications with the public and the false and misleading statements and information alleged herein, knew, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws. Each had the ability and/or opportunity to prevent the issuance of the misstatements or cause the misstatements to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the misrepresentations contained therein.

23.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded

on the NASDAQ National Market, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

24.    Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Monster common stock by disseminating materially false and misleading statements and/or concealing material adverse facts with respect to the statements concerning stock options challenged herein. The scheme: (i) deceived the investing public regarding Monster's business, operations, management and the intrinsic value of Monster common stock; (ii) permitted the Individual Defendants to receive substantial amounts of compensation disguised as "risk-based;" and (iii) caused Plaintiffs and other members of the Class to purchase Monster common stock at artificially inflated prices.

25.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various statements complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature with respect to the statements concerning stock options challenged herein. Because of their position with the Company, each of the Individual Defendants had access to the adverse undisclosed information about Monster's business

prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations, made by or about Monster and its business, issued or adopted by the Company, materially false and misleading.

## CLASS ACTION ALLEGATIONS

26.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or acquired the securities of Monster from May 6, 2005 to June 9, 2006, inclusive, and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, members of the immediate families of any excluded person, the legal representatives, heirs, successors or assigns of any excluded person, and any entity in which defendants have or had a controlling interest.

27.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Monster had over 117 million shares of common stock issued and actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, record owners and other members of the Class may be identified from records maintained by Monster or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

28.     Plaintiffs' claims are typical of the claims of the members of the Class as all members were similarly impacted by the wrongful conduct complained of herein.

29.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

9

30.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether defendants' acts violated the federal securities laws;

(b)    Whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Monster; and

(c)    To what extent the members of the Class have sustained damages and the proper measure of damages.

31.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

<u>**Improper Option Grants**</u>

32.    Publicly traded companies may award their officers, employees and directors stock options. A stock option provides an "optionee" the right to purchase shares of a company at a specific price – the "exercise price" or "strike price" – on or after a determined date. For instance, if a company grants an employee 10 options with an exercise price of $5 per share, the employee can buy 10 shares for a total of $50, regardless of what the market price of the Company's stock is on the date the options are exercised. An optionee hopes that the price of the

stock will be above the strike price, allowing the optionee to exercise the options, receive the stock and resell it at the higher market price. One of the advantages for investors of this form of compensation, as opposed to straight payments of cash, is that typically it aligns the interests of employees, management and/or directors with the company's shareholders because the options will only be exercised when the company's stock price rises above the exercise price. In this way, the thinking goes, insiders are motivated to perform their duties well so that the Company's results and prospects increase, driving the stock price upwards.

33.    When a company grants an employee or director stock options, it must do so under a written stock option plan filed with the SEC and disclosed to the public. This is so because potential gains, such as the one described above, are a form of risk based compensation and, therefore, may have an impact on, among other things, the company's compensation expense, earnings per share, and net income.  The consequence of a company's improper accounting for option grants is that investors will not have an accurate picture of the company's financial position.

34.    Under accounting rules in effect prior to approximately 2006, public companies in the United States were permitted to grant stock options to employees without recording an expense as long as the options' strike price was at or above the market's closing price for the stock on the day the options were granted. However, if the option granted was priced below the market price on the date granted, known as an "in the money" options grant, SEC regulations required that any publicly traded company recognize and record the difference as a compensation expense in their financial statements. *See* Accounting Principles Board Opinion No. 25 ("APB No. 25"), superseded as of December 31, 2005 by FAS 123(R). Accounting rules also require that companies recognize the same compensation expense if "in the money" options were

granted to non-employees. Thus while "in the money" stock options are more valuable to those to whom they are granted, the additional expenses, if reported, would reduce the total amount of net income and earnings per share reported to shareholders of a publicly traded company.

**APB No. 25**

35.     In effect through December 31, 2005, APB 25 required a company to recognize compensation expense for options granted with an exercise price that was less than the market price on the date of grant, *i.e.*, an "in the money" option. If an option was issued at an exercise price equal to the extant market price on the date of grant (*i.e.*, "at the money"), no compensation expense needed to be recorded.

36.     Thus, where an option is "in the money" on the date of grant, *i.e.*, the market price of the stock exceeds the option's exercise price on the date of grant, compensation cost is calculated by multiplying the total number of options granted by the difference between the exercise price of the option and the market price of the stock on the date of grant. Compensation cost is then amortized and recognized as an expense over the option's vesting period.

37.     Failure to properly account for in the money option grants results in the misstatement of a company's financials, since the extent to which the fair market value of a security exceeds the exercise price on the date of grant is compensation to the option recipient that must be accounted for as a cost to the corporation. A company that fails to record and properly amortize the intrinsic value of an in the money option grant understates compensation cost and overstates net income in the year of grant, and, in each year thereafter, as the option vests.

38.     The SEC has adopted the view that failure to properly account for backdated options violates securities laws when companies fail to record as compensation expense the amount by which the option grants were actually "in the money" at the time that the grant was

awarded. In a complaint filed by the SEC against Peregrine Systems, Inc. in June 2003, the SEC

alleged that Peregrine's option plan administrator used a "look back" process between quarterly

Board meetings to identify the day with the lowest stock price over the interval and then declared

this date to be the grant date. The SEC viewed this as a form of financial fraud because it

resulted in the understatement of compensation expenses. Specifically, the SEC stated that,

"[u]nder the applicable accounting rules, any positive difference in the stock price between the

exercise price and that on the measurement date … had to be accounted for as compensation

expense. By failing to record the compensation expense, Peregrine understated its expenses by

approximately $90 million." This, essentially, is what defendants have done here, except that

Monster overstated its net income by almost $340 million as a result of the scheme.

### The Company's Stock Option Plans

39.     Between 1997 and 2005, Monster granted stock options to its officers, directors

and employees pursuant to at least two stock option plans. The plans were designed and prepared

by Monster's management, adopted by the Board of Directors, and voted-on and approved by

Monster's shareholders. Options were granted under the 1996 Stock Option Plan (the "1996

Plan") and the 1999 Long-Term Incentive Plan (the "1999 Plan").

40.     The 1996 Plan provides for the issuance of both incentive stock options and stock

options that are not treated as an incentive stock option. The per share exercise price of an

incentive stock option granted under the 1996 Plan may not be less than the fair market value of

the Common Stock of the Company on the date of grant. Incentive stock options granted to

persons who have voting control over 10% or more of the Company's capital stock are granted at

an exercise price of not less than 110% of the fair market value of the underlying shares on the

date of the grant. The exercise price of stock options that are not treated as incentive stock

options granted under the 1996 Plan may not be less than the fair market value of the Common Stock of the Company on the date of the grant.

41.    The 1996 Plan provides a Committee of the Board of Directors with the sole and absolute discretion to grant options under the 1996 Plan, to interpret the provisions of the 1996 Plan, to fix and interpret the provisions of options agreements made under the Plan, to supervise the administration of the Plan, and to take such other action as may be necessary or desirable in order to carry out the provisions of the 1996 Plan. Options granted under the 1996 Plan will be evidenced by agreements consistent with the 1996 Plan.

42.    Under the 1999 Plan, the Compensation Committee may grant both incentive stock options and stock options that do not qualify as incentive stock options. The per share exercise price of an incentive stock option granted under the 1999 Plan may not be less than the fair market value of the Common Stock of the Company on the date of grant. Incentive stock options granted to persons who have voting control over 10% or more of the Company's capital stock are granted at an exercise price of not less than 110% of the fair market value of the underlying shares on the date of the grant. The exercise price of stock options that are not treated as incentive stock options granted under the 1999 Plan may not be less than the fair market value of the common stock of the Company on the date of the grant.

43.    Options granted under the 1999 Plan have a maximum term of ten years.  Unless the Compensation Committee determines otherwise, no options may be exercised within six months after the date the option is granted and each option is subject to a four-year vesting schedule pursuant to which the option will generally become 25% vested on each of the first four anniversaries of the date of grant, subject to continued employment.

## The Stock Options Backdating Scandal

44.    In the spring of 2006, many public corporations came under scrutiny for

backdating stock option grants. The scrutiny was sparked by articles showing that employees of

public companies received well-timed option grants in frequencies that could not be explained by

luck alone; statistically, the likelihood that the grants were timed arbitrarily was astronomical.

More than 200 companies have been implicated, leading to regulatory investigations,

indictments, and restatements.

45.    On May 6, 2006, *The Wall Street Journal* published an article by reporters

Charles Forelle and James Bandler, reporting on the evolving options backdating crisis:

> Backdating Probe Widens as 2 Quit Silicon Valley Firm --- Power
> Integrations Officials Leave Amid Options Scandal; 10 Companies
> Involved So Far
>
> (Copyright (c) 2006, Dow Jones & Company, Inc.)
>
> The stock-options backdating scandal continued to intensify, with
> the announcement by a Silicon Valley chip maker that its chairman
> and its chief financial officer had abruptly resigned. That brought
> to eight the number of officials at various companies to leave their
> posts amid scrutiny of how companies grant stock options.
>
> Power Integrations Inc., of San Jose, Calif., said Chairman Howard
> Earhart, who is a former chief executive, and finance chief John
> Cobb had resigned. It also said it probably will need to restate
> nearly seven years of financial results because of options-granting
> problems.

46.    The article explained that acknowledgments by companies that backdating

occurred sparked internal investigations at other companies, drawing the attention of the SEC,

federal prosecutors and investors:

> So far, at least 10 companies have been caught up in the stock-
> options-dating matter, with several already in effect
> acknowledging that some improper dating occurred. A number of
> companies are conducting their own investigations or are the
> subjects of Securities and Exchange Commission probes. In one

case, company practices have attracted the attention of federal prosecutors examining possible fraud violations.

The matter also is drawing concern from investors, who have bid down the stock prices of some of the companies caught up in the various probes. Chip maker Vitesse Semiconductor Corp. has seen shares fall about 40% since suspending three executives, while shares in giant health insurer UnitedHealth Group Inc. have fallen 18% since questions about its options-granting practices surfaced in mid-March, shaving more than $13 billion off its market capitalization.

[…]

At UnitedHealth, at least 11 executives, including CEO William McGuire and the company's general counsel, received at least one option grant dated on the lowest price of a quarter in 2000. Many executives also shared propitious option dates with Dr. McGuire through the years. The company has called its granting practices "appropriate," but its board is conducting a probe. UnitedHealth also has stopped giving option grants to some senior executives, including Dr. McGuire.

47.    Suspicious patterns of sharp price inclines following the granting of options, similar to those alleged herein, are "statistically unlikely" and "raise questions about whether there has been backdating or other gaming of the system."  The article, in relevant part, stated as follows:

UnitedHealth, Comverse Technology Inc. and Vitesse were among six companies whose options practices were examined in a March article in The Wall Street Journal. ***The article found that the CEOs of the companies routinely received grants dated ahead of sharp rises in share price, and that the likelihood of those beneficial grant dates having occurred randomly was minute.*** All six companies have since said they've begun probes by outside directors and lawyers into their granting practices. (The Journal contacted Power Integrations for the March article but didn't cite it.)

[…]

Typically, stock options are granted by boards of directors. They are generally supposed to carry exercise prices equal to the fair market value of the company's stock at the time of the grant. But at

a number of companies, grants to top executives show an unusual pattern: ***They're frequently dated just before [a] sharp rise in the share price, and at or near the bottom of a steep dip. The patterns, statistically unlikely, raise questions about whether there has been backdating or other gaming of the system.***

[…]

The SEC began examining options backdating more than a year ago. Its attention apparently was piqued by ***academic research that found unusual patterns of stock activity around the time of options grants, suggestive of possible backdating***. The research indicates that a dating problem could go beyond the cluster of companies already under scrutiny.

(emphasis added.)

48.    The *Journal* also reported that several of the option granting investigations had

led companies to announce restatements and led to the suspension of corporate executives:

Both Power Integrations and Comverse, a New York maker of telecommunications software, have said their reviews indicate that some options grants carried dates that "differed" from the grants' actual dates.

Both companies, whose reviews continue, said they expect to restate financial results to record "additional noncash charges." Under accounting rules, companies need to report an expense for grants of "in the money" options -- those that carry an exercise price below the market price at the time of the grant. Any options backdated to a day when the stock was lower would be in-the-money.

Another company, Vitesse, has suspended three executives, including CEO Louis R. Tomasetta, because of issues relating to "integrity of documents" in the options-granting process.

[…]

It's possible any executives who participated in backdating could be open to civil or criminal fraud charges of enriching themselves through false or misleading records or filings. Lawyers cautioned that any such criminal charges would require that an executive who took part in backdating did so intentionally.

[…]

17

> Comverse, for one, acted swiftly. Within days of beginning a probe
> led by outside directors, it said it would probably have to restate
> results. Within weeks, the investigation led to the resignation of
> Kobi Alexander, who founded Comverse more than two decades
> ago and built it into a major supplier of voice-messaging software
> and other products. Two other executives also resigned.

49.    Arthur Levitt, former Chairman of the SEC, recently described this backdating

scheme in the bluntest possible terms: Backdating "represents the ultimate in greed…. It is

stealing, in effect. It is ripping off shareholders in an unconscionable way." Charles Forelle and

James Bandler, "Five More Companies Show Questionable Options Pattern," *The Wall Street

Journal*, May 22, 2006.

50.    In testimony before the U.S. Committee on Banking, Housing, and Urban Affairs

on September 6, 2006, SEC Chairman Christopher Cox explained why options backdating

schemes are so harmful:

> Thank you for inviting me to testify today about options
> backdating. This issue is one of intense public interest because it
> strikes at the heart of the relationship among a public company's
> management, its directors, and its shareholders.
>
> […]
>
> There are many variations on the backdating theme. But here is a
> typical example of what some companies did: They granted an "in-
> the-money" option—that is, an option with an exercise price lower
> than that day's market price. They did this by misrepresenting the
> date of the option grant, to make it appear that the grant was made
> on an earlier date when the market value was lower. That, of
> course, is what is meant by abusive "backdating" in today's
> parlance.
>
> The purpose of disguising an in-the-money option through
> backdating is to allow the person who gets the option grant to
> realize larger potential gains—without the company having to
> show it as compensation on the financial statements.
>
> Rather obviously, this fact pattern results in a violation of the
> SEC's disclosure rules, a violation of accounting rules, and also a
> violation of the tax laws.

The SEC has been after the problem of abusive options backdating for several years.

[…]

But just as option compensation increased, so did the potential for abuse.

These [Brocade Communications Systems and Comverse Technology, Inc.] cases demonstrate some of the variations on the basic theme of fraudulent backdating that the Commission has uncovered. They involve backdated option grants that are more profitable to recipients; backdated option exercises that reduce recipients' taxes at the expense of shareholders; options granted to top executives; and options granted to rank and file employees. They involve actual personal gain to wrongdoers, and real harm to companies that failed to properly account for the options practices. . . .

(http://www.sec.gov/news/testimony/2006/ts090606cc.htm).

### **Defendants' Improper Stock Option Granting Practices**

51.    Defendants have admitted that Monster backdated stock options between fiscal years 1997 through 2003. As a result Monster's financial statements as of December 31, 2005 and 2004 and for the years ended December 31, 2005, 2004 and 2003, selected financial information as of and for the years ended December 31, 2002 and 2001 and for the quarterly periods in 2005 and 2004 were materially misstated.

52.    Defendants failed to comply with APB 25, the Generally Accepted Accounting Principle governing the reporting of stock-based compensation expense and, thus, Monster's Class Period financial statements materially misrepresented, among other financial metrics, the Company's measure of net income.

53.    Additionally, the Company and the Individual Defendants' practice of opportunistically granting executive and director stock options has rendered statements regarding

the stock option granting process, and the associated accounting, contained in Monster's financial reports filed with the SEC, materially false and misleading.

54.     For instance, Monster's Class Period financial reports created the false impression that defendants chose the grant dates for the options based on arbitrary or administrative factors, rather than, as was in fact the case, a calculation of what would most increase the likelihood of maximum gain for the executives and directors, maximize the cost to the corporation, and substantially diminish the risk associated with Monster common stock for these option recipients compared with ordinary investors in Monster common stock.

55.     Defendants represented in Monster's financial reports before and throughout the Class Period that the exercise price of options granted under Monster's stock option plans would not be less than the fair market value of the common stock on the date the option was granted, in the case of incentive stock options. (That is, Monster would not grant "in the money" incentive options.) By omitting any reference to the opportunistic practices of the Company and the Individual Defendants, these statements misleadingly implied that the risk and uncertainty associated with the options was the same faced by any other shareholder who bought Monster common stock at current fair market prices, when, in fact, the deck had been stacked for management by substantially reducing any such risk, based on an insider perspective of the current and prospective fortunes of the Company and the likely movement of its stock price.

56.     By gaming the timing of stock option grants to themselves and other officers and directors and the timing of the public disclosure of material information, defendants received a hidden form of direct compensation.

57.     However, according to the terms of the Company's shareholder-approved stock option plans, with limited exception, the per share exercise price of a granted option should have been no less than the fair market value per share on the date of grant.

58.     Moreover, pursuant to APB 25, if the market price on the date of grant exceeded the exercise price of the options (which was the case with many of Monster's backdated option grants) then the Company was required to recognize the difference as a compensation expense. In other words, since defendants' backdated option grants were "in the money" at the time of grant, defendants had an obligation to record as compensation expense, the difference between the market price of Monster stock at the time of grant and the exercise price of the option. Defendants elected not to do this, resulting in a significant overstatement of Monster's income and massive investor losses.

**McKelvey's Improper Stock Option Granting Practices**

59.     In a *Wall Street Journal* article dated June 12, 2006, Monster's former President and Chief Operating Officer, Jim Treacy, explained that the Company's option grant process was "all in the purview" of McKelvey and the Board's Compensation Committee.

60.     In the same article, McKelvey admitted that he was "completely responsible" for the option grants. McKelvey also acknowledged that he was responsible for determining which executives and employees would receive options.

61.     Indicating he stood by his statements even after the WSJ article appeared, McKelvey sent an email to Compensation Committee members Michael Kaufman and Ronald J. Kramer on June 12, 2006, stating, "as indicated in the article I spoke to the reporter and tried to be as open as possible. Basically, he said in his article what I told him…."

62.     In July 2006, McKelvey was interviewed by Monster's outside counsel in connection with the Company's internal investigation into its past backdating practices. According to a second *Wall Street Journal*[4] article on Monster's backdating probe, a source familiar with the July interview stated that McKelvey claimed to have no knowledge of any option backdating at the Company.  The article also reported, however, that Monster's investigation had uncovered evidence that contradicted McKelvey's statements.

63.     On October 6, 2006, McKelvey resigned as the Company's CEO and Chairman, but he remained Chairman *emeritus* and a member of Monster's Board.

64.     As pressure relating to the Company's ongoing investigation into option backdating mounted, McKelvey resigned from the Board altogether on October 29, 2006 and announced that he would not cooperate with the Company's internal option backdating investigation, canceling a meeting that had been scheduled for the following day.

65.     From the very beginning, McKelvey was the architect and primary cheerleader of the Company's option program.

66.     After the Company went public in December 1996, and the 1996 Stock Option Plan was established, McKelvey organized a series of "road shows" to educate TMP's employees on how the option plan worked and, more importantly, how it would benefit each employee.

67.     Confidential Witness 1 ("CW1"), a former senior executive with Monster and employee of the Company for more than ten years, recalls McKelvey traveling to different Company divisions to conduct these "road shows."

---

[4] *Wall Street Journal*, October 31, 2006, "Monster's Founder Quits Board Amid Options Probe."

68.    Confidential Witness 2 ("CW2"), a former global communications manager in TMP's Marketing Department from 1996 through 2004, recalled the "road shows" were pitched to each Company employee who was to receive options, and was presented as a "huge initiative" by the Company to "keep its talent through option awards."

69.    CW2 confirmed that McKelvey participated in these "road shows" and also recalls the presentation informed TMP's employees that option grant dates would be chosen by "look[ing] back during certain periods."   CW2 stated that his options were granted "in-the-money more often then not."

70.    There were a number of different mechanisms for granting options within the Company, including annual Company-wide grants, periodic individual grants, options granted as equity incentives in executive employment contracts, and option grants issued to newly hired employees.

71.    Annual Company-wide grants were made from a pool of options allocated by McKelvey to the various divisions of the Company.  For these grants McKelvey, in conjunction with members of the Company's executive committee, would predetermine the "grant date" and the number of options to be allotted to each division, after which the Company's division heads were expected to allocate their division's option pool amongst their employees.

72.    Under prevailing accounting rules, an option is not "granted" until at least the identities of the optionees and the number of shares underlying each option are determined.  As acknowledged by the Company in its Amended and Restated Annual Report for 2005 (the "Restatement"), filed with the Securities and Exchange Commission on December 13, 2006:

> In most cases, the original date assigned to the grant corresponded to the date as of which a unanimous written consent ("UWC") was executed by the members of the Compensation Committee of the Company's Board of Directors, *but the date of that consent did not correspond to the actual*

*date on which the identities of the individual optionees and the number of shares underlying each option was determined.* The Company believes that the dates as of which the UWC's were dated were earlier than the dates on which they were actually executed. In a significant number of instances, the stock price on the assigned date (the date as of which the UWC was executed) was lower, sometimes substantially lower, than the price on the date the award may be deemed to have actually been determined. *The Company believes that this practice was done intentionally, by persons formerly in positions of responsibility at the Company for the purpose of issuing options at a higher intrinsic value than would have otherwise been the case* (emphasis added).

73.    Even after the Company-wide grants were allocated by the division heads, the Company's Human Resources or Legal division would have to draft paperwork for each individual option grant.  Unanimous Written Consents ("UWC") purporting to grant options "as of" the backdated grant dates would also have to be prepared and signed by McKelvey and/or the Compensation Committee.

74.    Typically, months expired between the date McKelvey selected as the "grant date" for the Company-wide grants and the date the options were actually "granted" to the Company's employees.  In fact, as confirmed by the Company's Restatement "[t]he average lag period between the date as of which UWC's were executed and the date that options purportedly granted by such consents were inputted into the Company's Transcentive system was ninety-seven days."  Thus, an average of more than three months lapsed between the actual grant dates and the dates "as of" which most options were publicly disclosed to have been granted.

75.    As an example of this practice, on February 26, 1999, TMP's Corporate Human Resources division circulated a memorandum to the Company's division heads explaining that TMP's executive committee had chosen December 9, 1998 as the "grant date" for the 1998 Annual Company-wide option grant.  The memo also informed the division heads how many

options had been allocated to their divisions and required each division head to return his option allotment spreadsheets to Corporate Human Resources by March 12, 1999.

76.     Although the divisional option allotment had just been determined, and the intra-divisional allotment of options had not even begun, the "grant date" for this grant had already been predetermined.  In fact, the grant date had been selected at McKelvey's direction more than a month before the February 26th memo was even distributed.

77.     Specifically, during a January 15, 1999 executive committee meeting, McKelvey announced that he wanted to grant options at an exercise price of $25.00, even though the Company's stock closed at $42.38 that day.  Pursuant to this directive, an employee in the Company's Human Resources department selected December 9, 1998 as the "grant date" with an exercise price of $26.875, the nearest closing stock price to $25.00 in the month of December.

78.     By the time the February 26th memo was circulated to the division heads, the Company's stock price had climbed to $56.25, more than double the fair market value of Monster's stock on December 9, 1998.

79.     By March 12, 1999, the Company's stock price had climbed to $64.06, more than $37 per share above the fair market value of the Company's stock on the purported "grant date" for the 1998 Annual Company-wide grant.



80.    While it is unclear on exactly what date the 1998 Annual Company-wide options were eventually granted, it is clear that the options were not granted on December 9, 1998 and could not have been granted prior to March 12, 1999, the date by which each division head was to have allocated their allotted options.

81.    Even after the division heads had determined the distribution of their division's options, the Company's human resources or legal department would still have to prepare the option paperwork, and the proposed grants would have to be approved by McKelvey and/or the Company's Compensation Committee.  Clearly, the nearly 1.5 million options eventually granted to the Company's employees and executives "as of the 9th day of December, 1998" were substantially "in-the-money" when actually granted.

82.    Another example of this same course of improper conduct was Monster's Annual Company-wide option grant for 2001.

83.     On January 15, 2001, the Company's Corporate Human Resources division circulated a memorandum to McKelvey and the Company's division heads, informing each of how many options their division had been allotted by McKelvey.  The memo also stated that "this year's grant price is $40.875," the fair market value of the Company's stock on January 2, 2001, nearly two weeks before the memo was sent.  The Company's stock price on January 2, 2001 was the lowest it had been since January 19, 1999 (adjusting for splits, it was the lowest stock price since November 4, 1999).

84.     The memo directed the division heads to return their "final and complete [allocation] lists to [Corporate Human Resources] **no later than February 19th**." (emphasis in original).

85.     Just as he did with the 1998 Annual Company-wide grant, McKelvey chose an opportune "grant date" to apply to the more than 2 million options the Company planned to grant to its employees in 2001.  Only after choosing the January 2, 2001 "grant date" did McKelvey determine how many options each division would be allotted, and then direct the division heads to allocate these options amongst their employees.  Not until these important decisions were made and Compensation Committee approval was obtained could the grants actually be made to Monster's employees.

86.     Meanwhile, by the middle of February, the Company's stock price had risen to over $50 per share, more than $10 per share above the fair market value of the Company's stock on the pre-selected "grant date" of January 2, 2001.

87.     The Company's stock price, however, had actually crested by the end of January 2001, at a little over $66, and headed steadily downward through February.  Even though the proposed options for the 2001 Annual Company-wide grant were still well in the money

27

throughout the later part of February, the stock had yet to bottom-out. That did not occur until April 4, 2001, when Monster's stock closed at $30.62, before heading back up into the $60 range by the end of May.

88.    Consistent with McKelvey's practice of backdating option grants to ensure they were deeply "in-the-money" when actually granted, the massive 2001 Annual Company wide-grant was first re-dated from the originally backdated January 2, 2001 date, to March 13, 2001, to take advantage of the fact that the Company's stock price had fallen to $38.063.

89.    As the Company's stock price continued to fall, McKelvey changed the "grant date" again, finally settling on April 4, 2001, when the Company's stock closed at a new low of $30.625.

90.    The Company's adjusted stock price on April 4, 2001 was its lowest since November 2, 1999, and would not return to that level until weeks after September 11, 2001. Accordingly, when the 2001 Annual Company-wide grants were eventually made, more than 2 million options were issued at a price that was more than $10 a share *below the originally backdated option prices*, and were significantly in the money by the end of May 2001, when the stock was trading consistently in the $60 dollar range.



91.     The December 1, 1999 grant was another massive Annual Company-wide grant of approximately 1.75 million options that was backdated and approved by McKelvey.

92.     On that day, the Company's stock closed at $95.00.  The next day, however, the Company announced its alliance with AOL and its stock price jumped 25% to close at $127.06. This was the second largest one day increase in the Company's history.  By the end of December, the Company's stock had climbed to $142.00.

93.     Although McKelvey was not a member of the Board's Compensation Committee, he actually signed the UWC for this grant that was dated "as of the first day of December, 1999."

94.     The Company's closing stock price on December 1, 1999 was it lowest closing price through April 2000 and beyond (taking into account the Company's 2 for 1 stock split on March 1, 2001).

95.     Based on the Company's admission in its Restatement that an average of 97 days separated the purported "grant date" from the actual grant date, these options were actually granted sometime in 2000, likely in or about March or April 2000.



96.     Another form of backdating that McKelvey and others routinely engaged in was the adding of options to grants that had already been approved.

97.     For example, an option request form submitted to McKelvey in May 2001 by Jeff Taylor, founder of the Monster job search message board and "Chief Monster" at TMP, requested 8,700 options for four employees of the Monster.com division to be added to the "4/4/01" grant.  Although the form was not signed by Taylor until May 3, 2001, and *then* faxed to McKelvey for his signature, McKelvey signed off on the request, thus approving the post-hoc addition of options to an already backdated Company-wide grant.  This is actually backdating on-top-of backdating.

98.    Similarly, McKelvey also approved the addition of options for the employees of a newly acquired company, Morgan & Banks, to the backdated 1998 Annual Company-wide grant.

99.    Specifically, on January 28, 1999, the Company acquired Morgan & Banks ("M&B"), a global human resources firm.  As was typical with newly hired employees, McKelvey worked to grant them in-the-money options as an incentive and retention tool.

100.    By March 1999, McKelvey and Andrew Banks (of M&B) were deep into the negotiation of nearly 600,000 options to be issued to the Company's newly acquired employees. In an email to McKelvey dated March 12, 1999, Banks proposed the "immediate" issuance of options with grant dates and exercise prices backdated to "February 10, 1999…the low between now and the acquisition date…."

101.    Ultimately, McKelvey did even better, adding the 600,000 options for former M&B employees to the 800,000 options already granted to the Company's employees pursuant to the 1998 Annual Company-wide grant dated "as of" December 9, 1998.

102.    Even though the acquisition itself closed nearly two months after the purported "grant date," McKelvey approved the addition of more than 600,000 backdated options to this already backdated grant— more backdating upon backdating.

103.    Aside from the annual Company-wide grants, division heads often requested periodic grants to new hires.  For these periodic individual grants, division heads were asked to submit their requests to the corporate human resources department in New York to facilitate issuance of the grants.  Each of these grants required McKelvey's approval before they could be granted.

104.    The process would typically begin when a division head initiated an option request with that division's human resources department, after which a human resources

employee would fill out an option request form which included the optionee's name, the number of requested options, a proposed option "grant date," and a corresponding exercise price.

105.    The human resources employees handling this task were specifically trained to "go to [Monster's] stock info on Nasdaq.com to search for the lowest strike/date in quarter to find lowest amount to propose and include it on the sheets sent."

106.    The option request form was then sent back to the division heads for their approval before being forwarded to McKelvey for final approval.  No grants could be processed without McKelvey's signature.

107.    A memorandum from corporate human resources to the Company's division heads and top executives entitled "Granting stock options" made this procedure clear, stating "all option grants must be presented to Human Resources (with a copy to Jim Treacy) with all the information on the attached form completed and with Andy McKelvey's signed approval.  Any grants submitted to [HR] without the necessary information or Andy's signature, will be returned to you."

108.    Depending on the trend in the Company's stock price surrounding the grant request, McKelvey would either approve the backdated grant or hold the option approvals until the Company's stock price bottomed-out, at which time he would amend the "grant date" and exercise price if the Company's stock continued to decline.

109.    Once satisfied with the backdated "grant date" he had either chosen or approved, McKelvey sent the option request forms to the corporate human resources or legal departments, where Defendant Olesnyckyj or others would prepare backdated option agreements for the new optionees and UWC's to be signed by the Compensation Committee.

110.    A series of grants dated "as of the 21st day of September, 2001" are paradigmatic of this backdating practice.  Sometime around August 2001, Jeff Taylor sent a list of proposed options to Monster.com's Human Resources division in Massachusetts.  There, Mike Piotrowski, or another human resources employee, retroactively chose July 25, 2001 as the proposed "grant date" and fixed the exercise price for these options at $48.00.  At the time, this was the lowest stock price since April 30, 2001.

111.    The option request form was then returned to Taylor who signed the form and faxed it to McKelvey in New York on August 22, 2001 for his approval. By this time, however, Monster's stock price had *fallen* to $44.80, which would have rendered the proposed options "under water" given their pre-selected "grant date" of July 25th, when the Company's stock closed at $48.00.

112.    As the Company's stock price continued to decline, however, McKelvey held the option request until sometime after September 21, 2001.  On that date, the Company's stock price had essentially bottomed-out around $31, and McKelvey manually scratched-out the "grant date" and "grant price" column for each of the proposed grants, and replaced them with a new handwritten "grant date" of "9/21/01" and a new exercise price of "31.290."

113.    McKelvey then signed the option request form with his amendments, and sent it to either the corporate human resources or legal department where stock option agreements for each of the new optionees were drafted and dated "as of the 21st day of September, 2001." A UWC was then prepared and was later signed by the members of the Compensation Committee, purportedly "as of the 21st day of September, 2001."



114.    The last time the Company's stock price had closed as low as it did on September 21, 2001 was April 4, 2001, the same date the Company purportedly granted over 2 million options to its employees as part of the 2001 Annual Company-wide option grant.

115.    Aside from his role behind the scenes of the Company's backdating scheme, McKelvey also participated in numerous Compensation Committee meetings where options were "granted," including at least two meetings in which suspiciously dated options were apparently granted.

116.    Specifically, McKelvey attended meetings purportedly on September 11, 2002 and October 10, 2002 during which the Compensation Committee "granted" options. According to the Company's Restatement, however, even though options were apparently "granted" at certain Compensation Committee meetings, "[t]he Company…concluded that

neither the 'as of' dates referenced on Compensation Committee UWCs nor the dates of Minutes can be relied on as proper option grant measurement dates."

117.    The Company's stock price movements surrounding these two grants make them suspicious.  Specifically, on August 1, 2002, the Company's stock closed at $14.42.  By the time the September 11th and October 10th grants were purportedly made, however, the stock had slumped to $11.12 and $9.25 respectively.  By the end of October 2002, the stock had rebounded to $15.48.  This pattern is evident of option backdating.

118.    In addition to the instant Complaint, McKelvey has also been implicated in a complaint filed by the Securities and Exchange Commission against Olesnyckyj as the "CEO" and "senior executive" that conspired with Olesnyckyj to backdate options.

### McKelvey's Motives

119.    McKelvey has consistently stated to the public that hiring and retaining top employees and making strategic acquisitions with the Company's stock were top priorities for the success of his Company.  For instance, in an interview on September 25, 1998, McKelvey stated:

> In managing the growth of TMP, the most important aspect is our people. If you do not have good people, you have absolutely nothing.  We work and have worked very hard to try to build a strong management team and try to incent them so that they will do well when the company does well. When TMP was private, there were 15 or 20 managers that had some TMP stock and when we went public they converted that stock to TMP stock.

120.    Then, referencing to the Company's backdated annual Company-wide option grant of January 6, 1997, McKelvey continued:

> We have had a very aggressive position in terms of stock options and in fact last year had a stock option program for every employee in the company throughout the world who had been with us for 12 months or more.  Of the 3,000 employees at TMP today, 2,300 of them either have stock or options.  I believe that the more you bring management and the

> rank and file into an ownership position, the better it is for the company.
> Of course if the company does well then all of these people will become a
> little wealthier and they deserve it because they have made it happen!

121.    On January 6, 1997, the purported "grant date" of the 1997 Annual Company-wide option grant referred to above, the Company's stock closed at $12.87.  That was the second lowest closing price since the Company went public in December 1996, and the lowest closing price of the year.  (The lowest was December 31, 1996, when the stock closed at $12.75).

122.    By the end of March 1997, the Company's stock had eclipsed $20 per share, and would not return to the January 6th level until April 16, 2003.

123.    In the same September 28, 1998 interview, McKelvey was asked what he would do to ensure the success of the Company in the future.  McKelvey responded that TMP's continued growth was his top objective.  When asked if the Company had the necessary cash or credit to continue with his growth strategy, McKelvey pointed to the Company's stock as his currency, noting that the Company had "made several acquisitions with [its] own stock…."

124.    McKelvey's backdating scheme, which he used to retain and attract key personnel while hiding the compensation expense necessary to do so, succeeded in inflating the value of the Company's stock.  This was critical to his growth-by-acquisition plan for the Company's future success, as it allowed McKelvey to have the best of both worlds- he could offer hyper-competitive compensation packages to his employees without burdening the Company's profit and loss statement and stock value with this mounting expense.

125.    In a private message to Monster employees after the June 12, 2006 *Wall Street Journal* article was published, McKelvey echoed his sentiments about the importance of the Company's stock option plans to its ambitious growth:

> Ever since Monster Worldwide became a public company 11 years ago,
> we used our stock option incentive plan as an effective tool to drive our

growth and foster the entrepreneurial spirit that continues to exist throughout the organization. The option grants were used to attract and retain talented and creative individuals, to recognize individual performance and facilitate strategic acquisitions…Since day one, our philosophy has been to provide incentives to many members of our staff and recognize their important contributions across the organization- from administrative and support personnel to business unit leaders. These outstanding efforts have transformed Monster Worldwide into the global online recruitment industry leader it is today.

126.    The Company's stock options plans were relied on to attract and retain talented employees and to seize opportunities for growth. Backdating the options granted under these plans made them even more potent weapons in the Company's battle against its industry competitors.

127.    In addition to McKelvey's motives for leveraging the option programs to feed his appetite for corporate success, there were a number of more personal motives behind McKelvey's involvement in backdating.

128.    McKelvey is the Company's founder, and throughout the relevant period was Monster's Chief Executive Officer, Chairman of the Board and principal shareholder. McKelvey still owns more than 10 million shares of Monster common stock. He owes his considerable wealth to the Company's stock, from which he has made more than $353 million in sales to date.

129.    By 2001, most of McKelvey's wealth was tied up in his ownership of more than 24 million shares of Monster stock. To cash in on these assets without compromising his control of TMP, McKelvey leveraged his enormous equity position to obtain margin loans and other financing. In fact, as of March 31, 2001, McKelvey had pledged every share of Company stock he owned as collateral for one financing vehicle or another.

130.    All told, McKelvey had nearly $250 million in margin loans and credit facilities secured by his stock.

131.    As the Company's stock soared during the late 1990's, these arrangements provided McKelvey with ample cash at little risk.  When the Company's stock began to plummet in 2001, however, potential calls on McKelvey's margin loans threatened to impair his control of the Company he had founded.

132.    The situation was so dire that the Company's Board of Directors commissioned a study to analyze McKelvey's "alternatives" should the Company's falling stock price trigger margin calls.

133.    Specifically, the internal report stated,

> Andrew McKelvey, the Company's Chairman, Chief Executive Officer and principal shareholder, has pledged all of his shares of TMP common stock and Class B Common stock as collateral under 9 different margin loans and credit facilities.  The precipitous drop in the TMP stock price over the last several months has already resulted in one margin call, pursuant to which in early January 2001, Goldman Sachs sold 960,000 shares of Mr. McKelvey's common stock, and such price drop has currently left Mr. McKelvey dangerously close to additional margin calls or similar events under one or more of these loans and credit facilities.  Given the potential effect of substantial sales of TMP Common stock on the market price of TMP common stock, it is quite possible that a single margin call may itself trigger margin calls by other lenders due to the downward pressure on the stock.

134.    As described in the report, these margin calls posed a number of different threats to McKelvey and TMP.

135.    First, a forced sale of shares occasioned by margin calls could have substantially diluted McKelvey's control, and in some cases could have completely eviscerated it.

136.    For instance, all 4,762,000 of McKelvey's Class B Common stock were held by Merrill Lynch as collateral for a $100 million margin loan.  Each Class B share entitled McKelvey (but not the transferee) to 10 votes each.  In McKelvey's hands, this stock entitled

him to more than 30% of the Company's voting interest.  A margin call and forced sale of this stock would have left McKelvey with only roughly a 6% voting interest in his own company.

137.    As the internal report concluded, "A decline in Mr. McKelvey's voting control of TMP would not necessarily be gradual or in proportion to the actual number of TMP shares sold in any margin call, as Merrill Lynch holds all 4,672,000 shares of Class B Common Stock…."

138.    A forced sale of McKelvey's stock could have also jeopardized the Company's preferred accounting treatment for a number of acquisitions that closed during this period. Specifically, TMP accounted for its acquisitions using the pooling method of accounting. Pooling rules, however, prohibited "affiliates" of TMP, including McKelvey, from selling or hedging his Company stock, with limited exceptions, during "pooling periods."

139.    A forced sale of a large volume of McKelvey's stock in the summer of 2001 would have violated pooling rules and the Company would have been forced to account for at least four of its recent acquisitions using the purchase method of accounting.  This method would have, in turn, forced the Company to account for more than $300 million in acquired goodwill, resulting in an amortization expense of $2.8 million per quarter.

140.    The Company's internal report concluded "the effect of breaking any and all such poolings may include a substantial drop in our stock price and could very well lead to litigation on the basis of typical allegations ranging from breach of fiduciary duties to inadequate disclosure."

141.    Accordingly, security provisions in McKelvey's margin loans and credit facilities threatened to oust him from control of his company, could have forced the sale of his stock at prices that represented near historic lows for TMP, and could have saddled TMP's financial statements with additional acquisition related expenses.

142.    At $29.00 per share, the security provisions took effect.  The further TMP's stock price dropped, the deeper the hole McKelvey would have to climb out of.  For example, had TMP's stock price dropped to $16.00 per share, McKelvey would have been forced to provide his lenders with nearly $100 million in cash to avoid margin calls.

143.    Fortunately for McKelvey, his backdating scheme successfully propped up the Company's profits by continuing to grow the Company through strategic hiring while at the same time hiding $271.9 million of related compensation expense throughout the period of the fraud.  Disclosure of this compensation expense would have driven the Company's stock price lower.

144.    McKelvey also used the option backdating scheme to benefit his son, Stuart McKelvey, who was one of the Company's most highly paid executives.  Throughout the Class Period, McKelvey was responsible for determining the option grants to the Company's executives.  By 2005, McKelvey had granted his son 231,332 options, most, if not all, of which appear to have been backdated.

145.    Moreover, as reported in the Company's Restatement, following McKelvey's resignation he was forced to reimburse Monster approximately $533,000 for undisclosed and inappropriate expenses paid by the Company on his behalf.  Specifically, McKelvey was found to have enriched himself at the Company's expense by engaging in undisclosed and improper related party transactions including causing the Company to (1) grant stock options to four of his personal employees at various times from 1999-2002, (2) provide health care benefits to nine of his relatives and nine of his personal employees at various times since 1997, (3) process payroll for up to nine of his personal employees at various times since 1997, and (4) allow five of his

personal employees to participate in the Company's 401-K plan, which included matching payments by the Company.

146.    Although McKelvey did not grant himself options during the Class Period, his annual bonuses for 2003 through 2005 were directly tied to the Company's annual earnings per share ("EPS"). Specifically, McKelvey's bonus was determined on a sliding scale that was tied to the Company's annual EPS. Accordingly, when Monster reported EPS of $0.61 in 2004, McKelvey received a bonus of $1,800,000 pursuant to a schedule approved by the Compensation Committee. Likewise, when the Company reported EPS for 2005 of $0.86, McKelvey received another bonus of $1,800,000.

147.    As set forth in the Company's Restatement, however, but for the option backdating scheme, the Company's EPS for 2004 and 2005 respectively would have been only $0.49 and $0.79, instead of the reported EPS of $0.61 and $0.86. These figures would have entitled McKelvey to bonuses of only $1,087,500 and $1,140,000 respectively pursuant to his annual bonus schedules. Thus, the scheme and its cover-up resulted in an additional $1,373,000 in bonus payments to McKelvey.

148.    Although the Company's restated EPS figures make it clear that McKelvey improperly received bonus compensation that rightfully belongs to the Company, to date McKelvey has not offered to repay these amounts.

149.    McKelvey also made more than $9 million through insider trades during the Class Period. As Defendants' scheme to hide $271.9 million in compensation expense had the desired effect of inflating Monster's stock price during the Class Period, McKelvey's profits from the following insider trades during this period should be disgorged:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| 6/1/2005 | 26,203 | $26.76 | $701,312.81 |
| 7/1/2005 | 24,525 | $28.59 | $701,213.90 |
| 8/1/2005 | 23,155 | $30.28 | $701,144.98 |
| 9/1/2005 | 22,744 | $30.83 | $701,181.60 |
| 10/4/2005 | 23,219 | $30.15 | $700,001.77 |
| 11/1/2005 | 20,825 | $33.62 | $700,059.45 |
| 12/1/2005 | 17,849 | $39.27 | $700,910.60 |
| 1/3/2006 | 17,237 | $40.66 | $700,885.72 |
| 2/1/2006 | 14,960 | $46.87 | $701,139.30 |
| 3/1/2006 | 14,300 | $49.68 | $710,438.30 |
| 4/3/2006 | 14,125 | $49.67 | $701,560.50 |
| 5/1/2006 | 12,340 | $56.70 | $699,678.00 |
| 6/1/2006 | 14,400 | $48.80 | $702,721.44 |
| **Total** | **245,882** | | **$9,122,248.40** |

**Defendants' Scheme Caused the Company to Violate
Generally Accepted Accounting Principles and SEC Regulations**

150.    Defendants' options backdating scheme and the opportunistic granting of stock options carried out by Monster and the Individual Defendants caused the Company to violate GAAP and SEC Regulations both for the proper reporting of its earnings.

151.    According to SEC regulations, public companies must prepare their financial statements in accordance with GAAP. By failing to comply with GAAP, Monster's financial statements are presumptively in violation of those regulations.

152.    GAAP are the principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. They are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA"), a private professional association, through three successor groups it established: the Committee on Accounting Procedure, the Accounting Principles Board, and the Financial Accounting Standards Board ("FASB") with the permission of the SEC (Accounting Series Release 150).

153.    SEC Rule 4-01(a) of SEC Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate, despite footnote or other disclosures, unless the Commission has otherwise provided." 17 C.F.R. § 210.4-01(a)(1). Regulation S-X requires that interim financial statements must also comply with GAAP. 17 C.F.R. § 210.10-01(a).

154.    As noted in AICPA auditing standard ("AU"), § 110.02, a public company's management is responsible for preparing financial statements in conformity with GAAP:

> The financial statements are management's responsibility …
> Management is responsible for adopting sound accounting policies
> and for establishing and maintaining internal controls that will,
> among other things, initiate, record, process, and report
> transactions (as well as events and conditions) consistent with
> management's assertions embodied in the financial statements.
> The entity's transactions and the related assets, liabilities and
> equity are within the direct knowledge and control of
> management…. Thus, the fair presentation of financial statements
> in conformity with generally accepted accounting principles is an
> implicit and integral part of management's responsibility.

155.    As exemplified by the options manipulation during the Class Period, defendants wholly failed to adopt sound accounting policies and to maintain internal controls designed to ensure that the Company's public filings were fairly presented.

156.    The SEC also regulates statements by companies "that can reasonably be expected to reach investors and the trading markets, whoever the intended primary audience." Public Statements by Corporate Representatives, Exchange Act Release No. 33-6504, 3 Fed. Sec. L. Rep. (CCH) ¶ 23,120B, at 17,096, 17 C.F.R. § 241.20560, 1984 WL 126134 (Jan. 13, 1984).

157.    Under SEC regulations, the management of a public company has a duty "to make full and prompt announcements of material facts regarding the company's financial condition." Timely Disclosure of Material Corporate Developments, Exchange Act Release No. 34-8995, 3 Fed. Sec. L. Rep. (CCH) ¶ 23,120A, at 17,095, 17 C.F.R. § 241.8995, 1970 WL 10576 (Oct. 15, 1970).   Defendants violated this regulation throughout the Class Period by deliberately and/or recklessly misrepresenting the specific terms and the annual costs of the Company's employee and director stock plans.

158.    In Securities Act Release No. 6349, 23 S.E.C. Docket 962 (Sept. 28, 1981), the SEC stated that:

> It is the responsibility of management to identify and address those
> key variables and other qualitative and quantitative factors which
> are peculiar to and necessary for an understanding and evaluation
> of the individual company.

159.    Defendants violated this basic precept by: 1) concealing from the public a complete understanding of material facts relating to Monster's employee compensation expenses, specifically the costs the Company would have incurred had it properly accounted for stock options that defendants improperly backdated; and 2) concealing from the public a complete understanding of material facts relating to defendants' practice of opportunistically granting options, specifically that: a) while the options granted to executives and directors of the Company appeared, based on the usual characteristics of such instruments, to be a form of "risk-

based compensation," they were, instead, a disguised form of straight compensation, as defendants' practices substantially eliminated the risks faced by these option recipients; and b) by means of this subterfuge, defendants' compensation practices were performed in an unethical manner.

160.    In Accounting Series Release 173 (July 2, 1975), the SEC reiterated the duty of management to present a true representation of a company's operations:

> [I]t is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations.

161.    For the reasons stated above, defendants failed throughout the Class Period to present a correct impression of Monster's business realities.

162.    Item 7 of Form 10-K, Management's Discussion and Analysis of Financial Condition and Results of Operations, requires the issuer to furnish information required by Item 303 of Regulation S-K, 17 C.F.R. § 229.303.

163.    On May 18, 1989, the SEC issued an interpretive release (Securities Act Release No. 6835, 54 Fed. Reg. 22427 (May 18, 1989)), which stated, in relevant part:

> The MD&A requirements are intended to provide, in one section of a filing, material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future. As the Concept Release states:
>
> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long term analysis of the business of the company. The Item asks management to discuss the dynamics of the business and to analyze the financials.

164.    Defendants nowhere explained in the MD&A sections of their annual and quarterly SEC filings that they had caused Monster to be out of compliance with GAAP or the terms of its own option plans.

165.    Finally, Monster's options accounting violated the following fundamental principles of GAAP:

- The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions. (FASB Statement of Financial Accounting Concepts ("FASCON") No. 1);

- The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources. (*Id.*);

- The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. (*Id.*);

- The principle that financial reporting should provide information about an enterprise's financial performance during a certain time period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. (*Id.*);

- The principle that the quality of reliability and, in particular, of representational faithfulness leaves no room for accounting representations that subordinate substance to form. (FASCON No. 2);

- The principle that information should be reliable as well as relevant is a notion that is central to accounting. The reliability of a measure rests on the faithfulness with which it represents what it purports to represent. (*Id.*);

- The principle of completeness, that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions. (*Id.*);

- The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent. (*Id.*); and

- The principle that recognition of revenues, expenses, gains and losses and the related increments or decrements in assets and liabilities… is the essence of using accrual accounting to measure performance of entities. (FASCON No. 6).

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD REPRESENTATION

166.    During the Class Period, defendants filed three quarterly reports for 2005 with the SEC on Forms 10-Qs. These reports set out the Company's earnings for the respective quarter. The Company's 2005 annual report was filed on Form 10-K. Each of the Forms 10-Q and the Form10-K were materially false and misleading for the reasons discussed above, namely, because the reported earnings (the most fundamental measure of a company's results of operations) were materially artificially inflated by Company's improper understatement of compensation expenses that resulted from its option backdating scheme, which was undisclosed, in violation of GAAP.

167.    The Class Period begins on May 6, 2005, with the filing of Monster's report for the first quarter of 2005. The chart below identifies the false earnings per share figures reported in each of the Forms 10-Q and Form 10-K filed during the Class Period:

|  | Q1-05 | Q2-05 | Q3-05 | 05 10-K |
|---|---|---|---|---|
| Earnings Per Share (loss) As Originally Reported | $0.18 Form 10-Q filed 5/6/05 | $0.16 Form 10-Q filed 8/08/05 | $0.25 Form 10-Q filed 11/3/05 | $0.88 Form 10-K filed 2/16/06 |

168.    Each of the Forms 10-Q falsely represented that the financial information was not

misleading and complied with SEC regulations:

> The consolidated interim financial statements included herein are unaudited and have
> been prepared by the Company pursuant to the rules and regulations of the Securities and
> Exchange Commission. Certain information and footnote disclosures normally included
> in financial statements prepared in accordance with accounting principles generally
> accepted in the United States have been omitted pursuant to such rules and regulations,
> although the Company believes that the disclosures are adequate to make the information
> presented not misleading. The consolidated interim financial statements include the
> accounts of the Company and all of its wholly-owned and majority-owned subsidiaries.
> All significant inter-company accounts and transactions have been eliminated in
> consolidation.
>
> These statements reflect all normal recurring adjustments that, in the opinion of
> management, are necessary for fair presentation of the information contained herein.

169.    Each of the Forms 10-Q and Form 10-K falsely represented that the Company

accounted for its stock option grants pursuant to APB No. 25:

> Stock-Based Compensation
>
> The Company's financial statements are presented in accordance with Accounting
> Principles Board ("APB") Opinion No. 25, Accounting for Stock Issued to Employees.
> Under APB 25, generally, no compensation expense is recognized in connection with the
> awarding of stock option grants to employees provided that, as of the grant date, all terms
> associated with the award are fixed and the quoted market price of the stock is equal to or
> less than the amount an employee must pay to acquire the stock as defined. As the
> Company has only issued fixed term employee stock option grants at or above the quoted
> market price on the date of the grant, there has been no compensation expense associated
> with stock options recognized in the accompanying financial statements.

170.    In addition, each of the Forms 10-Q and Form 10-K contained certifications

signed by defendant McKelvey, which falsely assured investors that the reports accurately

convey the Company's results of operations, that they are free from false and misleading

statements and that the Company's disclosure controls and processes were adequate:

> (1) I have reviewed this [quarterly or annual report, as appropriate] of Monster
> Worldwide, Inc.;

(2) Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(3) Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

(4) The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5) The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

171.    The certifications were materially false and misleading because as stated above, the Forms10-Q and Form10-K contained false financial information and failed to disclose the option backdating scheme. The Company did not account for its employee stock option grants in accordance with APB No. 25 because it failed to recognize as compensation expense the amount by which a granted option was in the money. Defendants' assurances that the reports were free from error and accurately conveyed Monster's financial results were untrue and deceived investors. In addition, the Company's disclosure controls and procedures were not adequate. To the contrary, the controls were woefully inadequate, allowing the backdating scheme, and the attendant false accounting that inflated earnings by hundreds of millions of dollars, to flourish for years.

172.    On June 12, 2006, *The Wall Street Journal* published an article titled "Monster Worldwide Gave Officials Options Ahead of Share Run-Ups." The *Journal* reported that defendants frequently granted options to top executives ahead of sharp run-ups in the Company's share price. The article specifically pointed to options granted to James J. Treacy, Monster's former COO and Director in 1997, 1999 and 2001 as examples of options granted at very low prices, immediately before a swift ascent in the Company's stock price, and concluded that the odds of this happening without backdating were about "one in nine million."

173.    That same day, Monster issued a press release announcing its receipt of a subpoena from the U.S. Attorney for the Southern District of New York relating to the Company's stock option granting practices.

174.    Monster's stock price dropped sharply on the news, closing at $38.60, down $3.40 from the prior trading day close of $42, a one day drop of 8.1% on unusually heavy volume of over 7.7 million shares. Monster's stock price continued to drop as the market digested the news, falling to $35.58 per share by the close of June 13, 2006. This drop is in addition to the significant decline in Monster's stock price ($58 per share to $42 per share) that occurred between May 11, 2006 and June 9, 2006, which was due to market anticipation (later proven to be correct) that Monster was involved in the option backdating scandal, even in the absence of a specific Company acknowledgment of backdating issues.

175.    Defendants knew about the backdating scandal before *The Wall Street Journal* article was published, but did not disclose it. As announced on June 12, 2006, a committee of independent directors (the "Special Committee"), with the assistance of outside legal counsel, had already been conducting an internal review and analysis of all stock option grants previously issued.

176.    On June 14, 2006, the Company disclosed that the SEC ordered the Company to preserve all relevant information related to the granting of options in anticipation of a formal document request from the Agency.

177.    On July 11, 2006, Monster issued a press release stating that, "Although the review is in its early stages, the Company believes that it may need to restate its financial statements for the year ended December 31, 2005 and prior years to record additional non-cash charges for stock based compensation expense relating to various stock option grants."

178.    On August 14, 2006, the Company announced that it had received a delisting letter from the NASDAQ because the Company had failed to timely file its form 10-Q.

179.    On September 19, 2006, the Company announced that it had suspended Defendant Olesnyckyj pending the results of the ongoing options review. The Company also announced it was "very likely" going to restate its financial results over options issues.

180.    On October 5, 2006, the Company announced that it would not be able to provide comparable financial results for the three and nine-month periods ending September 30, 2005 during the third quarter 2006 conference call due to the investigation.

181.    On October 9, 2006, the Company announced that Defendant McKelvey, the Company's founder and majority shareholder, had resigned as CEO and Chairman of the Board on October 6, 2006 due to the demands of the ongoing options probe. However, McKelvey remained a member of Monster's Board.

182.    On October 25, 2006, the Company announced that while the Special Committee investigation was ongoing, it expected the investigation to reveal that "a substantial number of stock option grants during the period under review differed from the fair market value of the underlying shares on the recorded measurement date." The Company also announced that it expected to restate its financial statements from 1997 through 2005, and that its previously issued financial statements should not be relied upon.

183.    On October 30, 2006, Monster filed a Form 8-K with the SEC announcing that Defendant McKelvey had resigned, effective immediately, as a member of Monster's Board and Chairman Emeritus. Also attached to the Form 8-K was a letter from McKelvey's new lawyer to counsel for the Special Committee stating that McKelvey would not appear for a previously-agreed interview with the Special Committee on October 30, 2006, and there were no assurances he would be interviewed subsequently.

184.    According to McKelvey's new lawyer, McKelvey's prior statements about the lack of any knowledge about backdating were made in an interview at a time when McKelvey was "exhausted" and did not understand the questions. According to his counsel, McKelvey did not express his thoughts or recollections clearly because "he was still recovering from a serious illness," and he "felt poorly, was jet-lagged, came in without counsel and had not taken an opportunity to try to reflect on or reconstruct the events spanning many years that were the focus of [the Special Committee's] questions."

185.    On November 14, 2006, Monster announced that it had received another delisting notice from the NASDAQ based on Monster's failure to file its Form 10-Q for the 2006 third quarter.

186.    On November 22, 2006, Monster announced that its Board of Directors had terminated Defendant Olesnyckyj "for cause" as part of the options investigation.

187.    On December 13, 2006, Monster filed an amended Form 10-K for the year ending December 31, 2005 with the SEC, announcing a restatement of financial statements reflecting a $339.6 million cumulative charge for stock options granted between 1997 and March 2003.

188.    While Monster has yet to provide specific details of when options were backdated, by whom and who received them, Plaintiffs believe that, based on their investigation, the backdating involved millions of options granted to numerous Monster insiders.

189.    On February 17, 2007, defendant Olesnyckyj pleaded guilty to criminal securities fraud and conspiracy to commit securities fraud.

## LOSS CAUSATION

190.    As detailed herein, throughout the Class Period, defendants engaged in a scheme to deceive the market and engaged in a course of conduct that artificially inflated the price of Monster securities.

191.    As a result, Plaintiffs and the Class purchased Monster securities at artificially inflated prices and were damaged economically when the price of Monster securities dropped upon Company disclosures and leakage of the truth concerning Monster's option backdating scheme and its true financial condition, as alleged above.

## ADDITIONAL SCIENTER ALLEGATIONS

192.    Defendants acted with *scienter* in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, these defendants, by virtue of their receipt of information reflecting the truth regarding Monster, their control over, and/or receipt and/or modification of Monster's allegedly false and materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Monster, participated in the fraudulent scheme alleged herein.

193.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including defendants.

194.    Defendant Olesnyckyj has pleaded guilty to criminal securities fraud and conspiracy to commit securities fraud, as discussed in ¶9. Olesnyckyj pleaded guilty to conspiracy, which requires the existence of co-conspirators. Moreover, as reported, new hires were promised backdated options. That new hires would be told of option backdating strongly evidence that the scheme was not a closely-held secret at the Company.

195.    Defendants were personally motivated to commit the wrongdoing alleged herein because they benefited personally from it.  This was the point of the backdating scheme – to enrich insiders.

## APPLICABILITY OF PRESUMPTION OF RELIANCE FOR DEFENDANTS' OMISSIONS OF MATERIAL FACTS UNDER THE *AFFILIATED UTE* DOCTRINE, AND/OR, IN THE ALTERNATIVE, UNDER THE FRAUD ON THE MARKET DOCTRINE

196.    Plaintiffs and the Class are entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are primarily predicated upon the omission of material facts that defendants had a duty to disclose (namely, the existence of the backdating scheme and concealment of the Company's true method for granting and accounting for options).

197.    In the alternative, Plaintiffs and the Class are entitled to a presumption of reliance under the fraud on the market doctrine as established below.

198.    At all relevant times, the market for Monster's common stock was an efficient market for the following reasons.

199.    Monster's common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market.

200.    As a regulated issuer, Monster filed periodic public reports with the SEC and the NASDAQ.

201.    Monster regularly communicated with public investors through established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

202.    Monster was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the public and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

203.    As a result of the foregoing, the market for Monster's common stock promptly digested current information regarding Monster from all publicly available sources and reflected such information in Monster's stock price. Under these circumstances, all purchasers of Monster common stock during the Class Period suffered similar injury through their purchase of Monster's common stock at artificially inflated prices and a presumption of reliance applies.

## <u>NO SAFE HARBOR</u>

204.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each

of those forward-looking statements was made, the particular speaker knew that the particular

forward-looking statement was false, and/or the forward-looking statement was authorized

and/or approved by an executive officer of Monster who knew that those statements were false

when made.

### COUNT I

**Violation of Section 10(b) of the
Exchange Act and Rule 10b-5(a), (b) and (c)
Against All Defendants**

205.    Plaintiffs, on behalf of all members of the Class individually, repeat and re-allege

each allegation contained above as if fully set forth herein.

206.    During the Class Period, defendants carried out a plan, scheme and course of

conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and

maintain the market price of Monster common stock; and (iii) cause Plaintiffs and other

members of the Class to purchase Monster common stock at artificially inflated prices.

207.    In furtherance of this unlawful scheme, plan and course of conduct, defendants

jointly and individually, took the actions set forth herein. Defendants: (a) employed devices,

schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to

state material facts necessary to make the statements not misleading; and (c) engaged in acts,

practices, and a course of business which operated as a fraud and deceit upon the purchasers of

the Company's common stock in an effort to maintain artificially high market prices for

Monster's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

Defendants are sued either as primary participants in the wrongful and illegal conduct charged

herein or as controlling persons as alleged below.

208.    In addition to the duties of full disclosure imposed on defendants as a result of their making affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors, in compliance with GAAP and the integrated disclosure provisions of the SEC as embodied in SEC Regulations S-X (17 C.F.R. §§ 210.01 *et seq.*) and S-K (17 C.F.R. §§ 229.01 *et seq.*) and other SEC regulations, including truthful, complete and accurate information with respect to the Company's operations and performance so that the market prices of the Company's common stock would be based on truthful, complete and accurate information.

209.    Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Monster as specified herein.

210.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Monster's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Monster and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Monster common stock during the Class Period.

211.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Monster's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by  defendants' misstatements of the Company's business, compensation practices, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

212.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Monster's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Monster's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by these defendants, or upon the integrity of the market in which Monster's common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by these defendants but not disclosed in public statements by these defendants during the Class Period, Plaintiffs and the other members of the Class acquired Monster common stock during the Class Period at artificially high prices and were damaged thereby.

213.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs,

the other members of the Class, and the marketplace known the truth regarding Monster's

compensation practices and financial results, which were not disclosed by defendants, Plaintiffs

and other members of the Class would not have purchased or otherwise acquired their Monster

common stock, or, if they had acquired such common stock during the Class Period, they would

not have done so at the artificially inflated prices which they paid and would not have suffered

economic harm.

214.    By virtue of the foregoing, defendants have violated Section 10(b) of the

Exchange Act, and Rule 10b-5 promulgated thereunder.

215.    Defendants' fraudulent acts artificially inflated the price of Monster securities. As

a result, Plaintiffs and the Class purchased Monster securities at artificially inflated prices and

were damaged thereby.

216.    As a direct and proximate result of the wrongful conduct of defendants, Plaintiffs

and the other members of the Class suffered damages in connection with their respective

purchases and sales of the Company's common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

217.    Plaintiffs, on behalf of all members of the Class individually, repeat and re-allege

each allegation contained above as if fully set forth herein.

218.    The Individual Defendants acted as controlling persons of Monster within the

meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their ownership

and contractual rights, substantial participation in and/or awareness of the Company's operations

and/or intimate knowledge of the false financial statements filed by the Company with the SEC

and disseminated to the investing public, the Individual Defendants had the power to influence

and control and did influence and control, directly or indirectly, the decision-making of the

Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged herein to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

219.    As set forth above, defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their transactions of the Company's securities during the Class Period.

## COUNT III
### For Violations of Section 20A of the Exchange Act
### (Against Defendant McKelvey)

220.    Plaintiffs, on behalf of all members of the Class individually, repeat and reallege each and every allegation above as if fully set forth herein.

221.    This Count is asserted against defendant McKelvey for his violations of Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, on behalf of Plaintiffs and all other members of the Class who purchased Monster stock contemporaneously with McKelvey's  improper insider sales of stock during the Class Period.

222.    McKelvey, by virtue of his positions as Chairman and CEO of Monster as well as his role in the alleged fraud, had access to, and was in possession of, material non-public information about Monster at the time he reaped millions of dollars in proceeds from sales of Monster common stock.

223.     As set forth above, McKelvey sold a substantial number of shares of Monster common stock during the Class Period.  In particular McKelvey sold at least 245,882 shares of Monster stock (for aggregate proceeds of $9,122,248.40) in trades during the Class Period.

224.     These sales were made while McKelvey was in the possession of material, adverse non-public information regarding Monster's improper backdating scheme and this conduct violated Sections 10(b) and 20A of the Exchange Act.

225.     As set forth in the attached certifications, Plaintiffs purchased shares of Monster common stock on February 28, March 1, April 3, April 4, and  June 2, 2006, which purchases were made "contemporaneously" with McKelvey's above-stated sales within the meaning of Section 20A of the Exchange Act.

226.     Numerous other Class members also purchased Monster common stock contemporaneously with McKelvey's above-stated sales of stock.

227.     As a result, under Section 20A of the Exchange Act, McKelvey is liable to Plaintiffs and the Class for all profits gained and losses avoided by him as a result of these transactions.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: July 9, 2007

Respectfully submitted,

**LABATON SUCHAROW & RUDOFF LLP**

By: _____
Joel H. Bernstein (JB-0763)
Christopher J. Keller (CK-2347)
Jonathan Gardner (JG-8512)
Nicole M. Zeiss (NZ-3894)
100 Park Avenue, 12th Floor
New York, NY 10017
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

**GOLDMAN SCARLATO & KARON, P.C.**
Mark S. Goldman
Paul J. Scarlato
Brian D. Penny
101 W. Elm Street, Suite 360
Conshohocken, PA 19428
Tel.: (484) 342-0700
Fax: (484) 342-0701

## CERTIFICATION

I, Horace T. Alston, as a Trustee of the Steamship Trade Association/International Longshoremen's Association Pension Fund ("STA-ILA"), hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of STA-ILA. I have reviewed a complaint alleging violations of the federal securities laws prepared against Monster Worldwide Inc. ("Monster");

2.    STA-ILA did not purchase the securities at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.    STA-ILA is willing to serve as a lead plaintiff in this matter, including providing testimony at deposition and trial, if necessary;

4.    STA-ILA's transactions in Monster during the class period referred to in the complaint are reflected in Exhibit A hereto;

5.    STA-ILA has sought to serve as a lead plaintiff in the following class actions under the federal securities laws during the last three years, but either withdrew its motion for lead plaintiff or was not appointed as lead plaintiff;

*In re Wireless Facilities, Inc. Securities Litigation*
*In re Advanced Neuromodulation Systems*
*In re Bradley Pharmaceuticals*
*Chaentz v Avaya, Inc., et al*
*Edward J. Goodman Life Income Trust v Jabil Circuit, Inc. et al*

6.    STA-ILA is currently serving as lead plaintiff in the following class action under the federal securities laws.

*Archdiocese Of Milwaukee et al. v Mercury Interactive Corporation, et al.*
*Greenebaum v American Tower Corporation, et al*

7.    Beyond the pro rata share of any recovery, STA-ILA will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this $20$ day of April, 2007.

_Horace T. Alston_
Horace T. Alston
Trustee
Steamship Trade Association/International Longshoremen's Association Pension Fund

## EXHIBIT A

## TRANSACTIONS IN
## MONSTER WORLDWIDE INC

| Trans Type | Trade Date | Settle Date | Shares | Price Per Share | Cost/ Proceeds |
|---|---|---|---|---|---|
| Purchase | 03/01/06 | 03/06/06 | 500.00 | $ 49.81 | ($24,910.68) |
| Purchase | 03/09/06 | 03/14/06 | 400.00 | $ 47.05 | ($18,827.93) |
| Purchase | 03/17/06 | 03/22/06 | 300.00 | $ 50.86 | ($15,263.53) |
| Purchase | 04/04/06 | 04/07/06 | 800.00 | $ 50.93 | ($40,764.06) |
| Purchase | 04/12/06 | 04/18/06 | 300.00 | $ 50.04 | ($15,020.29) |
| Purchase | 04/21/06 | 04/26/06 | 300.00 | $ 52.74 | ($15,828.67) |
| Purchase | 05/09/06 | 05/12/06 | 500.00 | $ 58.56 | ($29,295.69) |
| Purchase | 05/17/06 | 05/22/06 | 600.00 | $ 52.98 | ($31,804.67) |
| Purchase | 06/05/06 | 06/08/06 | 1,100.00 | $ 46.27 | ($50,909.61) |

## CERTIFICATION

I, Thomas F. Gibson, as Chairman of the Middlesex County Retirement System ("Middlesex"), hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of Middlesex. I have reviewed a complaint prepared against Monster Worldwide Inc. ("Monster") alleging violations of the federal securities laws;

2.    Middlesex did not purchase securities of Monster at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.    Middlesex is willing to serve as a lead plaintiff in this matter, including providing testimony at deposition and trial, if necessary;

4.    Middlesex's transactions in the securities of Monster as reflected in Exhibit A, are attached hereto;

5.    Middlesex has not sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years, except for the following:

*Zucker v. Zoran Corporation, et al*

*Middlesex Retirement System, et al v. Quest Software, Inc. et al*

6.    Middlesex has sought to serve as a lead plaintiff in the following class actions under the federal securities laws during the last three years preceding the date of this Certification, but either withdrew its motion for lead plaintiff or was not appointed as lead plaintiff.

*In Re Bearingpoint, Inc. Securities Litigation*

*Long v. SFBC International Inc.*

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc. et al*

7.    Beyond its pro rata share of any recovery, Middlesex will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the

foregoing is true and correct this 1 st day of March, 2007.

Thomas F. Gibson
*Chairman*
*Middlesex County Retirement System*

**EXHIBIT A**
**TRANSACTIONS IN MONSTER WORLDWIDE, INC.**

| Transaction Type (Purchase/Sale) | Trade Date | Shares | Price Per Share | Cost/ Proceeds |
|---|---|---|---|---|
| Purchase | 02/28/06 | 200.00 | $ 48.86 | ($9,775.38) |
| Purchase | 03/08/06 | 100.00 | $ 46.30 | ($4,631.85) |
| Purchase | 03/24/06 | 100.00 | $ 49.29 | ($4,930.65) |
| Purchase | 04/03/06 | 100.00 | $ 50.41 | ($5,041.94) |
| Purchase | 04/11/06 | 200.00 | $ 50.52 | ($10,109.60) |
| Purchase | 04/20/06 | 100.00 | $ 52.96 | ($5,298.90) |
| Purchase | 05/16/06 | 300.00 | $ 54.13 | ($16,246.04) |
| Purchase | 05/24/06 | 100.00 | $ 50.26 | ($5,028.90) |
| Purchase | 06/02/06 | 300.00 | $ 47.53 | ($14,264.84) |