```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- x
IN RE MONSTER WORLDWIDE, INC.          :     07 Civ. 2237 (JSR)
SECURITIES LITIGATION                  :
-------------------------------------- x     MEMORANDUM ORDER
```

JED S. RAKOFF, U.S.D.J.

This is a private securities fraud action brought on behalf of a putative class of investors. Lead plaintiffs, the Middlesex County Retirement System and the Steamship Trade Association-International Longshoremen's Association Pension Fund (collectively, "plaintiffs"), bring claims against Monster Worldwide, Inc. ("Monster"), Andrew J. McKelvey (former CEO and Chairman of Monster), and Myron Olesnyckyj (former General Counsel, Senior Vice President, and Secretary of Monster) alleging violations of: (1) Section 10(b) of the Securities and Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, against all defendants; (2) Section 20(a) of the 1934 Act, against defendants McKelvey and Olesnyckyj; and (3) Section 20A of the 1934 Act, against defendant McKelvey.

Plaintiffs move, pre-discovery, for partial summary judgment establishing portions of their claims. See Rule 56(a), Fed. R. Civ. P. Regarding the Section 10(b) claim against all defendants, plaintiffs seek summary judgment establishing that (1) defendants made false and misleading material statements, (2) with scienter, (3) in connection with the purchase or sale of Monster securities, and (4) upon which plaintiffs and the proposed class members relied. Regarding the Section 20A claim against defendant McKelvey, plaintiffs seek summary judgment establishing that (1) McKelvey traded the securities at issue contemporaneously with the plaintiffs,

and (2) McKelvey was in possession of material, nonpublic information at the time of trade.

Even at this stage of the litigation, the following facts have been established beyond genuine dispute:

On May 6, 2005, Monster filed a Form 10-Q with the U.S. Securities and Exchange Commission ("SEC"). <u>See</u> Rule 56.1 Statement of Material Facts as to Which Lead Plaintiffs Contend There is no Genuine Issue of Material Fact to be Tried ("P. 56.1") ¶ 1; Monster Worldwide, Inc.'s Counter-Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Monster 56.1") ¶ 1.[1]  The May 10-Q included, among other things, the following statement:

> Under APB 25, generally, no compensation expense is recognized in connection with the awarding of stock option grants to employees provided that, as of the grant date, all terms associated with the award are fixed and the quoted market price of the stock is equal to or less than the amount an employee must pay to acquire the stock as defined.  As the Company has only issued fixed term employee stock option grants at or above the quoted market price on the date of the grant, there has been no compensation expense associated with stock options recognized in the accompanying financial statements.

P. 56.1 ¶ 2; Monster 56.1 ¶ 2.  In connection with the May 10-Q, McKelvey signed two certification statements assuring investors that

---

[1] Defendants Olesnyckyj and McKelvey declined to respond to any paragraphs in plaintiffs' 56.1 Statement on the basis of their Fifth Amendment privilege against self-incrimination.  <u>See</u> Objections and Responses of Defendant Myron Olesnyckyj to Lead Plaintiffs' Rule 56.1 Statement as to Which Lead Plaintiffs Contend There is no Genuine Issue of Material Fact to be Tried ("Olesnyckyj 56.1"); Defendant Andrew J. McKelvey's Local Rule 56.1(B) Statement in Opposition to Lead Plaintiffs' Motion for Summary Judgment ("McKelvey 56.1").  As a result, they have not disputed any of plaintiffs' 56.1 assertions.

2

the reports were free from false and misleading statements and that the Company's disclosure controls and processes were adequate.  P. 56.1 ¶ 3; Monster 56.1 ¶ 3.  Additional 10-Qs, identical to the May 10-Q in the respects here relevant, were filed on August 8, 2005 and November 3, 2005.  P. 56.1 ¶ 4-9; Monster 56.1 ¶ 4-9.  Monster also filed a 10-K, identical to the 10-Qs in the relevant respects, on February 16, 2006.  P. 56.1 ¶ 10-12; Monster 56.1 ¶ 10-12.  McKelvey signed certification statements for each of these documents.  P. 56.1 ¶¶ 6, 9, 11; Monster 56.1 ¶¶ 6, 9, 11.

On June 12, 2006, Monster announced that it had received a subpoena from the United States Attorney for the Southern District of New York in connection with its stock option granting practices.  P. 56.1 ¶ 14; Monster 56.1 ¶ 14.  On July 11, 2006, the Company issued a press release stating that it might need to restate financial statements for the current and previous years in order to record additional non-cash expenses for stock-based compensation in the form of stock option grants. P. 56.1 ¶ 15; Monster 56.1 ¶ 15.  On September 19, 2006, Monster announced that defendant Olesnyckyj had been suspended, and on October 9, 2006, it announced that defendant McKelvey had resigned as chairman and CEO of the Company. P. 56.1 ¶ 16-17; Monster 56.1 ¶ 16-17.

On December 13, 2006, Monster announced a restatement of its financial statements (including those referenced in the aforementioned 10-Qs and 10-K) in connection with the improper accounting of $339.6 million in expenses associated with stock

options granted between 1997 and 2003.  See Form 10-K/A Amendment to a Previously Filed 10-K at 2-7, Exhibit 5 to Declaration of Jonathan Gardner in Support of Lead Plaintiffs' Motion for Partial Summary Judgment dated February 13, 2008 ("Gardner Decl."); P. 56.1 ¶ 21; Monster 56.1 ¶ 21.  The restatement explained that the improper accounting was the result of a false backdating of the dates on which the options were purportedly granted and stated: "The Company believes that this [backdating] was done intentionally, by persons formerly in positions of responsibility at the Company for the purpose of issuing options at a higher intrinsic value than would have otherwise been the case."  Gardner Decl., Exhibit 5 at 2; P. 56.1 ¶ 22; Monster 56.1 ¶ 22.

On February 15, 2007, Olesnyckyj pleaded guilty, before The Honorable Laura Taylor Swain of this Court, to one count of Conspiracy to Commit Securities Fraud and one count of Securities Fraud.  In his plea allocution, Olesnyckyj stated:

> In 1994, I became the general counsel at the company known most recently as Monster Worldwide, Inc.  The company went public in 1996.  After that, I and others at Monster agreed to and did backdate annual companywide stock option grants as well as some other stock options grants.  Among other things, I and others at times chose the date that would be used as the grant date by looking at historical prices.  I and others at times prepared paperwork, such as unanimous written consents to be signed by members of the company's compensation committee, which included the backdated dates so that it would appear in the company's books that those were the dates of actual approval.  I and others at times changed the names of grantees and numbers of options granted after a particular unanimous written consent had been signed by the compensation committee.  I and others at times arranged to include backdated and inaccurate information in the company's books and records in order to conceal the practice of backdating.  I and others at times arranged to provide misleading information to the company's auditors so that they would not discover the practice of backdating.  I and

4

> others discussed and understood that the company should have recognized the compensation expense from granting in the money options and that it was not doing so.  As a result, I understood that the company's books and records, as well as its publicly recorded financial results and its filings with the SEC were inaccurate and misleading . . .
>
> The Court: When you did these things, did you know that what you were doing was wrong and illegal?
>
> The Defendant: Yes, your honor. [...]
>
> The Court: And how long did this conduct last? You said that you became general counsel of the company in '94, that it went public in '96.  How long did this go on?
>
> The Defendant: It's my understanding that it went on until 2006, your Honor.

Transcript of Plea before Judge Swain at 26-27, Exhibit 1 to Gardner Decl.; P. 56.1 ¶ 24-25; Monster 56.1 ¶ 24-25.

On January 23, 2008, McKelvey entered into a deferred prosecution agreement with the Government relating to one count of Conspiracy to Commit Securities Fraud and one count of Securities Fraud.  P. 56.1 ¶ 28; Monster 56.1 ¶ 28.  The statement of facts annexed to the agreement that McKelvey signed states, in relevant part:

> I, Andrew J. McKelvey, along with others at Monster Worldwide, Inc. routinely selected prices for stock options grants based on historical dates when Monster's stock price had closed at, or near, a low point, resulting in grants of in-the-money stock options.  Thereafter, I signed and certified public filings with the SEC that reported false and misleading financial results and contained misleading descriptions of Monster's options granting process. These filings created the impression that Monster did not grant in-the-money options and failed to disclose the compensation expense resulting from the in-the-money options grants.

Gardner Decl., Exhibit 2; P. 56.1 ¶ 29; Monster 56.1 ¶ 29.

The elements of a private securities fraud claim for violation of Section 10(b) and Rule 10b-5 are: "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation,'; (5) economic loss; and (6) 'loss causation,' i.e., a causal connection between the material misrepresentation and the loss." Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005) (internal citations and emphasis omitted).

As discussed above, plaintiffs have moved for summary judgment on the first four elements. None of the defendants contests that the statements at issue were made "in connection with" the purchase or sale of Monster securities. Accordingly, plaintiffs are entitled to summary judgment establishing the third element. However, defendants have raised material facts that preclude summary judgment, at this stage, on all other elements.

As to the first element, while the above-quoted statements in the 10-Qs and 10-K may have been false or misleading,[2] a genuine dispute exists as to whether the false or misleading aspects were material. In the context of a Section 10(b) claim, a statement is material if there is "a substantial likelihood that the disclosure of

---

[2] At oral argument, defendants also contested that any statement made during the Class Period was false and misleading. However, the Court need not reach this issue because it finds that defendants have raised a genuine issue of fact as to "materiality" and summary judgment would therefore not be appropriate on this element in any case.

6

the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (internal quotation marks omitted). The issue is generally not appropriate for disposal on summary judgment. See In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281, 379 (S.D.N.Y. 2003). "[O]nly if the established [misrepresentations] are so obviously important to an investor, that reasonable minds cannot differ on the question of materiality is the ultimate issue of materiality appropriately resolved as a matter of law by summary judgment." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976) (internal quotation marks omitted).

Defendants have adduced evidence that, if credited, would support a finding that the misrepresentations at issue here are not "so obviously important to an investor" as to be material as a matter of law. Professor Robert Glenn Hubbard, Dean of the Graduate School of Business at Columbia University and former Chairman of the Council of Economic Advisers, and Dr. John W. Peavy III, Co-Founder and Chief Investment Officer of RPF Equity Advisors, LLC and former Chief Investment Officer of the seventh largest pension fund in the U.S. and a major institutional investor in Monster during the relevant period, submitted affidavits opining that investors and analysts focus on future cash flow in measuring a company's value. Because, according to Hubbard and Peavy, expenses associated with employee stock options do not affect cash flow, such expenses, Hubbard and Peavy assert, are typically ignored by investors and analysts.

7

Declaration of Robert Glenn Hubbard dated March 3, 2008 ("Hubbard Decl.") at ¶¶ 20-23, Exhibit C to Declaration of David P. Staubitz in Opposition to Lead Plaintiffs' Motion for Partial Summary Judgment dated March 5, 2008 ("Staubitz Decl."); Declaration of John W. Peavy III dated March 4, 2008 ("Peavy Decl.") at ¶¶ 15-16, 25-26, 34-36, Exhibit D to Staubitz Decl.[3]  Furthermore, according to Hubbard, securities analysts following the Monster stock applied this rule, focusing only on cash flow and affirmatively backing out non-cash expenses, such as stock option expenses, when valuing the company. Hubbard Decl. ¶ 21.  In addition, Hubbard asserts that Monster's stock price did not react to the Company's restatement announcement of December 13, 2006, which publicly revealed the $339.6 million accounting charge being taken by the Company.  Hubbard Decl. ¶ 36. Peavy, for his part, affirms, "[i]f Monster had properly accounted for expenses associated with its employee stock options, that would not have impacted my investment decisions to own stock in the company.  That is, had Monster properly accounted for its employee stock options in its financial statements, my investment behavior would have been unchanged."  Peavy Decl. ¶ 13.

    Collectively, all of this is sufficient to raise an issue of material fact as to the materiality of the alleged false and misleading statements.  See United States v. Bilzerian, 926 F.2d

---

[3] Plaintiffs have not raised for purposes of this motion the issue of whether the testimony of Hubbard and/or Peavy is inadmissible in whole or part.

1285, 1298 (2d Cir. 1991); In re Miller Indus., Inc. Sec. Litig., 120 F. Supp. 2d 1371, 1380-1381 (N.D. Ga. 2000).

As to the second element, in this context scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S.Ct. 2499, 2507 (2007) (internal quotation marks omitted).

Although Olesnyckyj, as part of his guilty plea, admitted his scienter with regard to the backdating scheme in general, he did not expressly admit to his involvement with scienter in the specific misstatements here in issue.  Discovery may fill this gap, but at this stage a reasonable jury could theoretically find that although Olesnyckyj purposely falsified Monster's books and records, he did not himself purposely contribute to the public statements made during the Class Period (that is, from May 5, 2005 to June 9, 2006).

As to defendant McKelvey, there are genuine issues of material fact regarding his scienter.  McKelvey's deferred prosecution agreement is silent as to his intent and his knowledge of the falsity of the public filings that he signed, Gardner Decl., Exhibit 2; P. 56.1 ¶ 29; McKelvey 56.1, and the adverse inference from his asserting his Fifth Amendment privilege is insufficient on its own to establish scienter as a matter of law.  See Commodity Futures Trading Comm'n v. Int'l Fin. Servs., 323 F. Supp. 2d 482, 505 (S.D.N.Y. 2004).

Because a corporate defendant has no single mind of its own, see Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d

9

87, 101 (2d Cir. 2001), its scienter "is necessarily derived from its employees." In re Marsh & Mclennan Cos. Sec. Litig., 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006). Therefore, a court must look to the relevant employees of the company to determine if they had the requisite state of mind, and, if so, if their scienter is imputable to the company. In this case, because there are genuine issues of material fact regarding the individual defendants' scienter with regard to public statements made during the Class Period, summary judgment as to Monster's scienter must likewise be denied.

As to the fourth element –- reliance –- plaintiffs' seek to invoke the "fraud on the market" theory of Basic Inc. v. Levinson, 485 U.S. 224 (1988). Under this theory, once an investor demonstrates that the stock at issue traded on an efficient market, a rebuttable presumption of reliance arises. Id. at 241-48. However, the theory is based on the hypothesis that "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business." Id. at 241 (emphasis added) (internal quotation marks omitted). In other words, the "fraud on the market" theory of reliance presupposes that the statement as to which reliance is presumed was material. See id. at 245-48; Feinman v. Dean Witter Reynolds, Inc., 84 F.3d 539, 542 (2d Cir. 1996) ("the [Basic] presumption would apply only where the defendant has misrepresented or omitted a material fact") (emphasis in original). Because genuine issues of fact preclude summary judgment on the issue of materiality, plaintiffs may not rely on the Basic presumption at this point.

10

Because plaintiffs do not attempt to prove individual reliance as a matter of law, summary judgment on the issue of reliance must be denied.

As noted, plaintiffs also seek summary judgment on aspects of the Section 20A claim against defendant McKelvey. To establish such a claim, a plaintiff must prove "(1) a predicate violation of the [Exchange] Act or its rules and regulations; (2) that the defendant traded the security at issue contemporaneously with the plaintiff; and (3) that the defendant was in possession of material, nonpublic information at the time of the trade." In re Openwave Sys. Sec. Litig., 528 F. Supp. 2d 236, 255 (S.D.N.Y. 2007) (internal citation and quotation marks omitted). Plaintiffs move for summary judgment establishing elements 2 and 3 in their favor.

As to element 2, McKelvey does not genuinely dispute that he traded Monster stock on the same day as plaintiffs. See P. 56.1 ¶ 42-43; McKelvey 56.1; Defendant Andrew J. McKelvey's Memorandum of Law in Opposition to Lead Plaintiffs' Motion for Partial Summary Judgment ("McKelvey Memo") at 8-9 n.7 (not disputing that plaintiffs contemporaneously purchased Monster stock on the same day McKelvey sold it); transcript, 3/24/08 at 46-47. Therefore, plaintiffs' motion for summary judgment on the second element is granted. As to element 3, even though genuine issues of material fact exist as to the materiality of the nonpublic information at issue, McKelvey does not dispute that he was in possession of nonpublic information at the time of trade. See McKelvey Memo; transcript, 3/24/08 at 46. Therefore, summary judgment on that issue is granted as well.

11

In sum, plaintiffs' motion for partial summary judgment is granted as to the third element of the Section 10(b) claim against all defendants and as to the second element and a portion of the third element of the Section 20A claim against defendant McKelvey. In all other respects the motion is denied.

SO ORDERED.

_____
JED S. RAKOFF, U.S.D.J.

Dated:     New York, New York
           April 28, 2008