UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
IN RE MONSTER WORLDWIDE, INC.        :     07 Civ. 2237 (JSR)
SECURITIES LITIGATION                :
------------------------------------- x     <u>OPINION AND ORDER</u>

JED S. RAKOFF, U.S.D.J.

This is a private securities fraud action brought on behalf of a putative class of investors. The two named plaintiffs, the Middlesex County Retirement System ("Middlesex") and the Steamship Trade Association-International Longshoremen's Association Pension Fund ("STA-ILA"), allege that the three defendants -- Monster Worldwide, Inc. ("Monster"), Andrew J. McKelvey (former CEO and Chairman of Monster), and Myron Olesnyckyj (former General Counsel, Senior Vice President, and Secretary of Monster) -- violated sections 10(b), 20(a) and 20A of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1. Plaintiffs have moved for class certification and for appointment of Middlesex and STA-ILA as class representatives. For the reasons stated herein, the motion is granted except as to the appointment of STA-ILA as a class representative.

As to class certification, Rule 23, Fed. R. Civ. P., provides that a party seeking to certify a class must satisfy the familiar requirement of Rule 23(a), commonly referred to as numerosity, commonality, typicality and adequacy of representation, and must also satisfy at least one of the alternative requirements of Rule 23(b), here, the requirement of Rule 23(b)(3) that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other

available methods for fairly and efficiently adjudicating the controversy." It is now settled, moreover, that "(1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement." In re Initial Pub. Offering Sec. Litig. ("In re IPO"), 471 F.3d 24, 41 (2d Cir. 2006).

With respect to the requirements of Rule 23(a), defendants do not contest that the putative class of Monster shareholders is so numerous that "joinder of all members is impracticable," Fed. R. Civ. P. 23(a); indeed, Monster stock traded on NASDAQ, with up to 123 million shares of common stock outstanding and actively traded at the relevant period. See Declaration of Jonathan Gardner in Support of Lead Plaintiff's Motion for Class Certification dated Feb. 15, 2008 ("Gardner Decl."), Exhibits A and B. Nor do defendants contest that the following questions of law or fact are common to all members of the proposed class: (a) whether federal securities laws were violated by defendants' acts and omissions as alleged in the Complaint; (b) whether defendants misrepresented material facts about the business,

2

operations, and management of Monster including how the company granted and accounted for stock options; (c) whether defendants participated in the course of conduct alleged in the Complaint; (d) whether defendants acted with scienter; and (e) whether members of the class sustained damage as a result of defendants' conduct. See Memorandum of Law In Support of Lead Plaintiff's Motion for Class Certification ("Pl. Mem.") at 11.

The third requirement of Rule 23(a) (that the claims of the putative class representatives are typical of the claims of the class) and fourth requirement (that the class representatives fairly and adequately protect the interests of the class) tend to merge, see In re Vivendi Universal, S.A., 242 F.R.D 76, 85 (S.D.N.Y. 2007), and defendants challenge plaintiff's showing with respect to both these requirements on the ground that lead plaintiffs Middlesex and STA-ILA are subject to unique defenses and are therefore atypical and inadequate class representatives. In particular, Monster argues that the lead plaintiffs are subject to the following defenses that preclude a finding of adequacy and typicality: (1) lead plaintiffs' investments were not made in reliance on the Monster misstatements that are alleged to be the false or misleading statements on which plaintiffs' class claims are premised; (2) Middlesex sold its entire position in Monster (12,453 shares) on April 29, 2005, around the date of publication of a public study ("the Lie Study") that questioned the timing of stock option grants and suggested that corporate executives were timing grants to their advantage, see

3

Declaration of Jenny L. Floyd in Opposition to Lead Plaintiffs' Motion for Class Certification dated March 14, 2008 ("Floyd Decl."), Exhibits F & Q; (3) on February 23, 2005, STA-ILA received a general presentation from its investment advisor that included the statement, written in a power point presentation, that "stock option accounting is still a question," see Floyd Decl., Exhibit E at 3; and (4) both lead plaintiffs continued to purchase Monster stock after June 12, 2006, the end of the Class Period.

The first point is largely irrelevant in a case, like this, where plaintiff's theory of liability is premised on the "fraud on the market" presumption that "an investor's reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action." Basic Inc. v. Levinson, 485 U.S. 224, 247 (1988). See, e.g., Darquea v. Jarden Corp., 2008 WL 622811 (S.D.N.Y. Mar. 6, 2008)(even where lead plaintiffs' investment advisors testified that the misstatements at issue were not crucial to their decision to recommend the stock purchase, "there is no reason to believe that the defense will draw any extraordinary attention or divert the trial from the main issues"); In re Indep. Energy Holdings PLC Sec. Litig., 210 F.R.D. 476, 484 (S.D.N.Y. 2002)("While the extent of any non-reliance on [plaintiffs'] part will certainly be a fact question to be decided at trial, it is unlikely to significantly shift the focus of the litigation to the detriment of the absent class members").

As to the second point, while it is true that shortly after Professor Erik Lie of the University of Iowa published an article

entitled "On the Timing of CEO Stock Option Awards" in <u>Management Science</u> in May 2005, <u>see</u> Floyd Decl., Exhibit F, Middlesex sold its entire position in Monster (12,453 shares), both Middlesex and its money manager InTech, which placed all of the class period trades, deny they had any knowledge of the Lie study at the time, see Declaration of Nicole M. Zeiss in Further Support of Lead Plaintiffs' Motion for Class Certification dated May 2, 2008 ("Zeiss Decl."), Exhibit 2 at 79-80, Exhibit 3 at 195, Exhibit 4 at 103, Exhibit 5 at 115; and Monster has offered no evidence to the contrary.

As to the third point, plaintiffs aver that the February 23, 2005 presentation to STA-ILA by its investment manager, Roxbury, was about new stock option accounting rules for companies, not about backdating, let alone backdating at Monster. See Zeiss Decl., Exhibit 6 at 114-116. Again, Monster has presented no evidence to the contrary.

Finally, as to the fourth point,

> As numerous courts have held, the fact that a putative class representative purchased additional shares in reliance on the integrity of the market after the disclosure of corrective information has no bearing on whether or not [the representative] relied on the integrity of the market during the class period, that is, before the information at issue was corrected or changed. In other words, the fact that an investor purchased additional shares upon learning the new information does not mean that he or she did not rely on the integrity of the market in purchasing shares before the new information was known. The post-disclosure purchase of the additional shares therefore will not necessarily present individual issues of reliance that render the investor atypical or inadequate to represent class members who did not purchase such additional shares.

<u>In re Salomon Analyst Metromedia</u>, 236 F.R.D. 208, 216 (S.D.N.Y. 2006)(internal quotation marks, citations and emphases omitted).

5

However, while the alleged "unique defenses" do not preclude either lead plaintiff from serving as an adequate class representative, one of the two lead plaintiffs, namely, STA-ILA, suffers from a more fundamental inadequacy, i.e. an inadequate familiarity with, and concern for, the litigation. A class representative must "not simply lend[] his name to a suit controlled entirely by the class attorney," as the class is "entitled to an adequate representative, one who will check the otherwise unfettered discretion of counsel in prosecuting the suit." Beck v. Status Game Corp., 1995 WL 422067, *4, 6 (S.D.N.Y. 1995)(internal quotation marks omitted). Although "in complex actions such as securities actions, a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance on the expertise of counsel is to be expected," still the proposed class representative must be "aware of the basic facts underlying the lawsuit and not likely to abdicate his obligations to fellow class members." Wagner v. Barrick Gold Corp., 2008 WL 465115, *5 (S.D.N.Y. Feb. 15, 2008)(internal quotation marks and alterations omitted). To be sure, the requirement is modest: class representative status may be denied only "where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 61 (2d Cir. 2000)(internal quotation marks omitted). But the standard is not so low as to be meaningless.

Here, as part of class certification discovery, defendants deposed STA-ILA witness Horace Alston, Co-Chairman of the fund, who testified that he was the person at STA-ILA most knowledgeable about the lawsuit. See Zeiss Decl., Exhibit 5 at 10. However, Mr. Alston then testified that he did not know the name of the stock at issue in this case, did not know the name of either individual defendant, did not know whether STA-ILA ever owned Monster stock, did not know if an amended complaint had been filed, did not know whether he had ever seen any complaint in the action, did not know that defendant McKelvey had moved to dismiss the complaint, and did not know that STA-ILA had moved for pre-discovery summary judgment. See Declaration of Arunabha Bhoumik in Opposition to Lead Plaintiffs' Motion for Class Certification dated April 25, 2008 ("Bhoumik Decl."), Exhibit A at 36, 48, 50, 52-54, 57, 79, 132, 140. He also testified that STA-ILA had hired the Angelos Law Firm to represent it in this litigation, that he would "guess" that Angelos then hired Labaton Sucharow LLP as Lead Counsel, that STA-ILA had granted counsel at Angelos permission to file "any complaint for any reason they deemed necessary," and that STA-ILA did not review the complaint in this case before it was filed. Id. at 43-44, 50-53.

Confronted with this appalling testimony, plaintiffs' counsel sought to mitigate the damage by designating for deposition a second STA-ILA witness, Stephen Lukiewski, a trustee of the fund. But even though Mr. Lukiewski seemingly knew substantially more about the case than Mr. Alston, he admitted that he had mostly learned about the substance of the litigation only in the week before his deposition,

7

and had devoted almost no time to the case before then.  Id., Exhibit B at 12, 19, 43-44, 74.

The Court will not be a party to this sham.  The foregoing events establish beyond a doubt that STA-ILA has no interest in, genuine knowledge of, and/or meaningful involvement in this case and is simply the willing pawn of counsel.  STA-ILA cannot remotely be relied upon to protect the interests of the class against the possibly competing interests of the attorneys.  Indeed, the entire set of events discussed above leaves the Court with the distinct impression that plaintiffs' counsel may not have fulfilled their professional responsibilities in proposing STA-ILA as a class representative.  In any event, the Court concludes that STA-ILA cannot qualify as a class representative.

No such inadequacy is apparent, however, in the case of the other lead plaintiff, Middlesex,[1] and therefore the Court proceeds to the requirements of Rule 23(b)(3).  As noted above, "[w]hen seeking to certify a class pursuant to Rule 23(b)(3), plaintiffs must meet the following two additional criteria: (1) questions of law or fact common to class members must predominate over any questions affecting individual members; and (2) the class action device must be superior to any other method of adjudication."  Vivendi, 242 F.R.D. at 83.[2]

---

[1] The Court does however believe that it would be helpful to have a second class representative, and if plaintiffs seek hereafter to name an additional class representative, the Court would not be adverse to considering such an application.

[2] Rule 23(b)(3) includes the following factors as relevant to these two inquiries: "(A) the class members' interests in individually controlling the prosecution or defense of separate

8

The first criterion, known as "predominance", "is a more demanding criterion than the commonality inquiry under Rule 23(a). Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002)(internal citation omitted).

The legal and factual questions common to the entire class have already been listed above. As also noted, Monster principally attacks commonality, and now predominance, on the ground that the proof as to the element of reliance is, allegedly, highly individualized in this case; but plaintiffs respond that this is not a genuine problem because they intend to principally rely, so far as reliance is concerned, on the fraud-on-the-market theory of Basic v. Levinson, in which reliance is presumed and individual reliance need not be proven.

When it comes to predominance, however, Monster argues, even more vigorously than it did with respect to commonality, that the Basic presumption is inapplicable because (1) the presumption is unavailable in options backdating cases, which "present highly unusual facts with respect to individual investor knowledge and

---

actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."

9

reliance," see Memorandum of Law of Defendant Monster Worldwide, Inc. in Opposition to Lead Plaintiff's Motion for Class Certification ("Monster Mem.") at 9, and (2) the Basic presumption presupposes materiality and plaintiffs have not shown that the misstatements at issue in this case were material.

As to the first argument, Monster points to the following public information about option backdating and argues that it is sufficient to preclude plaintiffs from relying on Basic:

1. On August 12, 2004, a senior auditor at the IRS stated in a CNBC broadcast that a "30-day look-back plan [] is even widespread in Silicon Valley and maybe throughout the country." Floyd Decl., Exhibit C.

2. As discussed supra, in May 2005, Professor Lie published a study hypothesizing that stock option awards were "timed ex post facto. That is, the grant date might be set to be an earlier date with a particularly low price." Id., Exhibit F at 810. The report eventually received substantial media coverage, with most of the articles speculating that companies could be improperly backdating stock option grants. Id., Exhibit G.

3. On November 2, 2005, Mercury Interactive Corporation announced that its senior officers had knowingly backdated the overwhelming majority of the company's stock option grants between 1996 and 2002. Id., Exhibit H. This announcement received substantial press. Id., Exhibit I. Over 200 of Monster's institutional investors during the Class Period were also shareholders of Mercury during the third quarter of 2005.

10

See Declaration of Jenny L. Floyd in Further Opposition to Lead Plaintiffs' Motion for Class Certification dated Apr. 25, 2008 ("Floyd Decl. 2"), Exhibit A.

4. On March 18, 2006, the Wall Street Journal published an article entitled "The Perfect Payday," suggesting that many companies may have engaged in stock option backdating. Floyd Decl., Exhibit J. The article specifically mentioned five companies by name: Mercury Interactive Corp., Analog Devices Inc., Brooks Automation Inc., Comverse Technology Inc., and Vitesse Semiconductor Corp. Id.

5. Some time around June 1, 2006, an analysis by Deutsche Bank began circulating that implicated Monster in possible options backdating. Id., Exhibit L.

According to Monster, if, as a result of any of this information, a putative class member knew of or suspected options backdating at Monster, then that member could not have relied on the alleged misrepresentations at issue and the Basic presumption would be unavailable. Putative class members who may have had this information, argues Monster, include employees who were granted stock options,[3] those employed by or affiliated with the 140 public companies other than Monster that were implicated in options

---

[3] Although Monster spills much ink over the knowledge of these employees, see, e.g., Monster Mem. at 12-13, the plaintiffs' motion for class certification specifically excludes "any current or former employees of the Company to the extent they acquired Monster's securities through exercise of stock options." See Notice of Motion for Class Certification dated February 15, 2008. Therefore, the argument is moot.

11

backdating, and institutional and other sophisticated investors in the proposed Class who "had the financial acumen and wherewithal to analyze the publicly available information regarding Monster and discover that the Company was backdating stock option grants." Monster Mem. at 14.

However, despite all of this speculation, Monster provides no direct evidence that any putative class member actually knew about option backdating at Monster before the scandal became public on June 12, 2006. This failure of Monster to produce evidence of a single class member who had actually figured out what Monster claims so many class members would have figured out is telling. Nor is this case remotely analogous to those where reliance arguments have defeated motions for class certification or precluded plaintiffs from relying on the Basic presumption. See, e.g., In Re IPO, 471 F.3d at 42; Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 2006 WL 2161887, *12 (S.D.N.Y. Aug. 1, 2006); McLaughlin v. Am. Tobacco Co., 522 F.3d 215, 224 (2d Cir. 2008). Here, in contrast to those cases, none of the public information regarding options backdating is so blatant and so directly addressed to Monster as to be facially sufficient to preclude plaintiffs from relying on the Basic presumption for purposes of this motion for class certification.

As to Monster's second argument -- that the alleged misstatements were immaterial and therefore cannot support a presumption of reliance under Basic -- this argument was raised for the first time at oral argument and so was waived in terms of this

12

motion. Even on the merits, however, it fails. It is true, of course, that the <u>Basic</u> presumption of reliance is based on the hypothesis that "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business." 485 U.S. at 241 (internal quotation marks omitted). In other words, the theory presupposes that the statements upon which reliance is presumed were material. <u>See</u> <u>id.</u> at 245-48; <u>Feinman v. Dean Witter Reynolds, Inc.</u>, 84 F.3d 539, 542 (2d Cir. 1996) ("the [<u>Basic</u>] presumption would apply only where the defendant has misrepresented or omitted a <u>material</u> fact") (emphasis in original). However, even though, as the Court previously found in connection with plaintiff's pre-discovery motion for summary judgment, there is a genuine jury issue as to whether the misrepresentations here at issue were material, <u>see</u> Memorandum Order dated 4/28/08 at 6-9, the Court, which is the fact-finder for the limited purpose of this motion for class certification, now concludes that there is a sufficient showing of materiality as to warrant the application of <u>Basic</u>, at least on the present record.[4]

In the context of a Section 10(b) claim, a statement is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made

---

[4] When the issue of materiality was raised by defendants at oral argument on this motion, both parties agreed that the Court should rely on the submissions made in connection with plaintiffs' pre-discovery motion for summary judgment to decide this point for purposes of class certification. <u>See</u> transcript 5/9/08 at 54.

available." Basic, 485 U.S. at 231-32 (internal quotation marks omitted). The primary misstatements on which Monster relies are those set forth in the Forms 10-Q and 10-K that Monster filed with the U.S. Securities and Exchange Commission ("SEC") between May, 2005 and February 16, 2006, of which the following is typical:

> Under APB 25, generally, no compensation expense is recognized in connection with the awarding of stock option grants to employees provided that, as of the grant date, all terms associated with the award are fixed and the quoted market price of the stock is equal to or less than the amount an employee must pay to acquire the stock as defined. As the Company has only issued fixed term employee stock option grants at or above the quoted market price on the date of the grant, there has been no compensation expense associated with stock options recognized in the accompanying financial statements.

See Declaration of Jonathan Gardner in Support of Lead Plaintiffs' Motion for Partial Summary Judgment dated Feb. 13, 2008 ("Gardner SJ Decl."), Exhibit 12.

On December 13, 2006, Monster effectively admitted the false and misleading quality of the second sentence by announcing a restatement of its financial statements as a result of improper accounting for $339.6 million in expenses associated with stock options granted between 1997 and 2003, id., Exhibit 5. In the announcement, indeed, Monster expressly stated that the improper accounting was the result of a false backdating of the dates on which the options were purportedly granted. Id. at 2.

The materiality of these concededly false misstatements in the 10-Qs and 10-K is evidenced, inter alia, by the following facts:

First, on June 12, 2006, the date on which Monster was first publicly implicated in the backdating scandal, Monster's stock price

declined a statistically significant $3.40 per share, or 8 percent. See Declaration of Candace L. Preston dated Feb. 12, 2008 ("Preston Decl.") ¶ 23; United States v. Bilzerian, 926 F.2d 1285, 1298 (2d Cir. 1991) (the movement of stock price is relevant to the question of materiality of statements made).

Second, when the Company thereafter restated its financials, it thereby tacitly acknowledged that the previous financial statements were materially misstated, since, under Generally Accepted Accounting Principles ("GAAP"), restatements are only required to correct material accounting errors, and Monster would have had little motive to restate if not required to do so under GAAP. In re Veeco Instruments, Inc. Sec. Litig., 235 F.R.D. 220, 234 (S.D.N.Y. 2006).

Third, Monster's independent auditor, BDO Seidman, LLP, publicly opined that Monster had "identified material misstatements in its annual financial statements, which caused such annual financial statements to be restated." Gardner SJ Decl., Exhibit 5 at 101 (emphasis supplied).

Fourth, because co-defendant McKelvey personally certified the false statements in this case, they can be seen as "impugn[ing] the integrity of management," which in itself would material to investors. See In re Comverse Tech., Inc. Sec. Litig., 2008 WL 495547, *14 (E.D.N.Y. Feb. 20, 2008); Siemers v. Wells Fargo & Co., 2007 WL 1140660, *8 (N.D. Cal. Apr. 17, 2007); Takara Trust v. Molex Inc., 429 F.Supp.2d 960, 978 (N.D. Ill. 2006).

Based on the combination of these facts alone, the Court has no hesitancy in concluding that materiality has been sufficiently
15

established at this stage to warrant the conclusion, for purposes of class certification, that plaintiffs may rely on the <u>Basic</u> presumption.

Finally, the Court must consider whether a class action is superior to other available methods of adjudication. Plaintiffs argue that "[g]iven the size and geographical dispersion of the proposed Class and the likelihood that many purchasers will have sustained comparatively small losses, this case presents exactly the sort of circumstances for which a class action is appropriate. The proposed Class consists of thousands of potential class members many of whom lack the resources to litigate their claims against Defendants on an individual basis given the issues involved, the number of potential witnesses, and the tremendous resources available to Defendants to defend this case." Pl. Mem. at 17. Defendants do not disagree and, as a general rule, securities fraud cases "easily satisfy the superiority requirement [as] [m]ost violations of the federal securities laws . . . inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible." <u>Darquea</u>, 2008 WL 622811 at *5. Therefore, the Court finds that the class action is the superior method of adjudication.

For all of these reasons, class certification is hereby granted, plaintiff Middlesex is approved as class representative, and plaintiff STA-ILA is disapproved as a class representative.

SO ORDERED.

_____
JED S. RAKOFF, U.S.D.J.

Dated:   New York, New York
         July 14, 2008