**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE MONSTER WORLDWIDE, INC. SECURITIES LITIGATION | 07-cv-02237 (JSR) |

**MEMORANDUM OF LAW IN SUPPORT OF THE**
**CLASS REPRESENTATIVE'S UNOPPOSED MOTION FOR**
**APPROVAL OF PROPOSED CLASS SETTLEMENT AND PLAN OF ALLOCATION**

**LABATON SUCHAROW LLP**

140 Broadway
New York, New York 10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477

*Class Counsel for Middlesex County Retirement*
*System as Class Representative and the Class*

**GOLDMAN SCARLATO & KARON, P.C.**

101 W. Elm Street, Suite 360
Conshohocken, PA  19428
Telephone:  (484) 342-0700
Facsimile:  (484) 342-0701

*Counsel for Middlesex County Retirement*
*System as Class Representative and the Class*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................... ii

PRELIMINARY STATEMENT ......................................................................1

THE COURT'S PRELIMINARY APPROVAL ORDER AND THE PRE-
HEARING NOTICE PROGRAM ...................................................................2

ARGUMENT ...............................................................................................5

I.    THE PROPOSED SETTLEMENT IS PROCEDURALLY AND
      SUBSTANTIVELY FAIR, ADEQUATE AND REASONABLE, AND
      SHOULD THEREFORE BE APPROVED ..........................................5

      A.    Under Prevailing Law, Class Action Settlements Should Be
            Approved If They Are Fair, Adequate and Reasonable............................5

      B.    The Settlement Is Entitled to a Presumption of Fairness Because It
            Is the Product of Arm's-Length Negotiations Among Experienced
            Counsel After Meaningful Discovery ......................................8

      C.    The Settlement is Substantively Fair, Adequate and Reasonable
            According to the *Grinnell* Factors ...........................................9

            1.    Continued Litigation Would Be Complex and Expensive, and
                  Could Last for Years ...................................................... 9

            2.    The Lack of Opposition to the Settlement and the Very Small
                  Number of Opt-Outs Support Final Approval ......................... 11

            3.    In View of the Amount of Discovery Completed, The Parties'
                  Decision to Settle Is Well Informed.......................................... 12

            4.    The Class Faced Significant Risks in Establishing Liability ................... 13

            5.    The Class Faced Risks in Establishing Damages ..................................... 17

            6.    The Settlement Amount is Reasonable in View of the Best Possible
                  Recovery and the Risks in this Litigation ................................. 18

II.   THE PLAN OF ALLOCATION IS FAIR AND REASONABLE AND
      SHOULD BE APPROVED .......................................................21

CONCLUSION......................................................................................23

# TABLE OF AUTHORITIES

## CASES

*In re Apollo Group, Inc. Securities Litigation,* No. CV 04-2147-PHX-JAT,
  2008 WL 3072731 (D. Ariz. Aug. 4, 2008) ............................................................16

*AUSA Life Ins. Co. v. Ernst & Young*,
  No. 00-9472, 2002 WL 1467546 (2d Cir. July 8, 2002) ........................................16

*Becher v. Long Island Lighting Co.*,
  64 F. Supp. 2d 174 (E.D.N.Y. 1999) ......................................................................9

*Carson v. American Brands, Inc.*,
  450 U.S. 79 (1981) ..................................................................................................7

*Cinelli v. MCS Claim Servs., Inc.*,
  236 F.R.D. 118 (E.D.N.Y. 2006) ..........................................................................13

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974) ............................................................................. passim

*In re Global Crossing Sec. & ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) ..................................................................... passim

*Gompper v. VISX, Inc.*,
  298 F.3d 893 (9th Cir. 2002) .................................................................................16

*Gordon Partners v. Blumenthal*,
  No. 02-7377, 2007 WL 431864 (S.D.N.Y. Feb. 9, 2007) ......................................18

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*,
  142 F.R.D. 588 (S.D.N.Y. 1992) ...........................................................................21

*Hicks v. Morgan Stanley & Co.*,
  No. 01 Civ. 10071 (RJH), 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) ...............10

*Howard v. Hui*,
  No. C-92-3742 CRB, 2001 WL 1159780 (N.D. Cal. Sept. 24, 2001) .....................16

*In re Initial Pub. Offering Sec. Litig.*,
  226 F.R.D. 186 (S.D.N.Y. 2005) .............................................................................9

*Klein ex rel. IRA v. PDG Remediation, Inc.*,
  No. 95 Civ. 4954 (DAB), 1999 WL 38179 (S.D.N.Y. Jan. 28, 1999) .....................10

*In re JDS Uniphase Corp. Sec. Litig.*,
  No. C-02-1486 CW (EDL), 2008 WL 753758 (N.D. Cal. Mar. 19, 2008) ...............16

*Joel A. v. Giuliani*,
  218 F.3d 132 (2d Cir. 2000)......................................................................................5

*Maley v. Del Global Techs. Corp.*,
  186 F. Supp. 2d 358 (S.D.N.Y. 2002).................................................................8, 16

*Marisol A. ex rel v. Giuliani*,
  185 F.R.D. 152 (S.D.N.Y. 1999), *aff'd sub nom.*
  *Joel A. v. Giuliani, 218 F.3d 132 (2d Cir. 2000)* ...................................................12

*In re Merrill Lynch & Co., Inc. Research Reports S*ec. Litig.,
  246 F.R.D. 156 (S.D.N.Y. 2007) ...........................................................................20

*In re Merrill Lynch Tyco Research Sec. Litig.*,
  249 F.R.D. 124 (S.D.N.Y. 2008) ...........................................................................19

*Miller v. Thane Int'l, Inc.*,
  372 F. Supp. 2d 1198 (C.D. Cal. 2005) ..................................................................16

*In re NASDAQ Market-Makers Antitrust Litig.*,
  187 F.R.D. 465 (S.D.N.Y. 1998) ...........................................................................11

*Newman v. Stein*,
  464 F.2d 689 (2d Cir. 1972)...................................................................................19

*In re Omnicom Group, Inc. Sec. Litig.*,
  541 F. Supp. 2d 546 (S.D.N.Y. 2008)....................................................................18

*In re PaineWebber Ltd. P'ships Litig.*,
  171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997) .................6, 17

*In re Prudential Ins. Co. Am. Sales Practices Litig.*,
  148 F.3d 283 (3d Cir. 1998)...................................................................................10

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*,
  No. 94 Civ. 5587, 2003 WL 21136726 (S.D.N.Y. May 15, 2003)....................11, 13

*Robbins v. Koger Props., Inc.*,
  116 F.3d 1441 (11th Cir. 1997)..............................................................................16

*Ross v. A.H. Robins Co.*,
  700 F. Supp. 682 (S.D.N.Y. 1988).........................................................................11

*Taft v. Ackermans*,
  No. 02 Civ 7951 (PKL), 2007 WL 414493 (S.D.N.Y. Jan. 31, 2007).......................6

*In re Telik, Inc. Sec. Litig.*,
  No. 07Civ. 4819 2008 WL 4198516 (S.D.N.Y. Sep. 10, 2008) ..............................19

*United States v. New York City Bd. of Educ.*,
   85 F. Supp. 2d 130 (E.D.N.Y. 2000), *vacated on other grounds,*
   *Brennan v. New York City Bd. of Educ., 260 F.3d 123 (2d Cir. 2001)*.......................................7

*In re Visa Check/MasterMoney Antitrust Litig.*,
   297 F. Supp. 2d 503 (E.D.N.Y. 2003) ......................................................................................5

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
   396 F.3d 96 (2d Cir. 2005)............................................................................................ passim

*Weil v. Long Island Sav. Bank*,
   188 F. Supp. 2d 258 (E.D.N.Y. 2002) ....................................................................................13

*Weinberger v. Kendrick*,
   698 F.2d 61 (2d Cir. 1982).......................................................................................................7

*Winkler v. NRD Mining, Ltd.*,
   198 F.R.D. 355 (E.D.N.Y. Mar. 31, 2000) ............................................................................16

## STATUTES

Fed. R. Civ. P. 23(e) .....................................................................................................................5

## OTHER AUTHORITIES

Stephanie Plancich, Brian Saxton & Svetlana Starykh,
   *Recent Trends in Shareholder Class Actions: Filings Return to 2005 Levels as*
   *Subprime Cases Take Off; Average Settlements Hit New High* (NERA Dec. 2007)................20

Laura E. Simmons & Ellen M. Ryan,
   *Securities Class Action Settlements:2007 Review and Analysis*
   (Cornerstone Research 2007)...................................................................................................20

## PRELIMINARY STATEMENT

Pursuant to Rules 23(e) of the Federal Rules of Civil Procedure, Middlesex County Retirement System ("Class Representative" or "Middlesex"), on behalf of itself and the certified class ("Class"), respectfully submits this memorandum of law in support of (1) final approval of the proposed settlement (the "Settlement") of this class action ("Action")[1] for $47.5 million with Monster Worldwide, Inc. ("Monster" or the "Company"), Andrew J. McKelvey ("McKelvey") and Myron Olesnyckyj ("Olesnyckyj") (collectively "Defendants" and, without Monster, the "Individual Defendants") under the terms set forth in the Stipulation and Agreement of Settlement executed on September 24, 2008, and (2) approval of the proposed plan for the allocation of the net proceeds of the Settlement (the "Plan of Allocation") set forth in the Notice of Pendency of Class Action and Proposed Settlement (the "Notice") disseminated to the members of the Class.

If approved, the proposed $47.5 million Settlement, which will return 27.5% of the alleged damages estimated by the Class, will completely resolve the Action and release all related claims.[2] This very favorable Settlement was reached after extensive arm's-length negotiations by experienced counsel who possessed a firm understanding of the parties' respective claims and defenses, with the assistance of an independent and impartial mediator experienced in resolving securities class actions. Since commencing this Action in March 2007,

---

[1] The Action alleges that Defendants violated Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder by issuing false and misleading periodic reports, which were filed with the Securities and Exchange Commission ("SEC") during the period from May 6, 2005 through June 9, 2006, inclusive (the "Class Period"), containing misstatements about the stock option grants issued by Monster and the compensation expenses recorded in a scheme to artificially inflate the value of Monster securities. The Individual Defendants, as control persons, are allegedly liable under Section 20(a) of the Exchange Act and McKelvey is alleged to have violated Section 20A of the Exchange Act when he sold shares of Monster during the Class Period.

[2] Notably, McKelvey contributed $550,000 to Settlement.

the Class Representative has diligently pursued its claims against Defendants.  By the time the Settlement was reached, the Class Representative had already: (i) conducted an extensive investigation of the claims asserted in the initial complaint and the Amended Class Action Complaint for Violation of the Federal Securities Laws, dated July 9, 2007 ("Amended Complaint"); (ii) thoroughly researched the applicable law with respect to the claims asserted; (iii) opposed Defendant McKelvey's two motions to dismiss; (iv) successfully obtained certification of the Action as a class action; (v) completed class discovery; (vi) analyzed more than 1,300,000 pages of documents produced by Defendants and non-parties; (vii) deposed six fact witnesses; (viii) moved for partial summary judgment; (ix) consulted with experts on damages to develop rigorous loss causation and class damages analyses; (x) produced two expert reports from damages and accounting experts; (xi) reviewed and analyzed four expert reports produced by Defendants on damages, accounting and materiality; and (xii) exchanged mediation statements and engaged in a two-day mediation, which led ultimately to the present Settlement.[3]

In view of the substantial recovery of estimated damages and the risks that the Class Representative would face in obtaining a greater recovery for the Class through continued litigation and trial, this Settlement constitutes an excellent result for the Class that should be approved by the Court as fair, reasonable and adequate.

## THE COURT'S PRELIMINARY APPROVAL
## ORDER AND THE PRE-HEARING NOTICE PROGRAM

In its Preliminary Approval Order Providing for Notice and Hearing in Connection With Proposed Class Action Settlement (the "Preliminary Approval Order"), entered October 8, 2008,

---

[3] For a full recitation of the procedural and litigation history of the Action, the Court is respectfully referred to the Arisohn Decl. The discussion of this history is not repeated here, given the Court's familiarity with the proceedings.

the Court, among other things, granted preliminary approval to the Settlement.  A copy of the Preliminary Approval Order is attached as Ex. 1 to the accompanying Declaration of Mark S. Arisohn, dated November 14, 2008 (the "Arisohn Decl.").[4]

The Court also approved the Notice, Proof of Claim form ("Proof of Claim") and Summary Notice of Pendency of Class Action and Hearing on Proposed Settlement ("Publication Notice"), upon finding that in form, substance and procedural mechanisms they satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure, the Private Securities Litigation Reform Act ("PSLRA"), and due process.  Dissemination of the Notice, Proof of Claim form and Publication Notice was accordingly ordered.  Copies of the printed notices and Proof of Claim form are attached as Exs. A and B to the Affidavit of Michael Rosenbaum, dated November 12, 2008 ("Rosenbaum Aff.").  (*See* Arisohn Decl. Ex. 2.)  The Court also approved Berdon Claims Administration LLC as the Claims Administrator, subject to ongoing monitoring by counsel, and set a hearing for November 21, 2008 (the "Settlement Hearing") to consider the fairness, reasonableness and adequacy of the Settlement and the Plan of Allocation.

In compliance with the Preliminary Approval Order, under the supervision of counsel,[5]

---

[4] All exhibits referenced in Middlesex's submissions in connection with approval of the Settlement are annexed to the Arisohn Decl.  For clarity, citations to exhibits that themselves have attached exhibits, will be referenced as "Ex. ___ - ___."  The first numerical reference refers to the designation of the entire exhibit attached here and the second reference refers to the designation within the exhibit itself.

[5] In addition to frequent telephone conferences and email communications with Class Counsel, Berdon has sent counsel for both sides weekly status memoranda summarizing specific data points to chart the progress of the notice program.  Accordingly, counsel have been able to monitor the: (1) number of notice packets mailed by Berdon; (2) number of brokers/nominees who provided names and addresses of potential class member to Berdon for mailing of notice packets; (3) number of names with addresses provided by brokers/nominees; (4) number of brokers/nominees who made requests for notice packets in bulk so that they could do the mailing; (5) number of notice packets requested by brokers/nominees; (6) notice packets requested directly by potential class members; (7) notice packets re-mailed to an updated address; (8) notice packets returned as undeliverable; (9) number of exclusions requested; and (10) number of claims filed. Arisohn Decl. ¶ 12.

the Claims Administrator mailed copies of the Notice and Proof of Claim to all members of the Class who could be reasonably identified (including more than a thousand institutional investors who owned Monster securities during the Class Period for their own benefit)[6] and known brokers/nominees who may have purchased Monster securities for the beneficial interest of individual investors.  *See* Arisohn Decl. Ex. 2 ¶¶ 3-7.  To date, the Claims Administrator has mailed 115,591 notice packets containing the Notice and Proof of Claim forms to potential Class Members and brokers/nominees who requested notice packets so that they could forward them to potential Class Members.  *Id.* ¶ 7.

In addition, the Publication Notice was published in *Investor's Business Daily* and transmitted over *Business Wire* on October 17, 2008.  *Id.* ¶ 9.  The Publication Notice served to inform potential Class Members of the general nature of the Settlement and the method for obtaining the Notice and Proof of Claim.  The notices and Proof of Claim form were also posted on Class Counsel's website and the Claims Administrator's website for easy downloading by interested investors.  Arisohn Decl. ¶ 11.

The Notice describes, *inter alia*, the claims asserted in this Action, the contentions of the parties, the course of litigation, the terms of the Settlement, the Plan of Allocation, and the right to object and procedures for objecting to the Settlement and/or the Plan of Allocation.  The Notice also advises Class Members of the scheduled Settlement Hearing, and of Class Counsel's intention to seek an award of attorneys' fees of twenty-five percent (25%) of the Settlement Fund, and reimbursement of expenses not to exceed $620,000, plus interest.  In addition, the Notice informed Class members that the Class Representative may also seek an award of up to $25,000 for its reasonable costs and expenses, pursuant to the PSLRA.

---

[6] The Class's damages consultant who developed the Plan of Allocation estimated that more than half of the allegedly damaged shares were owned by institutions.  Arisohn Decl. ¶ 13.

In response to this extensive notice program, no timely or valid objections to the Settlement, the Plan of Allocation, or the proposed award of fees and expenses, have been filed or received.[7]  Arisohn Decl. ¶ 82.  This absence of objection is particularly compelling here, where such a large proportion of the Class is made up of institutions.

For all these reasons, as discussed below and in the accompanying declarations and affidavits, Middlesex as Class Representative respectfully requests that the Court enter (1) the proposed Final Order and Judgment, which was an exhibit to the Stipulation, and (2) the proposed Order Approving Plan of Allocation, both in the forms submitted herewith.

## ARGUMENT

**I.    THE PROPOSED SETTLEMENT IS PROCEDURALLY AND SUBSTANTIVELY FAIR, ADEQUATE AND REASONABLE, AND SHOULD THEREFORE BE APPROVED**

### A.    Under Prevailing Law, Class Action Settlements Should Be Approved If They Are Fair, Adequate and Reasonable

A settlement of claims brought by a certified class is subject to approval by the Court after reasonable notice and a hearing.  Fed. R. Civ. P. 23(e).  A settlement will be approved if it is "fair, adequate, and reasonable, and not a product of collusion."  *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (internal quotation marks omitted).

This determination falls within a court's sound discretion.  *See Joel A. v. Giuliani*, 218 F.3d 132, 139 (2d Cir. 2000); *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503, 509 (E.D.N.Y. 2003).  In exercising such discretion, a court should be mindful of the

---

[7] On November 13, 2008, after the November 7, 2008 deadline for objections, Middlesex received by email an "objection" criticizing class actions in general, the payment of class action attorney fees as a whole and characterizing such litigation as an unfair redistribution of losses.  *See* Arisohn Decl. Ex. 4.   Nothing in the email is addressed to the merits of this Settlement or the fee request.  There is also nothing to indicate that the author is a class member and he did not serve his objection on counsel or file it with the Court, as was required by the Notice.

"strong judicial policy in favor of settlements, particularly in the class action context." *Wal-Mart*, 396 F.3d at 116 (quoting *In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998)) (internal quotation marks omitted); *see Taft v. Ackermans*, No. 02 Civ 7951 (PKL), 2007 WL 414493, at *4 (S.D.N.Y. Jan. 31, 2007) (same); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 455 (S.D.N.Y. 2004) ("[F]ederal courts favor settlement, especially in complex and large-scale disputes, so as to encourage compromise and conserve judicial and private resources. Accordingly, this Court will take into consideration such public policy concerns in exercising its discretion.") (citations omitted); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 209 (S.D.N.Y. 1995) ("There is an overriding public interest in settling and quieting litigation, and this is particularly true in class action suits.") (citations omitted).

A court determines the fairness of a settlement by looking at both its terms and the negotiation process leading up to it. *See Wal-Mart*, 396 F.3d at 116. With respect to process, a class action settlement enjoys a strong "presumption of fairness" where it is the product of arm's-length negotiations conducted by experienced, capable counsel after meaningful discovery. *Id.*; *see also Global Crossing*, 225 F.R.D. at 461.

With respect to the substantive terms of a settlement, the standards governing approval are well-established. Courts in this Circuit examine the fairness, adequacy and reasonableness of a class action settlement utilizing the "*Grinnell* factors," to the extent they are applicable:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation.

*Wal-Mart*, 396 F.3d at 117 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 454 (2d Cir. 1974)) (citations omitted).

To support a finding that a settlement is fair, not every factor must weigh in favor of the settlement, but "rather the court should consider the totality of these factors in light of the particular circumstances." *Global Crossing*, 225 F.R.D. at 456 (quoting *Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003)).[8]

Moreover, in applying the *Grinnell* factors, a court should not substitute its judgment for those of the parties who negotiated the settlement, or conduct a "mini-trial" of the merits of the action. *See Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982); *see also*, *Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981) ("Courts judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement … . They do not decide the merits of the case or resolve unsettled legal questions."). "[T]he essence of a settlement agreement is compromise. … a yielding of absolutes and an abandoning of highest hopes." *United States v. New York City Bd. of Educ.*, 85 F. Supp. 2d 130, 157 (E.D.N.Y. 2000), *vacated on other grounds*, *Brennan v. New York City Bd. of Educ.*, 260 F.3d 123 (2d Cir. 2001) (internal quotation marks omitted). As such, a court must assess the settlement as presented, without modifying its terms and without substituting its "business judgment for that of counsel, absent evidence of fraud or overreaching." *Global Crossing*, 225 F.R.D. at 455 (citation omitted).

Middlesex submits that the proposed Settlement is eminently fair, reasonable, and adequate when measured under the relevant criteria. All parties have thoroughly weighed the strengths and weaknesses of the claims and defenses and, after extensive litigation efforts and

---

[8] Here, the ability of Monster to withstand a full judgment was not an issue in negotiating the Settlement.

negotiations facilitated by an independent and experienced mediator, have reached an informed and carefully crafted compromise.

**B.      The Settlement Is Entitled to a Presumption of Fairness
Because It Is the Product of Arm's-Length Negotiations
<u>Among Experienced Counsel After Meaningful Discovery</u>**

As noted above, a strong presumption of fairness attaches to a class action settlement reached in arm's-length negotiations among able counsel after meaningful discovery. *See Wal-Mart*, 396 F.3d at 116.  Moreover, "'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation." *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 366 (S.D.N.Y. 2002) (citation omitted).

A presumption of fairness is appropriate here.  As is discussed in detail in the Arisohn Decl. ¶¶ 32-68, by the time the parties began negotiating the Settlement, Middlesex had opposed two motions to dismiss, moved for partial summary judgment, completed class discovery, had the Class certified and completed a substantial amount of fact discovery, including the review and analysis of 1.3 million pages of documents and the depositions of six fact witnesses. Although expert discovery was not completed, the parties had exchanged six expert reports and Class Counsel had spent considerable time consulting with experts in formulating their litigation strategy.  After briefing the dispositive motions, completing this discovery, exchanging mediation submissions, the parties participated in two days of intense mediation before a highly experienced, impartial and independent mediator, Jonathan Marks.  Thus, at the time the agreement in principle was reached, Middlesex and Class Counsel were fully aware of the strengths and weaknesses of the claims and the potential for a recovery greater than that achieved by the Settlement.

Mediator Jonathan Marks' active supervision and facilitation of the parties' negotiations strongly supports a presumption that the Settlement is fair.  *See In re Initial Pub. Offering Sec.*

*Litig.*, 226 F.R.D. 186, 194 & n.42 (S.D.N.Y. 2005) (where negotiations were facilitated by former judge, settlement was "clearly the result of arm's-length bargaining"); *Becher v. Long Island Lighting Co.*, 64 F. Supp. 2d 174, 181 (E.D.N.Y. 1999) (approving settlement facilitated by an "arms-length negotiations before a respected neutral mediator").

There is no question, moreover, that collusion played no part in reaching this Settlement. Indeed, counsel for both sides were determined and zealous in their representation of their clients; even with the two Individual Defendants facing criminal proceedings arising out of the conduct complained of, counsel for the Defendants vigorously put Class Counsel to their proof for each element of each violation alleged. Middlesex's aggressive motion for partial summary judgment at such an early stage in the Action, arguing that liability was established by the criminal proceedings and Monster's December 13, 2006 restatement ("Restatement"), was robustly opposed by Defendants and largely denied by the Court. That the parties were represented by zealous and well-experienced counsel, as has been recognized by the Court, is not subject to meaningful dispute and is a further consideration in support of the Settlement. *See Global Crossing*, 225 F.R.D. at 461 (approving a settlement upon finding that "[b]oth sides have been represented well … Counsel for plaintiffs, the Settling Defendants, and STB possessed the requisite expertise to negotiate a fair settlement."). Therefore, the Court should accord a presumption of fairness to the Settlement in considering the substantive *Grinnell* factors discussed below.

### C.    The Settlement is Substantively Fair, Adequate and Reasonable According to the *Grinnell* Factors

#### 1.    Continued Litigation Would Be Complex and Expensive, and Could Last for Years

This litigation was challenging and complex, and vigorously prosecuted and defended. Without the Settlement, the prosecution of this Action would require additional large

expenditures over an extended period, after which the Class might obtain a result far less beneficial than the one provided by the Settlement.  *See In re Prudential Ins. Co. Am. Sales Practices Litig.*, 148 F.3d 283, 318 (3d Cir. 1998) (settlement favored where "trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court").

 If this case were to proceed to trial, the parties would have to expend additional substantial resources in completing fact and expert discovery, resolving disputed discovery and evidentiary questions in pretrial motions, resolving another round of summary judgment motions and conducting the trial itself, which was slated to last four weeks.  The jury would be called upon to appreciate and assimilate intricate facts and theories to understand the nexus between the Defendants' options-backdating conduct, the alleged securities laws violations and the Class's injury.  Accordingly, at any trial of this Action, a favorable outcome for the Class was far from assured.

 Moreover, in light of the vigorously contested nature of the case and the relative novelty of the issues, a judgment favorable to the Class would undoubtedly have been the subject of post-trial motions and appeals.  Even if the Class were ultimately to prevail, any appeal would substantially delay payments to Class Members.  By contrast, the Settlement offers the Class the certainty of a prompt payout from the Settlement Fund.  *See Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071 (RJH), 2005 WL 2757792, at *6 (S.D.N.Y. Oct. 24, 2005) ("Further litigation would necessarily involve further costs [and] justice may best be served with a fair settlement today as opposed to an uncertain future settlement or trial of this action."); *Klein ex rel. IRA v. PDG Remediation, Inc.*, No. 95 Civ. 4954 (DAB), 1999 WL 38179, at *2 (S.D.N.Y. Jan. 28, 1999) (considering complexity, expense and duration of litigation, settlement that "offer[ed]

Class members the benefit of immediate recovery as opposed to an uncertain award several years from now" was preferred outcome).  Accordingly, the first *Grinnell* factor favors approval.

**2.      The Lack of Opposition to the Settlement and the Very
          Small Number of Opt-Outs Support Final Approval**

As of the filing of these submissions, despite the dissemination of more than 115,000 notice packets, no Class Member has objected substantively to the Settlement.  The only criticism received to date is the untimely and invalid November 13 email to Middlesex, which did not raise *any* issue concerning the merits of this Settlement. Arisohn Decl. ¶ 82; Ex. 4. "'[T]he absence of objectants may itself be taken as evidencing the fairness of a settlement'. " *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587, 2003 WL 21136726, at *1 (S.D.N.Y. May 15, 2003) (*citing Ross v. A.H. Robins Co.*, 700 F. Supp. 682, 684 (S.D.N.Y. 1988)); *see also City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974) (approving settlement where only 20 objectors appeared from group of 14,156 claimants); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 478-80 (S.D.N.Y. 1998) (approving settlement where "miniscule" percentage of the class objected).

In addition, both the Notice and Summary Notice advised members of the Class of their right to a request exclusion from the Class.  To effect their exclusion, the Notice instructed that a valid written request be submitted to the Claims Administrator so that it was postmarked on or before November 7, 2008.  To date, only three timely requests for exclusion have been received. Arisohn Decl. Ex. 2-C.  (To date, no untimely requests have been received.)  One of the requests was mailed by a non-Class Member and is therefore invalid.  However, Middlesex requests that if the Court approves the Settlement, all of these exclusion requests be allowed, as set forth in Exhibit A to the Final Order and Judgment submitted herewith.

In addition to the immaterial number of objections and exclusion requests, the reaction of the Class is also persuasive because no institutional investor has objected to the Settlement. Accordingly, this overwhelmingly favorable response is a powerful indication that the Settlement is fair and adequate and the second *Grinnell* factor favors approval.

### 3.   In View of the Amount of Discovery Completed, The Parties' Decision to Settle Is Well Informed

Courts consider the stage of the proceedings and the amount of discovery completed to assess whether the parties had sufficient information to make informed decisions with respect to settlement. *See Marisol A. ex rel v. Giuliani*, 185 F.R.D. 152, 163 (S.D.N.Y. 1999), *aff'd sub nom. Joel A. v. Giuliani*, 218 F.3d 132 (2d Cir. 2000).  Here, there can be no question that Middlesex and Class Counsel agreed to mediate, and later entered into the Settlement, only after developing a thorough understanding of the strengths and weaknesses of the claims asserted in the Action.

As detailed in the Arisohn Decl. (¶¶ 53-54), prior to the commencement of formal discovery, counsel conducted an extensive investigation to, among other things, locate and interview numerous former Monster employees.  Even before McKelvey's motion to dismiss was decided, Monster electronically produced core non-privileged documents that it had produced to the SEC.  Thereafter, Middlesex served document requests on each of the Defendants and served more than 30 additional document subpoenas on non-parties, including Monster's outside auditor, financial analysts and former Monster employees.  Overall, approximately 1.3 million pages of documents were produced to the Class and reviewed by Class Counsel by the time the Settlement was reached.  Moreover, depositions of Monster employees, former Monster employees (including Defendant McKelvey), and the investment advisor who invested in Monster securities on behalf of Middlesex during the Class Period, were taken by the

time the Settlement was reached.  The parties also propounded interrogatories and requests for admission.  Arisohn Decl. ¶¶ 55-61.

Middlesex's and Class Counsel's understanding of the claims was further informed by the briefing on McKelvey's two motions to dismiss, Middlesex's motion for partial summary judgment and on Middlesex's motion for class certification, as well as the mediation submissions exchanged by the parties and the mediation itself.  Arisohn Decl. ¶¶ 37-52, 69-71.  Accordingly, Middlesex and Class Counsel had a very well-founded understanding of the merits of the claims warranting approval of the Settlement.  *See Global Crossing*, 225 F.R.D. at 458 (plaintiffs "had the requisite information to make informed decisions about the relative benefits of litigating or settling" where they reviewed documents concurrently with settlement discussions); *RMED Int'l*, 2003 WL 21136726, at *1 ("[c]onsidering the stage of the proceedings, both sides and the Court are well apprised of the facts and the law involved and therefore are able to make an intelligent decision about the settlement value"); *Weil v. Long Island Sav. Bank*, 188 F. Supp. 2d 258, 263-64 (E.D.N.Y. 2002) (settlement approved where plaintiffs in a position to make "an educated evaluation of the relative strengths and weaknesses of the parties' cases").  The Class Representative's fully informed decision to enter into the Settlement favors approval.

### 4. The Class Faced Significant Risks in Establishing Liability

In analyzing the risks concerning liability, the Court need not "decide the merits of the case or resolve unsettled legal questions."  *Cinelli v. MCS Claim Servs., Inc.*, 236 F.R.D. 118, 121 (E.D.N.Y. 2006) (quoting *Marisol A.*, 185 F.R.D. at 164).  Rather, the Court weighs the likelihood of success on the merits against the relief brought by the Settlement.  *Id.*  Courts routinely approve settlements where plaintiffs would have faced significant legal and factual obstacles to establishing liability.  *See Global Crossing*, 225 F.R.D. at 459.

This Action presented significant risks given the relatively novel nature of the fraud here at issue: to Class Counsel's knowledge, no civil options backdating case has proceeded to trial to date. Issues of proof in such a case are complicated by the fact that the fraud alleged is at its crux a violation of an accounting rule, APB No. 25, which might not be understood easily by a jury, although the concept of backdating for financial gain would be. Other difficulties in trying this case before a jury include demonstrating the link between the nature of the legal violation – the misrepresentation of Monster's financial condition to investors – and the alleged conduct of backdating options. In addition, the link between the backdating of options and the detrimental effect of that conduct years later as the options vested may also prove opaque to a jury.

Proving Defendants' scienter to the jury would also have posed difficulties for the Class, which would arguably need to show that Defendants not only knew about the options backdating, but that they were intentionally or recklessly understating Monster's compensation expenses. The jury would be confronted with much contrary testimony from both fact and expert witnesses about the meaning of the documentary evidence, the criminal proceedings and Monster's Restatement. Defendant and former CEO McKelvey was also likely to try to convince the jury that he was a hands-off manager and that he relied upon Monster's General Counsel Olesnyckyj, and others with more accounting knowledge, to advise him on accounting rules and the stock option granting process. Arisohn Decl. ¶¶ 37-39, 42, 81. Given McKelvey's poor health and age, the jury could have sympathized with him. Defendants also contended that some of the alleged misstatements were in fact true at the time they were made, inasmuch as the options backdating practices had been discontinued by the time the Class Period began. *Id.* ¶ 40. Overall, the jury would have been confronted with conflicting testimony as to precisely what disclosures were required and what the Defendants' intentions were.

In addition, materiality and reliance would have been the focus of much disputed and conflicting evidence.  Arisohn Decl. ¶¶ 40-43, 50-51, 62-66.   In opposing summary judgment and class certification, Defendants and their experts opined, and would likely offer testimony at trial, that as a non-cash item, compensation arising from in-the-money backdated option grants was not material to investors and was regularly ignored by investors.[9]  They also would have presented testimony that Monster's stock price moved as a consequence of "collateral" issues, not the alleged backdating or undisclosed compensation expenses. The Class Representative would have had to persuade the jury that even non-cash items, such as compensation arising from in-the-money backdated option grants, can be material to investors and was material to Monster's investors, which it believed it could do.  However, a parade of experts and prominent investors saying the opposite created a risk to recovery.

It was also very likely that Defendants would have continued to present opinion testimony and evidence at trial challenging investors' reliance upon the alleged misstatements. Arisohn Decl. ¶¶ 51, 78.  In particular, Defendants asserted that media reports revealing the prevalence of options backdating as a practice throughout public companies put sophisticated investors on notice that they could not rely upon companies' statements concerning their options policies.  If this theory had traction with the jury, it could not only have undermined the Class's ability to establish its claims, but it could have caused decertification of the Class.[10]

---

[9] To do so, Defendants submitted an expert report by Robert Glenn Hubbard, a professor and Dean of the Graduate School of Business of Columbia University, visiting scholar at the American Enterprise Institute, an advisor to the President of the Federal Reserve Bank of New York and a former Chairman of the President's Council of Economic Advisors. They also submitted a report by John W. Peavy III, the former Chief Investment Officer of the Teacher Retirement System of Texas and the Chief Investment Officer and CEO of a registered investment advisor that manages more than $1 billion in assets.  Arisohn Decl. ¶ 62.

[10] This risk of decertification also shows that the sixth *Grinnell* factor weighs in favor of the Settlement.

An additional consideration is that much of the Class's evidence would have come from documents produced by Monster itself.  At trial the Class Representative would be reliant upon hostile witnesses to introduce this key evidence.

Overall, there was a significant risk that a jury could have found for the Defendants at trial on any number of elements of liability, notwithstanding the Class Representative's and Class Counsel's belief that strong evidence of the alleged fraud could be marshaled for the jury. There was also a further risk that any finding for the Class would have been overturned on appeal.  Numerous cases continue to demonstrate the enormous risks associated with prosecuting securities class actions.[11]

Given the uncertain prospects of success at trial, and on any appeal, settlement at this time is highly beneficial to the Class.  If the Court declines to approve the Settlement and Defendants obtain summary judgment or a favorable verdict, the Class will be left with no recovery after years of additional proceedings.  The Settlement, however, will provide tangible and certain relief to the Class now, and "without subjecting them to the risks, complexity, duration and expense of continuing litigation."  *Global Crossing*, 225 F.R.D. at 456-57; *see also*, *Maley*, 186 F. Supp. 2d at 362 ("Settlement at this juncture results in a substantial and tangible

---

[11]   Earlier this year, a jury verdict for the plaintiffs was overturned by the trial court on loss causation grounds in *In re Apollo Group, Inc. Securities Litigation*, No. CV 04-2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), and several months before that, a jury returned a defense verdict in *In re JDS Uniphase Corp. Sec. Litig.*, No. C-02-1486 CW (EDL), 2008 WL 753758 (N.D. Cal. Mar. 19, 2008).  *See also Miller v. Thane Int'l, Inc.*, 372 F. Supp. 2d 1198 (C.D. Cal. 2005) (defense verdict after bench trial); *Gompper v. VISX, Inc.*, 298 F.3d 893, 898 (9th Cir. 2002) ((defense verdict following trial); *AUSA Life Ins. Co. v. Ernst & Young*, No. 00-9472, 2002 WL 1467546 (2d Cir. July 8, 2002) (affirming district court's dismissal after a full bench trial); *Winkler v. NRD Mining, Ltd.*, 198 F.R.D. 355 (E.D.N.Y. Mar. 31, 2000) (granting defendants' motion for judgment as a matter of law after jury verdict for plaintiffs); *Howard v. Hui*, No. C-92-3742 CRB, 2001 WL 1159780 (N.D. Cal. Sept. 24, 2001) (dismissal of claims with prejudice against 3 of 4 remaining defendants by district court, and defense verdict for the fourth defendants following successful appeal of district court's ruling for defendants as matter of law); *Robbins v. Koger Props., Inc.,* 116 F.3d 1441 (11th Cir. 1997) (jury damages award of over $81 million for plaintiffs reversed on appeal for failure to prove loss causation).

present recovery, without the attendant risk and delay of trial.  These factors weigh in favor of the proposed Settlement.").

**5.**     **The Class Faced Risks in Establishing Damages**

Almost invariably, damages issues in securities litigation are reduced to a "battle of the experts," which could lead the jury in this Action to minimize or eliminate the Class's proffered losses.  *See In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997) (noting unpredictability of outcome of a battle of damage experts), *aff'd*, 117 F.3d 721 (2d Cir. 1997).  In their expert reports, Defendants' damages experts, Dean Hubbard and John D. Montgomery, Ph.D., a Vice President with National Economic Research Associates, Inc. and a former economist for the President's Counsel of Economic Advisers, the International Monetary Fund and the Board of Governors of the Federal Reserve System, collectively opined that the Class could not establish loss causation or damages in the Action.  Arisohn Decl. ¶¶ 63-66.

Specifically, Montgomery was prepared to testify that the alleged options backdating disclosures on June 12 and 13th had no statistically significant net impact on Monster's stock price and hence the Class did not suffer any loss.  He stated that the Class's expert incorrectly excluded a positive and statistically significant price increase and market correction on June 14, 2006 that would have reduced per share damages from $3.71 to a statistically insignificant $0.74 – an 80% reduction.  He also opined that a positive price reaction on July 12, 2006 to an announcement about Monster's restatement plans must be considered a recovery, reducing any purported damages to zero.  With respect to loss causation, Montgomery also concluded that the alleged stock declines were due to factors collateral to the options backdating disclosures, i.e. the consequences of the backdating (the costs of an investigation, the distraction of management, the threat of a restatement etc.) not the undisclosed compensation expenses or the backdating itself.  *Id*. ¶ 65.

17

Dean Hubbard reported that understated compensation expenses did not influence the stock price during the Class Period, in part because of his finding that the financial statements provided detailed information about Monster's historical option grants.  He also opined that the alleged disclosures only provided limited information about the backdating by June 13 and that this news was mitigated by subsequent disclosures, such as the Restatement.  *Id*. ¶ 66.

Middlesex and Class Counsel strongly believed that damages could be established.  The Class served Defendants with an expert report on damages by Gregg A. Jarrell, a professor at the University of Rochester's William E. Simon Graduate School of Business Administration.  *Id*. ¶ 67-68.  Professor Jarrell found damages to the Class arising from the alleged disclosures on both June 12 and 13th and statistically significant negative stock price movement, in the amount of $3.71 per share.  He based his opinion on a detailed event study that analyzed all information about Monster's stock available to the market and screened out unrelated factors, such as general market movement and industry specific news.

However, at summary judgment or trial the arbiter could have heard this testimony, even assuming liability was proven, and credited Defendants' experts over those of the Class to determine that the Class suffered no (or substantially less) recoverable damages.  *See, e.g., Gordon Partners v. Blumenthal*, No. 02-7377 (LAK) (AJP), 2007 WL 431864 (S.D.N.Y. Feb. 9, 2007) (granting motion for summary judgment for, *inter alia*, failure to demonstrate loss causation); *In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp.2d 546, 554 (S.D.N.Y. 2008) (same). This *Grinnell* factor strongly favors approval of the Settlement.

> **6.    The Settlement Amount is Reasonable in View of the
>        Best Possible Recovery and the Risks in this Litigation**

The eighth and ninth *Grinnell* factors also strongly weigh in favor of approving the Settlement.  The $47.5 million recovery represents approximately 27.5% of the aggregate

damages estimated by the Class's non-testifying damages expert, based on the findings of Professor Jarrell.  The analysis estimates that Defendants' alleged violations resulted in class-wide damages to shareholders and option purchasers of approximately $172,600,000.  Arisohn Decl. ¶ 5.  The Settlement is a very significant recovery that falls well within the range of reasonableness when weighing the best possible recovery and all the risks of proceeding with the Action.  *See Wal-Mart*, 396 F.3d at 119 ("there is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion") (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

As noted above, Defendants would vigorously dispute this quantification of the damages suffered by the Class and believed damages to be either zero or 80% less that that estimated by Professor Jarrell.  Arisohn Decl. ¶¶ 64-66.  Obviously, the Settlement represents significantly more than Defendants estimated.

With respect to the size of the recovery, in *In re Telik, Inc. Sec. Litig.*, No. 07 Civ 4819 2008 WL 4198516, *7 (S.D.N.Y. Sep. 10, 2008), the court found that the settlement amount, at 25% of claimed damages, represented "a percentage well above that in most securities class actions."  For comparison, it is worth noting the recent approval of a $4.9 million securities class action settlement, representing about three percent of plaintiffs' claimed damages, in *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 135 (S.D.N.Y. 2008).  In granting approval of the settlement, which gave class members about a tenth of what the Monster Class will receive, whether measured by absolute dollars or percent of claimed damages, the court noted that "the estimated recovery of three percent of the total damages estimated by the plaintiffs, does not meaningfully diverge from the range of reasonableness for settlements of

19

similarly-sized securities class actions." *See also In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 246 F.R.D. 156, 167 (S.D.N.Y. 2007) (approving a settlement that provided the class with a $125 million settlement fund, amounting to between 3 and 7% of plaintiffs' estimated damages, as well within the range of reasonableness for a large securities class action).

To further put the significance of the recovery into perspective, the most recent annual study by Cornerstone Research[12] found that where estimated damages were in the range of $126 million to $500 million, the median settlement amount represented 3.5 percent of the "plaintiffs' style" damages for cases settled in 2007 and 3.2 percent for cases settled during the period 1996-2006. *See* Cornerstone Research, *Securities Class Action Settlements: 2007 Review and Analysis*, at 6, Arisohn Decl. Ex. 5. The report also found that the median of all settlements was $9 million in 2007 and $6.9 million during the period 1996-2006. *Id.* at 2. (The Cornerstone report also indicates that through 2007, cases litigated by Labaton secured the highest median percentages of recovery among other major firms. *Id*. at 14.) A recent study by NERA Economic Consulting, Dr. Montgomery's firm, reported that between 2002 and 2007 the median settlement amount in securities fraud class actions was $6.8 million and the median in 2007 was $9.6 million. In 2007, the median ratio of settlements to investor losses in shareholder class actions was 2.4%. *See* Stephanie Plancich, Brian Saxton & Svetlana Starykh, *Recent Trends in Shareholder Class Actions: Filings Return to 2005 Levels as Subprime Cases Take Off; Average Settlements Hit New High* (NERA Dec. 2007), Arisohn Decl. Ex. 6 at 13-14.

Viewed in light of the significant risks discussed above and in the Arisohn Decl. ¶¶ 74-81, the Settlement clearly represents an excellent result for the Class. There is no certainty in

---

[12] In addition to providing expert testimony and financial analysis, Cornerstone, together with Stanford Law School, cosponsors the Securities Class Action Clearinghouse, a leading source of data and analysis on federal securities fraud class action litigation. *See* http://securities.stanford.edu/.

litigation and few cases tried before a jury result in an award of the full amount of damages claimed.

In sum, Middlesex and Class Counsel submit that the Settlement is eminently fair, adequate and reasonable in light of the best possible recovery and all of the risks of litigation, and should be approved.  The last two *Grinnell* factors clearly weigh in favor of approval.

## II.     THE PLAN OF ALLOCATION IS FAIR AND REASONABLE AND SHOULD BE APPROVED

"When formulated by competent and experienced class counsel," a plan for allocation of net settlement proceeds "need have only a reasonable, rational basis."  *Global Crossing*, 225 F.R.D. at 462 (citation omitted).  A reasonable plan may consider the relative strength and values of different categories of claims.  *Id.*; *see also In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 595-96 (S.D.N.Y. 1992) (plan of allocation that distributes greater part of settlement proceeds to those most injured is reasonable).

Plaintiffs respectfully submit that the Plan of Allocation for the Settlement Fund, fully described in the Notice, also should be approved as it provides a fair and equitable method of dividing the Settlement Fund among Class Members who submit timely and valid Proof of Claim forms ("Authorized Claimants"), consistent with governing law.  As clearly set forth in the Notice, at 10-12, Class Members were informed that they had an opportunity to object to the Plan of Allocation no later than November 7, 2008.  Arisohn Decl. Ex. 2-A.  To date, Middlesex and Class Counsel are aware of no such objections.  Arisohn Decl. ¶ 82; Ex. 4 .

The Plan of Allocation is predicated on: (1) the Supreme Court's decision in *Dura Pharmaceuticals* and its progeny; and (2) the specific timing of the alleged corrective disclosures on June 12 and 3, 2006.  In addition, it was developed by the Class's non-testifying damages expert, based on the findings of Professor Jarrell. Arisohn Decl. ¶ 85.  As explained in the

Notice, the Plan of Allocation apportions the recovery among Class Members who purchased or acquired Monster's common stock, call options and put options.

The Plan of Allocation reflects an assessment, relying on the assistance of experts, of the damages that may have been recovered from each alleged stock drop (those on June 12 and 13), had liability been successfully established.   The Plan distributes the recovery according to when Class Members acquired or sold their Monster securities—taking into account the statistical significance of each of the stock drops and the strength of potential claims.  Arisohn Decl. ¶ 87.

For instance, Class Members who sold their common stock before the first corrective disclosure on June 12, 2006 will not recover.  Class Members who bought common stock during the Class Period and sold after June 9, 2006, but before the close of business on June 12, 2006, thus suffering from only some of the disclosures, will receive a recovery, but less than Class Members who retained their stock past the stock drop on June 13, 2006.  Arisohn Decl. ¶ 88. The Plan limits Class Members' recovery to their out-of-pocket loss, pursuant to the Exchange Act.

Under the Plan of Allocation, each Authorized Claimant is entitled to recover his/her/its Recognized Loss to the extent that the Net Settlement Fund is sufficient.  If there are not sufficient funds, Authorized Claimants will be entitled to receive their *pro rata* share of the Fund, *i.e.* the percentage of their Recognized Loss determined by the ratio of the total Recognized Losses of all Authorized Claimants to the value of the Net Settlement Amount.

The Plan of Allocation therefore represents a fair and equitable method for allocating the Net Settlement Fund among Authorized Claimants and should be approved by the Court.

## <u>CONCLUSION</u>

For all the foregoing reasons, Middlesex as Class Representative for the Class respectfully requests that the Court enter (1) the proposed Final Order and Judgment, which was an exhibit to the Stipulation and (2) the proposed Order Approving Plan of Allocation, both in the forms submitted herewith.

Dated: New York, New York
       November 14, 2008

Respectfully submitted,

**LABATON SUCHAROW LLP**

By:        /s/ Mark S. Arisohn

Mark S. Arisohn (MA-2364)
Christopher Keller  (CK-2347)
Jonathan Gardner (JG-8512)
Nicole M. Zeiss (NZ-3894)
140 Broadway
New York, New York 10005
Tel.:  (212) 907-0700
Fax:  (212) 818-0477

*Class Counsel for Middlesex County Retirement System as Class Representative and the Class*

23