## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE MONSTER WORLDWIDE, INC. SECURITIES LITIGATION | 07-cv-02237 (JSR) |

### DECLARATION OF MARK S. ARISOHN IN SUPPORT OF PROPOSED CLASS SETTLEMENT, PLAN OF ALLOCATION AND AWARD OF ATTORNEYS' FEES AND EXPENSES

MARK S. ARISOHN  declares as follows pursuant to 28 U.S.C. § 1746:

1.      I am a member of the law firm of Labaton Sucharow LLP ("Labaton"), Court-appointed Class Counsel for Class Representative Middlesex County Retirement System ("Class Representative" or "Middlesex") and the certified Class in the above-titled action (the "Action"). I am admitted to practice before this Court.

2.      I was actively involved in the prosecution of this case, am intimately familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my close supervision and active participation in the Action.

3.      I respectfully submit this declaration in support of Middlesex's motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the Settlement of this class action and the Plan of Allocation of the Net Settlement Fund (the "Plan of Allocation").[1]  I also submit this declaration in support of Class Counsel's motion for an award of attorneys' fees and reimbursement of counsel's expenses incurred during the prosecution of this Action and Middlesex's application for reimbursement of its reasonable costs and expenses (including lost

_____

[1] All capitalized terms herein are defined in the Stipulation and have the same meaning as that set forth in the Stipulation.

wages) directly relating to the representation of the Class, pursuant to the Private Securities

Litigation Reform Act ("PSLRA"), 15 U.S.C. §78u-4 (a)(4).

## I.      BENEFITS OF THE SETTLEMENT TO THE CLASS

4.      The Stipulation and Agreement of Settlement (the "Stipulation"), filed with the

Court on September 24, 2008 and preliminarily approved by the Court by order entered on

October 8, 2008, provides for the gross payment of $47,500,000 in cash (the "Settlement Fund")

to the Class in exchange for a release of the Settled Claims brought against Defendants.

Defendant Monster Worldwide, Inc. has contributed $46,950,000 to the Settlement and

Defendant Andrew McKelvey has contributed $550,000 to the Settlement.  Since October 2008,

the Settlement Fund has been invested in securities backed by the full faith and credit of the

United States government and has been earning interest for the benefit of the Class.

5.      The Settlement provides for a recovery of 27.5% of the aggregate damages

estimated by the Class's non-testifying damages expert.  The analysis estimates that Defendants'

alleged violations of the Securities Exchange Act of 1934 ("Exchange Act") resulted in class-

wide damages to shareholders and option purchasers of approximately $172,600,000.

6.       Defendants' experts fervently challenged that any damages were suffered by the

Class given, among other things, an increase in Monster's stock price the day after the allegedly

corrective disclosures, which they assert was a market correction.  Though the Class's damages

and accounting experts would have presented testimony supporting the claim for damages,

Defendants were clearly prepared to present testimony that no damages were suffered.

Middlesex understood that, if the Action survived summary judgment motions, loss causation

and damages would have become important jury issues with no guarantee of a favorable

outcome.  In light of this and other difficulties that the Class faced in seeking to prove its case,

Middlesex and Class Counsel believe that this Settlement represents an excellent recovery for the Class.

7. After the deduction of any attorneys' fees, expenses and notice and administration costs approved by the Court, together with any taxes and tax expenses that may be payable by the Settlement Fund, the Net Settlement Fund will be distributed to Authorized Claimants, *i.e.,* Class Members who submit timely and valid Proof of Claim forms, in accordance with the Plan of Allocation.  (The allocation formula utilized was designed by the Class's damages consultant to provide Class Members with the strongest claims a greater share of the recovery.)  If the requested attorneys' fees and expenses are awarded, the average recovery per share is estimated to be approximately $1.00 per share.

8. The Settlement was only reached after extensive investigation, fact discovery involving the review of more than one million pages of documents and depositions, expert discovery, aggressive motion practice and several months of discussions (including two mediation sessions before an impartial mediator).

## II. THE COURT'S PRELIMINARY APPROVAL ORDER AND MIDDLESEX'S DISSEMINATION OF PRE-HEARING NOTICES

9. Middlesex moved for preliminary approval of the Settlement on September 24, 2008.  After a hearing on September 29, 2008, this Court issued a Preliminary Approval Order Providing for Notice and Hearing in Connection With Proposed Class Action Settlement (the "Preliminary Approval Order").  (Ex. 1 hereto.)[2]

---

[2] All exhibits referenced in Middlesex's submissions in connection with approval of the Settlement are annexed hereto.  For clarity, citations to exhibits that themselves have attached exhibits, will be referenced as "Ex. ___ - ___." The first numerical reference refers to the designation of the entire exhibit attached here and the second reference refers to the designation within the exhibit itself.

10.     In the Preliminary Approval Order, the Court made the following findings, determinations and directives, among others:

(a)     granted preliminary approval to the Settlement as sufficiently fair, reasonable and adequate to warrant dissemination of notice to the Class and a hearing on the fairness of the Settlement;

(b)     scheduling a hearing (the "Settlement Hearing") for November 21, 2008 at 5:00 p.m. to consider, among other things, whether the proposed Settlement is fair, reasonable, and adequate and should be finally approved; whether the proposed Plan of Allocation of the Net Settlement Fund is fair and reasonable and should be approved; whether the Final Order and Judgment as provided under the Stipulation should be entered; whether Counsel's application for an award of attorneys' fees and reimbursement of expenses should be granted; and whether Middlesex's application for reimbursement of expenses should be granted;

(c)     approving the form, substance and requirements of the Notice of Pendency of Class Action and Proposed Settlement ("Notice"), the Summary Notice of Pendency of Class Action and Hearing on Proposed Settlement ("Publication Notice") and the Proof of Claim form;

(d)     appointing Berdon Claims Administration LLC ("Berdon") to administer the notice program and Settlement, under the supervision of Counsel; and directing that the notices be disseminated; and

(e)     establishing procedures and deadlines for Class Members to exclude themselves from the Settlement or object to the Settlement, Plan of Allocation, the attorneys' fees and reimbursement of expenses requested by Counsel and the reimbursement of expenses requested by Middlesex.

11.     Annexed hereto as Exhibit 2 is the Affidavit of Michael Rosenbaum, Managing Director of Berdon ("Rosenbaum Aff."). The Rosenbaum Affidavit attests to, among other things, the efforts made to disseminate the Notice and Proof of Claim forms, the web-posting of the Notice and Proof of Claim forms and publication of the Publication Notice, all in compliance with the Preliminary Approval Order. The notices and Proof of Claim form were also posted on Class Counsel's website.

12.     As directed by the Court, Counsel has actively monitored the progress of the notice program and administration of the Settlement. In addition to frequent telephone

conferences with Class Counsel and email communications, Berdon has sent counsel for both sides weekly status memoranda summarizing specific data points to chart the progress. Accordingly, the parties have been able to monitor the: (1) number of notice packets mailed by Berdon; (2) number of brokers/nominees who provided names and addresses of potential class member to Berdon for mailing of notice packets; (3) number of names with addresses provided by brokers/nominees; (4) number of brokers/nominees who made requests for notice packets in bulk so that they could do the mailing; (5) number of notice packets requested by brokers/nominees; (6) notice packets requested directly by potential class members; (7) notice packets re-mailed to an updated address; (8) notice packets returned as undeliverable; (9) number of exclusions requested; and (10) number of claims filed.

13.     In order to assure thorough dissemination of the notice, Berdon worked diligently to notify all the potential class members identified by Monster's transfer agent as owners of record, all institutions that purchased Monster securities during the class period for their own benefit using data from the Vickers Stock Research Corp.'s directory of institutional investors (the Class's damages consultant estimated that more than half of the allegedly damaged shares were owned by institutions, which numbered 1,248), all brokers/nominees who may have purchased Monster securities for the benefit of others.  For example, rather than waiting several weeks or a month to contact brokers/nominees who did not respond to the initial notice mailing, Berdon promptly instituted an outreach campaign to brokers/nominees.  For instance, the day of the initial mailing, Berdon contacted the appropriate offices at Merrill Lynch and Citigroup to request their shareholder information.  Within ten days, Merrill had requested 29,126 notice packets and Citigroup sent 17,523 names and addresses to Berdon.  (Ex. 2 ¶ 5.)

14.     To date, 115,591 notice packets have been disseminated to potential Class

Members.  (*Id*. at ¶ 7.)

### III.     SUMMARY OF ALLEGATIONS AND CLAIMS

#### A.     The Parties

15.     This securities fraud class action was brought under the Exchange Act against

Monster Worldwide, Inc. ("Monster"), its founder and former Chief Executive Officer ("CEO"),

Andrew J. McKelvey ("McKelvey"), and its former General Counsel, Myron Olesnyckyj

("Olesnyckyj") (collectively "Defendants" and McKelvey and Olesnyckyj are collectively the

"Individual Defendants") concerning alleged undisclosed "backdating" of stock option grants

made to Monster's directors, officers, and employees between 1997 and 2003.

16.     Monster is a global company that provides an array of services to assist people

who are looking for employment.  It is the parent company of Monster.com, a prominent online

service that connects job seekers with employers.  Like other public companies, Monster

awarded stock options to its employees, executives and directors. (*See* Amended Class Action

Complaint for Violation of the Federal Securities Laws, filed on July 9, 2007 (the "Amended

Complaint") ¶¶ 17, 39-43, Dkt. No. 37.)

17.     Middlesex  represents more than 13,800 active and retired public employees of 31

municipalities and 37 other governmental subdivisions within Middlesex County, Massachusetts.

(*See* Declaration of Thomas Gibson, dated November 13, 2008, ¶ 1, Ex. 3 hereto.)  Middlesex

purchased almost 1,500 shares of Monster common stock during the class period and is alleged

to have suffered damages as a result of the alleged fraud.  (*See* Declaration in Support of Motion

for Appointment as Lead Plaintiff, Dkt. No. 28.)

**B.      The Alleged Fraud**

18.      The Amended Complaint alleges that Defendants violated Section 10(b) of the

Exchange Act and Rule 10b-5 promulgated thereunder by issuing false and misleading periodic

reports, which were filed with the Securities and Exchange Commission ("SEC") during the

period from May 6, 2005 through June 9, 2006, inclusive (the "Class Period"), containing

misstatements about the stock option grants issued by Monster and the compensation expenses

recorded in a scheme to artificially inflate the value of Monster securities.  The Individual

Defendants, as control persons, are allegedly liable under Section 20(a) of the Exchange Act and

McKelvey is alleged to have violated Section 20A of the Exchange Act when he sold shares of

Monster during the Class Period.

19.      Middlesex's investigation showed that Monster granted stock options in various

amounts and at various times to directors, officers and employees as part of their overall

compensation.  Each Monster stock option gave the recipient the right to buy one share of

common stock from the Company at a set price, called the "exercise price" or the "strike price,"

on a future date after the option vested.

20.      The Company's option grants were granted pursuant to written stock option plans,

each of which were publicly filed with the SEC so that investors would have an accurate

understanding of the compensation being paid: the 1996 Stock Option Plan (the "1996 Plan")

and the 1999 Long-Term Incentive Plan (the "1999 Plan") (collectively, the "Stock Option

Plan").  The Stock Option Plan specifically provided that the exercise price of Monster's options

could not be less than the fair market value of the common stock of the Company on the date of

grant.  Monster's publicly filed financial reports, both before and during the Class Period, stated

that:

> The Company's financial statements are presented in accordance with Accounting Principles Board ("APB") Opinion No. 25, Accounting for Stock Issued to Employees. Under APB 25, generally, no compensation expense is recognized in connection with the awarding of stock option grants to employees provided that, as of the grant date, all terms associated with the award are fixed and the quoted market price of the stock is equal to or less than the amount an employee must pay to acquire the stock as defined. As the Company has only issued fixed term employee stock option grants *at or above the quoted market price on the date of the grant, there has been no compensation expense associated with stock options recognized in the accompanying financial statements.*

2005 Form 10-K. (Emphasis added.)

21.     However, based on a substantial investigation by Class Counsel, Monster's December 13, 2006 restatement covering its financial results from 1997 to 2005 ("Restatement") and Olesnyckyj's guilty plea to criminal charges of securities fraud arising from Monster's stock option granting practices, Middlesex claimed in this Action that contrary to its public representations, Defendants improperly backdated Monster's stock option grants by "cherry picking" select grant dates, with the benefit of hindsight, that were lower than the then-current market value of Monster's stock in order to take advantage of favorably low exercise prices.  By granting stock options with an exercise price that was *lower* than the market price on the date the stock option was granted, the stock options were immediately "in-the-money."  Such "in-the-money" options were used as a form of compensation to attract new employees and retain others.

22.     Middlesex also claimed that Defendants did not properly account for this undisclosed compensation.  Under Accounting Principles Board Opinion ("APB") No. 25, *Accounting for Stock Issued to Employees*, which was in effect until January 1, 2006, Monster was required to recognize the intrinsic value of stock-based compensation as an expense over the vesting period of the stock option.  Where the exercise price and the market price were the same on the grant date, total stock-based compensation was zero and there was no compensation expense to be recorded.  Where the market price of the stock exceeded the exercise price on the

date of grant, however, the compensation had intrinsic value and an expense had to be taken in the financial statements.  Understating compensation expenses overstated the Company's net income.

23.     Middlesex alleged that Defendants' failures to disclose these practices constituted securities fraud.  First, the backdated stock option grants were inconsistent with the Company's public disclosures concerning its option grant policies and accounting, and violated the terms of the Company's publicly filed Stock Option Plan.  Second, Monster's publicly issued financial statements during the Class Period were false and misleading and violated generally accepted accounting principles ("GAAP") by accounting for the stock option grants as though they were not "in-the-money" when granted.

24.     These material misstatements were alleged to have caused Monster's securities to trade at artificially inflated prices during the Class Period, ultimately causing damages to those who purchased stock at artificially inflated prices when the truth was allegedly disclose later.

25.     Monster has denied all of Middlesex's allegations and does not admit, as part of this Settlement, any such wrongdoing.  Nor can the Settlement be used as an admission against Defendants Olesnyckyj or McKelvey.  Asserting a Fifth Amendment right under the Constitution of the United States, Defendant Olesnyckyj neither admits nor denies that he is liable and neither admits nor denies that the Class has suffered any losses attributable to Defendants' actions. Defendant McKelvey has denied all of Middlesex's allegations to the extent consistent with a Deferred Prosecution Agreement between him and the United States Attorney's Office for the Southern District of New York ("U.S.A.O."), dated January 23, 2008.

C.     **The Corrective Disclosures**

26.     The artificial inflation allegedly began on May 6, 2005 after Monster issued a press release announcing its first quarter 2005 results.  The inflation was removed on June 12

and 13, 2006 when the alleged truth was disclosed.  On June 12, 2006 a *Wall Street Journal* article reported that Monster was likely to have backdated the stock options it issued to employees and executives, who were "frequently granted options . . .ahead of sharp run-ups in its share price, raising questions about whether the grants were backdated or otherwise timed to boost their value to the recipients."  There were further disclosures later that day, including that a special committee had already begun an investigation into Monster's option granting practices and that a grand jury subpoena from the U.S.A.O. had been issued.

27.     On June 13, an analyst report lowered the rating and price target for Monster stock and Monster announced that the SEC had commenced an informal investigation of Monster's stock option grants and requested the Company to preserve documents.

28.     Monster's stock price dropped over 15% over these two days.   However, as noted below in Section VI, Defendants' experts contended that the disclosures had no statistically significant net impact on Monster's stock price over time and that the alleged price declines were due to factors *collateral* to the options backdating disclosures.

**D.     Post Class Period Events**

29.     On December 13, 2006, Monster filed an amended and restated annual report reporting that the Company's internal investigation into Monster's stock option practices revealed intentional backdating by un-named persons who were formerly in "positions of responsibility at the Company."  In its Restatement, Monster admitted that from 1997 to early 2003, stock option grants had been backdated and announced:

> The Company believes that this practice was done intentionally, by persons formerly in positions of responsibility at the Company for the purpose of issuing options at a higher intrinsic value than would have otherwise been the case.

As a result, the Company reported additional compensation expenses of $339.6 million (pre-tax) from 1997 to 2005.

30.     On March 27, 2007, Olesnyckyj pled guilty to one count of conspiracy to commit securities fraud and one count of securities fraud.  On January 22, 2008, McKelvey was charged with conspiracy to commit securities fraud and securities fraud.  On that same day, McKelvey entered into a deferred prosecution agreement with the Government in consideration of health concerns.

31.     Civil actions brought by the SEC against Olesnyckyj and McKelvey have been settled.  Both will be barred permanently from serving as officers or directors of a public company in the future and enjoined from violating several sections of the Exchange Act and the Securities Act of 1933.  McKelvey has also paid $275,989.72 in disgorgement and prejudgment interest.  No SEC action has been filed against Monster.

## IV.     PROCEDURAL HISTORY OF THE ACTION

### A.     Pleadings and Case Management

32.     On March 15, 2007, Middlesex filed a class action complaint against Defendants and, by Order entered June 19, 2007, the Court appointed Middlesex and another pension fund to serve as Lead Plaintiffs and approved Lead Plaintiffs' selection of Labaton, then known as Labaton Sucharow & Rudoff LLP, to serve as Lead Counsel.

33.     On April 18, 2007, Monster and Olesnyckyj filed answers to the initial complaint.

34.     The Amended Complaint was filed on July 9, 2007, approximately three weeks after argument on McKelvey's first motion to dismiss, discussed below.  The Amended Complaint contained expanded allegations concerning McKelvey's involvement in the stock option granting process at Monster and his involvement in the alleged backdating.  Ninety-seven paragraphs of additional facts were added to the initial complaint, based on Class Counsel's review of documents produced by Monster and an investigation involving numerous interviews with former Monster employees.

35.     On September 11, 2007 and October 17, 2007, Monster and Olesnyckyj, respectively, filed answers to the Amended Complaint.

36.     On January 10, 2008, the Court entered a Civil Case Management Plan for the Action setting, *inter alia*, a trial ready date of July 30, 2008 and a discovery cut-off of June 9, 2008.  This schedule remained in place until the U.S.A.O. moved to intervene in the Action to seek a stay of approximately a dozen key fact depositions due to an ongoing criminal investigation and, subsequently, a criminal trial of a former Monster employee who left his employment before the start of the Class Period.  Of note, the government sought to stay the deposition of Olesnyckyj, several important witnesses who had been part of Monster's Human Resources department and intimately involved in granting stock options at Monster and Monster's auditors.  Middlesex opposed the government's motion for a stay.  On June 2, 2008, the Court granted the government a partial stay of the requested discovery until September 5, 2008.  The overall discovery cut-off was moved to November 5, 2008 and February 9, 2009 was set as the date for trial.

### B.     Defendant McKelvey's Two Motions to Dismiss

37.     During the lead plaintiff appointment process, McKelvey moved to dismiss the claims against him in their entirety.  He argued that the initial complaint did not sufficiently particularize his scienter, specifically focusing on the sufficiency of allegations about his involvement in the alleged backdating and knowledge of the accounting implications of the backdating.  The motion was fully briefed and then argued on June 14, 2007.

38.     During the argument, after a discussion of documentary evidence found during a review of the documents produced by Monster, the Court proposed that, in lieu of a ruling on the initial complaint and dismissal with leave to replead, the motion be withdrawn and an amended complaint be filed solely as to the allegations against McKelvey.  The parties consented.

39.     On July 23, 2007, McKelvey again moved to dismiss the claims against him. Although he largely conceded that the Amended Complaint sufficiently particularized his alleged involvement in the backdating, he argued that it failed to particularize that he knew the accounting for the stock options was improper.   McKelvey maintained that the accounting for such options under APB 25 was "notoriously opaque" and that backdating itself was not improper.  His second motion was denied on November 15, 2007.

### C.     Middlesex's Motion for Summary Judgment

40.     On February 14, 2008, Middlesex moved against each of the Defendants for partial summary judgment on its claims in order to establish the liability elements of scienter, materiality, reliance and falsity as a matter of law based on the Company's Restatement, Olesnyckyj's guilty plea and McKelvey's Deferred Prosecution Agreement.  Middlesex also submitted expert testimony demonstrating the efficiency of the market for Monster's securities. Each of the Defendants opposed the motion, which was fully briefed by March 14, 2008. Defendants argued that scienter, materiality, reliance and even falsity could not be established as a matter of law based on the particularities of the Restatement, Olesnyckyj's guilty plea and McKelvey's Deferred Prosecution Agreement. They also marshaled expert testimony from the Dean of the Graduate School of Business at Columbia University and the former Chief Investment Officer of the Teacher Retirement System of Texas opining on the immateriality of the compensation expenses arising from allegedly backdated "in-the-money" options grants given that they are "non-cash" items typically ignored by investors and analysts.  They did not dispute that the market for Monster's securities was efficient.

41.     On April 25, 2008, the Court substantially denied the motion.  Although it granted partial summary judgment as to three elements of the Section 20A claim against McKelvey and

the "in connection with" element of the Section 10(b) claim, the other portions of the motion relating to the Section 10(b) claim were denied.

42.     Specifically, the Court found that notwithstanding the Company's Restatement, Olesnyckyj's guilty plea and McKelvey's Deferred Prosecution Agreement, disputed issues of fact were raised by Defendants that should be decided by a trier-of-fact and not by the Court as a matter of law.  As to scienter, the Court credited Defendants' arguments and held that Olesnyckyj's guilty plea was not sufficiently specific.  He "did not expressly admit to his involvement with scienter in the specific misstatements here in issue."  (Dkt. No. 113 at 9.) McKelvey's agreement did not admit his intent or knowledge.  *Id.*  Because there were disputed issues as to the Individual Defendants, Monster's scienter could not be established as a matter of law.  *Id.* at 10.  As to materiality, the Court found that a jury could credit Monster's experts' testimony that investors generally, and Monster's shareholders specifically, focus on future cash flow when making investment decisions and that compensation expenses arising from backdated option grants are ignored because they *do not* affect cash flow.  *Id.* at 7-8.  Last, reliance could not be established as a matter of law because there were fact issues as to the element of materiality.  *Id.* at 10.

43.     Accordingly, the decision established that the Class would have to, among other things, reconstruct the alleged backdating at the Company by synthesizing numerous pieces of evidence about: stock option decision making; grant dates; grant documentation; financial reporting and accounting methodology for presentation to the jury.

**D.    Class Certification**

44.     Lead Plaintiffs moved to certify the Class and to be appointed class representatives on February 14, 2008.  (Since Middlesex was appointed to be Class Representative by the Court, the following discussion will be focused on Middlesex.)  In

anticipation of the motion, Defendants commenced extensive discovery by serving document requests and interrogatories.  Defendants' initial requests were broad and all encompassing— Monster alone had 38 initial requests for documents and 15 interrogatory requests.

45.     Middlesex objected to the scope of the requested discovery, however Defendants were still entitled to a substantial number of documents and certain depositions.  Middlesex thus produced thousands of pages of documents, including account statements, investment guidelines, investment manager reports, materials reviewed at board meetings, board minutes, documents relating to the Middlesex County Retirement System as a whole and other legal documents. Class Counsel worked closely with representatives of Middlesex, specifically Thomas Gibson, Chairman of the Middlesex County Retirement Board, and Melissa Cunningham, Director of Investments, reviewing and collecting relevant documents.

### 1.       Depositions of Middlesex

46.     Defendants deposed Thomas Gibson on March 31, 2008 for an entire day. Gibson is the Chairman of the Middlesex County Retirement Board and he testified as a Fed. R. Civ. P. 30(b)(6) witness.  In preparation for the deposition, Class Counsel met with Gibson and other representatives of Middlesex in Billerica, Massachusetts several weeks before the deposition and held other extensive conferences by telephone.

47.     At the deposition, Defendants questioned Gibson about, *inter alia*: (i) Middlesex's investment decisions to buy and sell Monster stock; (ii) Middlesex's investment policies, practices and procedures; (iii) records, news articles and SEC filings concerning the Company and the backdating of stock options; (iv) Middlesex's knowledge of stock option backdating; (v) Middlesex's decision to commence the lawsuit; (vi) Middlesex's knowledge of the allegations set forth in the Amended Complaint; (vii) Middlesex's damages; and (viii) Middlesex's choice of counsel.

### 2. Discovery of Outside Investment Manager

48.     Defendants also sought discovery from INTECH, one of Middlesex's outside investment managers, by serving a subpoena *duces tecum* and deposition subpoena.  It is common for public pension funds to diversify their investment strategy by apportioning their capital among a number of investment managers, who usually specialize in different asset classes – *i.e.*, equity, fixed income, emerging markets, etc.

49.     On very short notice, INTECH produced responsive documents and appeared for a deposition in Florida that lasted several hours.  At the deposition INTECH answered questions about its investment process and modeling, Middlesex's trading and its challenged awareness of news about Monster and stock option backdating.

### 3. Defendants' Opposition to Class Certification

50.     Defendants vigorously opposed Middlesex's motion for class certification by papers filed on March 14, 2008 and April 25, 2008.  Replies supporting certification were filed by Class Counsel on March 28, 2008 and May 2, 2008.  Defendants dedicated the majority of their arguments to class-wide issues.  As to Middlesex, Defendants only challenged reliance and typicality/adequacy by suggesting that it must have known about backdating at Monster, because it closed out its Monster position near the time of a seminal article on backdating by Professor Erik Lie, and through arguments concerning Middlesex's post Class Period purchases of Monster stock. The Court rejected both of these arguments and appointed Middlesex as Class Representative.  (Dkt. No. 126 at 4-5.)  However, Middlesex's trading clearly would have remained an issue at trial and would have been put to the jury if the case proceeded.

51.     Defendants' main challenge to certification was to predominance, arguing that reliance was necessarily an individual issue in this case, because the stock option backdating scandal was so widely known to investors, and that the fraud-on-the-market presumption of

reliance established in *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988), was not available.  The

Court also rejected these arguments finding that the presumption was applicable given the

sufficient showing of materiality for purposes of certification and that Monster had not shown

that a single putative class member knew about the backdating at Monster before the allegedly

corrective disclosures.  (*Id.* at 12-16.)   However, had the case proceeded to trial, Defendants

likely would have continued to rebut the presumption of reliance through evidence concerning

public knowledge of the stock option backdating scandal and suspicions about the probability of

backdating at Monster.

52.     Accordingly, the Court certified the Action as a class action on behalf of all

persons or entities who purchased the securities of Monster Worldwide, Inc. during the Class

Period and who were damaged thereby (excluding the Defendants and certain other persons such

as employees who received stock options), appointed Middlesex as the Class Representative and

appointed Labaton Sucharow LLP as Class Counsel.

**V.     FACT DISCOVERY**

53.     Prior to formal discovery beginning, Class Counsel conducted an extensive

investigation of the claims in the Action.  This investigation included, *inter alia:* (i) review and

analysis of filings made by Monster with the SEC; (ii) review and analysis of press releases,

public statements, securities analysts' reports, conference calls and announcements made by

Defendants; (iii) identification of and interviews with more than two-dozen former employees of

the Company; (iv) review and analysis of news articles concerning Monster,  Defendants,

backdating of stock options in general and the accounting for such stock options; (v) review and

analysis of the criminal and SEC proceedings pending against Olesnyckyj; and (vi) researching

the applicable law and accounting rules with respect to the claims and potential defenses.   Some

of the identified witnesses became confidential sources that supported allegations in the
Amended Complaint.

54.     Before McKelvey's motion to dismiss was decided, Monster electronically
produced approximately 1.2 million pages of core non-privileged documents that it had produced
to the SEC as part of the SEC's investigation into the backdating.  Thereafter, Middlesex served
document requests on each of the Defendants requesting additional documents.

55.     Middlesex also served more than thirty subpoenas *duces tecum* to non-parties,
such as Monster's auditor, BDO Seidman, LLP, financial analysts, Monster's Special Committee
that was investigating the Company's stock option practices and former Monster employees.
Issuing and pursuing these subpoenas required a significant amount of time and resources.  Not
only did each third party have to be served but, more importantly, each third party presented
different issues in terms of the types of documents requested, the documents preserved, and the
method and type of production.  While some third parties had the documents in readily-
accessible electronic format, many only had hard copies.  In addition, each third party often
raised unique concerns about confidentiality, requiring individual negotiations with each one of
them.

56.     Overall, approximately 1.3 million pages of documents were produced to the
Class and reviewed by counsel at the point of Settlement.  The parties also propounded
interrogatories and requests for admission.

### 1.      Document Review and Analysis

57.     To review, organize and analyze this vast amount of information, Middlesex
dedicated extensive resources and technology.  The vast majority of the documents were placed
in an electronic database that allowed counsel to search the documents through "Boolean" type
searches (as in the Westlaw and Lexis-Nexis databases), as well as by multiple other categories,

such as by author and/or recipients, type of document (*e.g.*, emails, SEC filings, Unanimous Written Consents ("UWCs"), "Stock Option Agreement," "Stock Option Grant Form," "Stock Option Grant Approval Form," "Stock Option Policy/Procedure," accounting documents), date, bates number, etc.)  The electronic database was accessible through the internet, allowing attorneys under the direction of Class Counsel to review documents and coordinate discovery remotely.  For example, when attorneys in one location pulled "hot" documents, they were organized into an electronic folder and other attorneys in other locations could immediately open the folder and review this distilled set of material.

58.     To host this large electronic document repository Class Counsel hired Merrill Legal Computer Solutions, Inc. ("Merrill") – one of the leading litigation technology support companies.  Merrill's search engine is considered to be one of the best in the field and provides some of the most advanced features for electronic databases.  In addition, Merrill's specialized services allow it to provide low-cost server capacity to store millions of pages of documents.

59.     In addition to negotiating a preferential rate with Merrill, Class Counsel achieved substantial savings by working primarily electronically and saving hundreds of thousands of dollars in copying costs.  Indeed, just one set of copies from defendants of a 1.3 million-page document production at the customary rate of 10 cents per page would cost $130,000.  At a minimum, two sets of documents are always required to maintain the integrity of the "master" set, which would have cost $260,000.  Had Class Counsel relied on a paper production, copying-related costs would have easily climbed to hundreds of thousands of dollars.  Instead here, the costs associated with using the document production were approximately $90,000 – a significant savings.

### 2.      The Document Review

60.      To review this substantial document production, a team of approximately twenty attorneys was assembled and thorough document review guidelines and protocols were prepared. These attorneys worked full-time to complete the document review and analysis. The review was structured to limit overall cost, with the bulk of the initial review being conducted by more junior attorneys. All aspects of the review were supervised by Class Counsel and the team held weekly conferences and the fruits of the review were subject to quality control assessments.  As the review was completed and we moved to deposition preparation, the team grew smaller to adjust to different demands.  This number of attorneys was necessary because of the relatively brief period permitted for fact-discovery.  Also, the review was very labor intensive.  For instance, each stock option grant, and the bona fides of each grant date, had to be documented through an aggregation of UWC's, emails concerning decision making, human resources documentation of recipients, department memoranda and the various grant processing forms, which changed over time.

### 3.      Deposition Discovery

61.      Despite the government's stay of several key depositions, at the time of the Settlement, Class Counsel had deposed six important witness, including McKelvey.  For instance, Monster's former Chief Operating Officer, James Treacy (who was later indicted by the government), and its former corporate controller, Anthony Bonica, were deposed.  Both asserted their Fifth Amendment rights in response to detailed questioning about their role at the Company and involvement in the alleged backdating.  Monster's former Vice President of Investor Relations was deposed and gave testimony concerning communications to the marketplace.  Also of note, McKelvey's executive assistant throughout the Class Period was deposed and she gave testimony concerning McKelvey's management of the Company, his involvement in the  stock

option granting and approval process and about numerous documents concerning stock option grants that referred to her.

## VI.   EXPERT DISCOVERY

62.     Defendants marshaled several prominent experts to challenge the claims made in the Action.  To oppose Middlesex's effort to secure partial summary judgment, and later class certification, Defendants submitted a declaration by Robert Glenn Hubbard, a professor and Dean of the Graduate School of Business of Columbia University, visiting scholar at the American Enterprise Institute, an advisor to the President of the Federal Reserve Bank of New York and a former Chairman of the President's Council of Economic Advisors.  Dean Hubbard opined on the general immateriality of non-cash expenses, such as compensation arising from the grant of in-the-money employee stock options, and that Monster's stock price was not influenced by such expenses.  Defendants also submitted the declaration of John W. Peavy III, the former Chief Investment Officer of the Teacher Retirement System of Texas and the Chief Investment Officer and CEO of a registered investment advisor that manages more than $1 billion in assets. Peavy also opined on the general immateriality of such compensation expenses to the investment community and that, as an investment advisor, such non-cash items regularly are not part of his assessment of an investment.

63.     Additionally, Defendants served the Class with two extensive expert reports on the issue of damages, another report by Peavy on the immateriality of non-cash compensation expenses and a report by J. Richard Dietrich, a professor of accounting at the Fisher College of Business at the Ohio State University and a member of the Standing Advisory Group of the Public Company Accountancy Oversight Board and former academic fellow in the Office of the Chief Accountant at the SEC, concerning the impact of Monster's Restatement.

64.     Defendants' damages experts, Dean Hubbard and John D. Montgomery, Ph.D., a Vice President with National Economic Research Associates, Inc. and a former economist for the President's Counsel of Economic Advisers, the International Monetary Fund and the Board of Governors of the Federal Reserve System, collectively opined that the Class could not establish loss causation or damages in the Action.

65.     Dr. Montgomery was prepared to testify that the alleged options backdating disclosures on June 12 and 13th had no statistically significant net impact on Monster's stock price and hence the Class did not suffer any loss.  He stated that the Class's expert incorrectly excluded a positive and statistically significant price increase and market correction on June 14, 2006 that would have reduced per share damages from $3.71 to a statistically insignificant $0.74 – an 80% reduction.  He also opined that a positive price reaction on July 12, 2006 to an announcement about Monster's restatement plans must be considered a recovery, reducing any purported damages to zero.  With respect to loss causation, Dr. Montgomery also concluded that the alleged stock declines were due to factors collateral to the options backdating disclosures, *i.e.* the consequences of the backdating (the costs of an investigation, the distraction of management, the threat of a restatement, etc.) not the disclosures relating to compensation expenses or the backdating itself.

66.     In his expert report, Dean Hubbard elaborated on his prior declaration and opined on issues relating to loss causation and damages.  He reported that understated compensation expenses did not influence the stock price during the Class Period, in part because of his finding that the financial statements provided detailed information about Monster's historical option grants.  He also opined that the alleged disclosures only provided limited information about the

backdating by June 13 and that this news was mitigated by subsequent disclosures, such as the Restatement.

67.     The Class served Defendants with an expert report on damages by Gregg A. Jarrell, a professor at the University of Rochester's William E. Simon Graduate School of Business Administration, and an expert report on accounting for stock options and the impact of the Restatement by Harris L. Devor, a certified public accountant and former testifying expert in numerous complex securities class actions, such as *In re WorldCom Securities Litigation*.

68.     Professor Jarrell's opinion found damages to the Class arising from the alleged disclosures on June 12 and 13th and statistically significant negative stock price movement, in the amount of $3.71 per share.  He based his opinion on a detailed event study that analyzed all information about Monster's stock available to the market and screened out unrelated factors, such as general market movement and industry specific news.  Devor analyzed Monster's Restatement and opined that the undisclosed compensation expenses during the Class Period were material, as admitted by the Restatement.

## VII.   SETTLEMENT PROCESS

69.     At the beginning of 2008, with the news of McKelvey's Deferred Prosecution Agreement and poor health, the parties began to explore the possibility of a settlement, all the while moving forward with litigating the partial summary judgment motion, class certification, fact discovery and expert discovery.  As part of its initial disclosures, Monster produced relevant insurance policies to Middlesex, however because of Olesnyckyj's guilty plea and the potential conviction of James Treacy at his upcoming criminal trial, there was a threat that Monster's insurers would disclaim coverage.

70.     The parties held an in-person conference to discuss the possibility of a resolution, but the discussions were largely unproductive.  Subsequently, the parties agreed to mediate the

case before a prominent and very experienced impartial mediator, Jonathan Marks.  Marks was one of the mediators of the Microsoft antitrust litigation.

71.     After the parties exchanged mediation submissions, they participated in two formal day-long mediation sessions with Marks on July 22 and 23, 2008.  The settlement negotiations were well-informed by the litigation of the Action and discussion of the comprehensive mediation statements.  At the mediation, the parties engaged in frank discussions of the strengths and vulnerabilities of the case.  Class Counsel consulted with Middlesex throughout the mediation.

72.     The parties reached an agreement in principle at the end of the second day of the mediation and a Memorandum of Understanding was executed several days later. The formal Stipulation and exhibits were then negotiated over the following two months.

73.     When the formal agreement was finalized, on September 24, 2008, the Stipulation was executed by the parties thereto and submitted to the Court for preliminary approval, which was granted, after a hearing, by order entered October 8, 2008.

## VIII.  ASSESSMENT OF STRENGTHS AND WEAKNESSES

74.     The investigation and discovery, described above, on both liability and damages issues enabled Middlesex and Class Counsel to thoroughly evaluate the strengths and weaknesses of the claims and the risks of continued litigation, and accordingly to enter into the Settlement on a fully informed basis.

75.     Middlesex and Counsel considered, among other things: (i) the substantial cash benefit to Class Members under the terms of the Stipulation; (ii) the risks and expense of additional fact discovery and completion of fact and expert depositions; (iii) the probability that Defendants would move for summary judgment at the close of discovery, leading to another battle of the experts with respect to reliance, materiality, damages and loss causation issues; (iv)

the risk of prevailing through summary judgment given Defendants' damages arguments; (v) the strong likelihood of a complex and risky expert driven continued challenge to class certification and the attendant risks, especially in a complex action such as this, of the ability to maintain class status through to judgment; (vi) the difficulties and risks involved in proving the claims, given that to date no civil options backdating case has proceeded to trial, the ever-developing law on loss causation and the nature of the alleged fraud here; (vii) the delays inherent in such litigation, including appeals; (viii) the uncertainty in the various theories of damages and the threat to a recovery if Defendants' theories about Monster's stock increases were credited by the jury--even assuming that the Class could establish liability on the part of Defendants; and (ix) the risks of presenting a fact intensive and accounting case to a jury.

76.     For instance, in opposing partial summary judgment, Defendants strenuously argued that Middlesex could not establish a claim under Section 10(b) of the Exchange Act, because none of the allegedly false statements was material—relying on the non-cash nature of the compensation expenses and expert testimony that Monster's stock price moved as a consequence of "collateral" issues, not the alleged disclosure of backdating or increased compensation expenses.  Defendants would clearly have taken this position throughout the litigation of the Action and presented it to a jury.

77.     Middlesex and Class Counsel believed they could counter these arguments and that a jury would understand that Defendants' statements about their stock option practices and financial results were important to investors.  In addition, Middlesex would have argued that these "collateral" matters were not collateral at all and were part-and-parcel of the allegedly undisclosed information that artificially inflated Monster's stock price during the Class Period.

However, a jury's reaction to this defense and the conflicting expert testimony remained a real risk and could have resulted in no recovery for the Class.

78.     Defendants also would have continued to dispute reliance, arguing that the market was well aware of stock option backdating and that sophisticated investors would have been able, like the *Wall Street Journal* did, to deduce that Monster must have been backdating stock option grants.  Middlesex and Class Counsel believed they could counter these arguments and that a jury would understand that Defendants went to great lengths to *hide* this information from the market, but given the widespread knowledge of the scandal this issue remained a risk to recovery.

79.     Defendants also clearly would have argued to the jury that loss causation could not be established, given their expert's analysis of Monster's stock price reaction to news about compensation expenses, and that damages could not be proven, given the movement of Monster's stock after the allegedly corrective disclosures.

80.     Although Middlesex and Class Counsel believed they could counter these arguments with expert testimony to survive a motion for summary judgment and prevail at trial, just the June 14, 2006 stock price increase could potentially wipe out 80% of the Class's purported damages—leaving the Class with less than they are recovering as a result of the Settlement.  Also, such battles between experts are notoriously difficult to assess.

81.     Although Middlesex and Class Counsel were confident they could convince a jury of each of the Defendants' scienter and involvement in the alleged fraud, McKelvey's poor health, age and purported reasonable reliance on the advice of experts, such as the Company's general counsel and in-house accountants, created a risk that the jury could sympathize with him.

A dismissal as to McKelvey could have had a deleterious spill-over effect on the balance of the Class's case.

## IX.     REACTION OF THE CLASS

82.     No one has timely or validly objected to the Settlement, the Plan of Allocation, the amount of Class Counsel's fee and expense application or the maximum amount of Middlesex's expense reimbursement request.  On November 13, 2008, after the November 7, 2008 deadline for objections, Middlesex received by email an "objection" criticizing class actions and the payment of class action attorney fees generally, and characterizing such litigation as an unfair redistribution of losses.  *See* Ex. 4 hereto.   Nothing in the email is addressed to the merits of the Settlement or the fee request in this case.  There is also nothing to indicate that the author is a class member and he did not serve his objection on counsel or file it with the Court, as was required by the Notice.

83.     This absence of substantive objections is particularly persuasive given the large proportion of institutions who owned Monster securities and who, accordingly, are potential Class Members.

## X.     PLAN OF ALLOCATION

84.     Pursuant to the Preliminary Approval Order, and as explained in the Notice, all Class Members wishing to participate in the Settlement are to file a valid Proof of Claim on or before January 5, 2009.

85.     As set forth in the Notice, all Class Members who file valid Proof of Claim forms will receive a distribution of the net settlement proceeds, after deduction of fees and expenses approved by the Court and taxes incurred on interest income earned by the Settlement Fund.  The distribution will be made in accordance with the Plan of Allocation set forth and described in

detail in the Notice.  (*See* Ex.2-A at 10-12.)  The Plan of Allocation was developed by the Class's non-testifying damages expert, based on the findings of Professor Jarrell.

86.     As explained in the Notice, the Plan of Allocation apportions the recovery among Class Members who purchased or acquired Monster's common stock, call options and put options.

87.     The Plan of Allocation reflects an assessment, relying on the Class's damages expert's findings and its non-testifying damages expert's analysis, of the damages that may have been recovered from each alleged stock drop (those on June 12 and 13), had liability been successfully established.[3]  The Plan distributes the recovery according to when Class Members acquired or sold their Monster securities—taking into account the statistical significance of each of the stock drops and the strength of potential claims.

88.     For instance, Class Members who sold their common stock before the first corrective disclosure on June 12, 2006 will not recover.  Class Members who bought common stock during the Class Period and sold after June 9, 2006, but before the close of business on June 12, 2006, thus suffering from only some of the disclosures, will receive a recovery, but less than Class Members who retained their stock past the stock drop on June 13, 2006.

89.     The Plan limits Class Members' recovery to their out-of-pocket loss, pursuant to the Exchange Act.

90.     Middlesex and Class Counsel respectfully submit that the Plan is fair and reasonable and should be approved by the Court.

---

[3] Defendants had no input into the Plan of Allocation.

## XI.    MISCELLANEOUS EXHIBITS

91.    Annexed hereto as Exhibit 5 is a true and correct copy of Laura E. Simmons & Ellen M. Ryan, *Securities Class Action Settlements: 2007 Review and Analysis* (Cornerstone Research 2008).

92.    Annexed hereto as Exhibit 6 is a true and correct copy of Stephanie Plancich, Brian Saxton & Svetlana Starykh, *Recent Trends in Shareholder Class Actions: Filings Return to 2005 Levels as Subprime Cases Take Off; Average Settlements Hit New High* (NERA Dec. 2007).

93.    Annexed hereto as Exhibit 7 is a true and correct copy of Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. EMPIRICAL LEGAL STUD. 27 (2004).

94.    Annexed hereto as Exhibit 8 is a table of billing rates for defense firms compiled by Class Counsel from fee applications submitted by such firms in bankruptcy matters.

95.    Annexed hereto as Exhibit 9 is the Declaration of Mark S. Arisohn on Behalf of Labaton Sucharow LLP in Support of Class Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, dated November 14, 2008.

96.    Annexed hereto as Exhibit 10 is the Declaration of Mark S. Goldman on Behalf of Goldman Scarlato & Karon, P.C. in Support of Class Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, dated November 14, 2008.

97.    Annexed hereto as Exhibit 11 is a true and correct copy of *In re Bristol-Myers Squibb Sec. Litig.*, Slip Op., No. 00-1990 (D.N.J. May 11, 2006).

98.    Annexed hereto as Exhibit 12 is a true and correct copy of the transcript of proceedings before the Court on September 29, 2008.

99.    Annexed hereto as Exhibit 13 is the firm resume of Labaton Sucharow LLP.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on November 14, 2008.

_____/s/ Mark S. Arisohn_____
MARK S. ARISOHN
